1      **UNITED STATES DISTRICT COURT**
       **FOR THE DISTRICT OF ARIZONA**
2
                     _____
3
  **United States of America,**          )
4                                         )
                                          )
5                   Plaintiff,            )
                                          )
6          vs.                            )   NO. **CR 10-55 PHX-MHM**
                                          )
7  **Elton Simpson,**                     )   Phoenix, Arizona
                                          )   January 19, 2010
8                                         )   1:55 p.m.
                    Defendant.            )
9  _____       )

10              **TRANSCRIPT OF PROCEEDINGS**

11                 **(Detention Hearing)**

12  **BEFORE THE HONORABLE LAWRENCE O. ANDERSON, MAGISTRATE JUDGE**

13

14  APPEARANCES:

15  For the Government:     Michael Morrissey, Esq.
                            U.S. Attorney
16                          40 N. Central, Suite 1200
                            Phoenix, Arizona  85004
17
    For the Defendant:      Kristina Sitton, Esq.
18                          Assistant Federal Public Defender
                            850 W. Adams Street, Suite 201
19                          Phoenix, Arizona  8500

20  Transcriber:            Merilyn A. Sanchez
                            401 W. Washington, SPC 37
21                          Phoenix, AZ  85003-2118
                            (602) 322-7250
22

23  Proceedings Recorded by Electronic Sound Recording
    Transcript Prepared by Transcriptionist
24

25

I N D E X

Witness:          Direct     Cross   Redirect   Recross   VD

**JEFFREY HEBERT**

By Mr. Morrissey  9


                         E X H I B I T S

No.      Description                 Identified   Admitted

1      CD of recorded conversation    15

P R O C E E D I N G S

THE COURTROOM DEPUTY CLERK:  All rise.

THE COURT:  Thank you.  You may be seated.

THE COURTROOM DEPUTY CLERK:  Criminal docket 10-55, United States of America versus Elton Simpson, on for detention hearing.

MR. MORRISSEY:  Good afternoon, Your Honor, Mike Morrissey for the Government.

THE COURT:  Good afternoon, Mr. Morrissey.

MS. SITTON:  And Christina Sitton here with Mr. Simpson.  He is present and in custody.  Good afternoon, Your Honor.

THE COURT:  Good afternoon, Ms. Sitton.  And are you Elton Francis Simpson?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Good afternoon, Mr. Simpson.

THE DEFENDANT:  Good afternoon.

THE COURT:  All right, Mr. Morrissey, is the government requesting the detention of Mr. Simpson?

MR. MORRISSEY:  Yes, Your Honor.

THE COURT:  Upon what ground or basis?

MR. MORRISSEY:  Flight risk and a danger as well.

THE COURT:  Before we have any proffers,

1  Mr. Morrissey, you and I have had a recent discussion about

2  whether or not the Government can ask for detention on the

3  basis of danger when the crime alleged is not a crime of

4  violence.

5          My belief is that this defendant was charged with

6  false statement to an FBI agent; is that correct?

7          MR. MORRISSEY:  Yes, Judge, involving the false

8  statement involving international and domestic terrorism,

9  however.

10         THE COURT:  Well, I understand that.  But the

11 crime that's charged is false statement.  He's not charged

12 with international terrorism or domestic terrorism.

13         MR. MORRISSEY:  Judge, he's charged with false

14 statement with the terrorism enhancement.  He just is,

15 because it affects the potential penalty that he faces.  It

16 changes the penalty to up to eight years.

17         So I think that is exactly and inherently what he

18 is charged with.

19         THE COURT:  You have a criminal code there, do

20 you not?

21         MR. MORRISSEY:  I do, Your Honor.

22         THE COURT:  Mr. Morrissey?

23         MR. MORRISSEY:  Yes.

24         THE COURT:  I would kindly ask that you turn to

25 the definition of crime of violence in 18 U.S.C. 3156.

1    Certainly this is not a surprise that I'm having this

2    dialogue with you.

3              3156.  Crime of violence is defined in 18 U.S.C.

4    3156(a)(4)as, (A), an offense that has as an element of the

5    offense the use, attempted use, or threatened use of

6    physical force against the person or property of another;

7    any other offense that is a felony and that, by its nature,

8    involves a substantial risk that physical force against a

9    person or property of another may be used in the course of

10   committing the offense; or any felony under those chapters

11   there.  And I believe chapter 109A and -- is the chapter

12   that deals with crimes against children.

13             Where does the crime of false statement to an FBI

14   agent fall within that definition, Mr. Morrissey?

15             MR. MORRISSEY:  Judge, I think it would be under

16   subsection 4(B) in this instance because it's an offense

17   that does by its nature involve a substantial risk of

18   physical force.  Because if what he's lying about as charged

19   is whether or not he had discussed fighting Jihad in a

20   foreign country, under United States versus Hir, H-i-r, 517

21   F.3d 1081, that stands for the proposition that danger in

22   other country equals danger to this community and,

23   therefore, he can be detained on that basis.

24             THE COURT:  The crime in Hir was the crime of

25   terrorism, correct?

1          MR. MORRISSEY:  It was material support,

2    Your Honor.

3          THE COURT:  Okay.  Do you have any case law that

4    this particular charge meets the crime, the definition of

5    crime of violence?

6          MR. MORRISSEY:  I don't.

7          THE COURT:  Do you have any record you want to

8    make that it is a crime of violence, before I hear from

9    Ms. Sitton, that you haven't already shared with me?

10          MR. MORRISSEY:  No.  I think the Court has heard

11    my argument that a lie involving domestic or international

12    terrorism does involve a risk of violence.  And I would also

13    point out that the Government is seeking detention as a

14    flight risk.

15          THE COURT:  Okay.  Just on the issue of whether

16    or not this crime meets the definition of crime of violence,

17    which opens the door to allowing the Government to ask for

18    detention on that ground, do you have a position on that,

19    Ms. Sitton?

20          MS. SITTON:  Your Honor, I think that in addition

21    to the concerns that were noted by the Court, I think the

22    specific part of the danger definition is that the crime, by

23    its very nature, involves -- or the words, by its very

24    nature, would specifically preclude this sort of offense,

25    because it would kind of assume that the crime, the general

crime that he is charged with, that is making a false

statement, would by its very nature involve this risk and

it's just not there in this case.  And in addition to the

kind of general criminal principle that just statements

alone aren't enough to incur any sort of criminal liability

as it purports to be with terrorism, in addition to the fact

that this crime itself is not listed within the terrorism

statutes, which begin at 18 U.S. Code 2331.

THE COURT:  Thank you, Ms. Sitton.  So you agree

with the Court's position?

MS. SITTON:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Morrissey, any last words before we go to the issue of

flight and I make a ruling?

MR. MORRISSEY:  No, Your Honor.

THE COURT:  All right.  I'm going to deny the

Government's request that Mr. Simpson be detained as a

danger to the community in light of the fact that it does

not meet the definition of crime of violence in the federal

code.  And I rely upon Judge Aspey's decision in

United States versus Montoya that contains a legal

discussion of crimes of violence and detention on the basis

of dangerousness only.  And in that well-written opinion,

found at 486 Federal Supplement 2d 996, 486 Federal

Supplement 2d 996, Judge Aspey cites United States versus

Klein, which is the Ninth Circuit case in which the Ninth

Circuit held that possession of a firearm by a felony --

felon is not a crime of violence and it cites with approval,

I think, United States versus Byrd.  And that's the Fifth

Circuit case, 1992.  That citation is 969 F.2d 106, 969 F.2d

106.  And it's the way the code is drafted that makes me

take the position that unless the crime is a crime of

violence and meets the definition, the Government may not

argue detention on the basis of danger.

THE COURT:  All right.  What -- how are you going

to proceed regarding the flight risk, Mr. Morrissey?  Are

you going to call a witness or proceed by proffer only?

MR. MORRISSEY:  I intend to call a witness, Your

Honor.

THE COURT:  Okay, you may do so.

MR. MORRISSEY:  Your Honor, the Government calls

FBI agent Jeff Hebert.

THE COURTROOM DEPUTY CLERK:  Please step forward.

Please raise your right hand.

(The witness, Jeff Hebert, was duly sworn.)

THE COURTROOM DEPUTY CLERK:  Please have a seat

on the witness stand.

THE COURTROOM DEPUTY CLERK:  Please state your

name and spell it for the record.

THE WITNESS:  My name is Jeffrey Hebert.  First

1    name is spelled J-e-f-f-r-e-y.  Last name is spelled

2    H-e-b-e-r-t.

3            THE COURT:  All right.  Good afternoon, Special

4    Agent Hebert.

5            You may proceed.

6            MR. MORRISSEY:  Thank you, Your Honor.

7

8                    JEFFREY HEBERT,

9    called as a witness herein, having been duly sworn, was

10   examined and testified as follows:

11

12                   DIRECT EXAMINATION

13   BY MR. MORRISSEY:

14   Q.  Agent Hebert, what's your assignment with the FBI?

15   A.  I'm a special agent.

16   Q.  And within in that status, what's your assignment within

17   the FBI?

18   A.  I investigate counterterrorism matters.

19   Q.  Are you one of the agents assigned to the Simpson

20   investigation?

21   A.  Yes.

22   Q.  Is part of the FBI's responsibility to deter and disrupt

23   international and domestic terrorism?

24   A.  Yes, it is.

25   Q.  As of this date, does Mr. Simpson have a valid passport?

1   A.   Yes, he does.

2   Q.   And how do you know that?

3   A.   We know that through several different means.  One is

4   that we checked with our liaison to the State Department who

5   confirmed that Mr. Simpson applied for and received a U.S.

6   passport.  In addition, we have an individual who has been

7   acting as a source for us who also reported that Mr. Simpson

8   has a passport.  Finally, in our interview with Mr. Simpson,

9   he told us himself that he has a U.S. passport.

10  Q.   And was the date of the interview January 7th, 2010?

11  A.   Yes.

12  Q.   Was the individual who acted as an informant, is his

13  name Dabla Deng?

14  A.   Yes, it is.

15  Q.   D-e-n-g?

16  A.   Um-hmmm.

17              THE COURT:  Is that a "yes"?

18              THE WITNESS:  Yes.

19              THE COURT:  Thank you.

20  BY MR. MORRISSEY:

21  Q.   Was that passport issued on or about November 30th,

22  2009?

23  A.   Yes.

24  Q.   In your investigation, did you confirm whether or not

25  Mr. Simpson had a plane flight to South Africa?

1    A.   Yes.

2    Q.   How did you do that?

3    A.   We confirmed that through consultation with Customs and

4    Border Protection.  They maintain a database of all

5    international reservations.  We confirmed with them that

6    Mr. Simpson did in fact have a flight reserved to South

7    Africa on January 15th.  In addition, during our interview

8    with Mr. Simpson, he told us that he intended to travel to

9    South Africa on the 15th.

10   Q.   Of 2010?

11   A.   Correct.

12   Q.   In that interview with Mr. Simpson, did he indicated how

13   long he intended to be gone?

14   A.   He told us he was going to be gone approximately five

15   years.

16          MR. MORRISSEY:  Your Honor, I would also note

17   that the Court can take notice of and rely on the Pretrial

18   Services Report which reports similar information that the

19   defendant self reported to Pretrial Services that he was

20   planning on leaving the United States to go to school for

21   six years, that his passport was delayed, but that he

22   expected his passport and visa as well to be delivered to

23   him on the date that he was arrested.

24          THE COURT:  All right.  Thank you, Mr. Morrissey.

25   I've already read it.

BY MR. MORRISSEY:

Q.  Agent Hebert, speaking of the interview on January 7th,

2010, was Mr. Simpson in custody on that date?

A.  No, he was not.

Q.  Where did that interview take place?

A.  The interview took place in front of Mr. Simpson's

residence.

Q.  And if out Mr. Simpson had refused to talk to you that

day, what would you have done?

A.  We would have gone about our business.

Q.  Okay.  Did you have any subpoena or any method to compel

him to talk to you that day?

A.  No.

Q.  Speaking of his travel plans, what did Mr. Simpson tell

you on that day?

A.  He told us that he applied for a visa to travel to South

Africa to go to school.  He had not received his visa at

that time, but expected it within the next coming week and

intended, once he received that visa, to in fact travel on

January 15th of this year.

Q.  In that interview, did you ask Mr. Simpson if he had any

plans to travel other than in South Africa?

A.  Yes, we did.

Q.  What did you ask him about?

A.  We asked him several times if he had planned or

1    discussed -- excuse me, if he had discussed with anybody

2    planning to go anywhere other than South Africa.

3    Specifically we asked him if he planned on traveling from

4    South Africa to Somalia.

5    Q.  Was he asked that multiple times?

6    A.  He was.

7    Q.  Was Mr. Simpson asked in "yes" or "no" fashion whether

8    or not he had ever discussed with anyone traveling to

9    Somalia?

10   A.  Yes, he was.

11   Q.  And what did he say?

12   A.  He said no.

13   Q.  Was Mr. Simpson asked whether he knew Dabla Deng?

14   A.  Yes, he was.

15   Q.  And what did he say?

16   A.  He stated that he knew Mr. Deng.

17   Q.  From -- is it a date, I believe the date is 2006 onward,

18   has Mr. Deng been acting as an informant with the FBI with

19   respect to Mr. Simpson?

20   A.  Yes, he has.

21   Q.  As part of those duties, has Mr. Deng recorded

22   consensually certain conversations with Mr. Simpson?

23   A.  He has.

24   Q.  Did a conversation occur between Mr. Deng and

25   Mr. Simpson on May 29th, 2009?

1  A.  Yes.

2  Q.  Was that conversation recorded?

3  A.  It was.

4  Q.  How long was the contact on that date?

5  A.  It was approximately four hours in total.

6  Q.  Have you listened to the entirety of the tape of that

7  conversation on that day?

8  A.  Yes.

9  Q.  Is -- have you listened to a CD that you brought with

10  you today that is a copy of that conversation?

11  A.  Yes.

12  Q.  Is the CD a fair and accurate copy of the conversation?

13  A.  Yes.

14  Q.  From -- you've known Mr. Deng since 2006?

15  A.  I've known Mr. Deng since 2005.

16  Q.  Okay.  And are you familiar with Mr. Deng's voice?

17  A.  Yes.

18  Q.  Are you able to identify it on tape?

19  A.  Yes.

20  Q.  You interviewed Mr. Simpson on January 7th, 2010.  Is

21  that accurate?

22  A.  That's correct.

23  Q.  Was there a previous contact with Mr. Simpson before

24  that?

25  A.  Yes.

1   Q.  When was that?

2   A.  It was in approximately March, 2007.

3   Q.  On that date, did you have a brief conversation with

4   Mr. Simpson?

5   A.  Oh, the entire conversation lasted approximately an hour

6   on that date.

7   Q.  Okay, so that's not quite so brief?

8   A.  Right.

9   Q.  Okay.  Are you able to recognize Mr. Simpson's voice on

10  tape?

11  A.  Yes.

12  Q.  Is the CD that you brought with you today --

13          MR. MORRISSEY:  Well, Your Honor, at this point

14  the Government offers Exhibit 1 for admission.

15          THE COURT:  And I assume you're going to play

16  just a snippet of it?

17          MR. MORRISSEY:  That's correct, Your Honor.

18          THE COURT:  Any objection, Ms. Sitton?

19          MS. SITTON:  No, Your Honor.

20          THE COURT:  All right.  Then Exhibit 1 will be

21  marked.  I assume you have it in the machine.

22          MR. MORRISSEY:  It is, Your Honor.

23          THE COURT:  So at the end of the proceedings

24  today, I would like for you to take it out, Mr. Morrissey,

25  and have it marked by the clerk.

1          You may proceed.

2          MR. MORRISSEY:  Thank you.

3          (A portion of Exhibit 1 was played.)

4          MR. MORRISSEY:  Your Honor, I'm going to try to

5    back this up for a second.

6          (A portion of Exhibit 1 was played.)

7          THE COURT:  Have you prepared a transcript of

8    what's important to the Government, Mr. Morrissey?

9          MR. MORRISSEY:  I have, Your Honor, but it's got

10   handwritten annotations.

11         (A portion of Exhibit 1 was played.)

12         MR. MORRISSEY:  Judge, may my agent step down and

13   help me back this up?

14         THE COURT:  Yes, go help out the prosecutor, if

15   you would, Special Agent Hebert.

16         MR. MORRISSEY:  And, Your Honor, just for the

17   record, this is roughly a six-minute portion of tape.

18         THE COURT:  Okay.

19         (A portion of Exhibit 1 was played.)

20   BY MR. MORRISSEY:

21   Q.  Agent Hebert, did you just hear the statement "Aqui,

22   it's time to go to Somalia, brother"?

23   A.  Yes.

24   Q.  Whose voice was that?

25   A.  Mr. Simpson's.

Q.  Who made the statement, "Hey, we know plenty of brothers
from Somalia"?

A.  Mr. Simpson.

            (A portion of Exhibit 1 was played.)

BY MR. HEBERT:

Q.  Agent Hebert, did you just hear the discussion about if
the Kufar fight against us, that mean we are establishing,
the Sharia?

A.  Yes.

Q.  What's the Sharia?

A.  The Sharia within Islam is, my understanding, a -- an
all governing code of conduct that covers both criminal,
civil, and everyday life that dictates how a true Moslem
should live their life.

Q.  And whose voice was speaking those words?

A.  Mr. Simpson.

Q.  You just stated your understanding.  As part of your
training with the FBI for the last five years, working
counterterrorism, has it been your responsibility to learn
about extreme -- proponents of extreme Jihad?

A.  Yes.

Q.  And what training briefly have you received to
distinguish between mainstream religious thought and
radicalism?

A.  In brief, training seminars, books, articles.

1   Q.   Does West Point have an academy?

2   A.   They do.

3   Q.   Would you tell us about that?

4   A.   Yes, West Point, through -- I forget the exact name, but

5   they put on a training once a year, roughly, that lasts

6   approximately a week that details the history of the advent

7   of what we consider radical Islam, dating back through not

8   only the beginnings within -- within Islam, but also

9   through, say, Mohava (phonetic) school of thought, Solomonic

10  school of thought, and how those different schools of

11  thought have given rise to various terrorism groups that are

12  active today.

13  Q.   Okay.  Now.

14             (A portion of Exhibit 1 was played.)

15  BY MR. MORRISSEY:

16  Q.   Agent Hebert, just previous to the section the

17  statement, "The only time America went over there or the

18  Ethiopia, that's what they fight against," who made that

19  statement?

20  A.   Mr. Simpson.

21  Q.   The last section we just heard is the statement made,

22  "I'm telling you, man, we can make it to the battlefield.

23  It's time to roll"?

24  A.   Yes.

25  Q.   Who made that statement?

1    A.   Mr. Simpson.

2    Q.   The statement we just heard about, "I only have one

3    couch, I can donate it, I'm out of here," is that Mr. Deng?

4    A.   Yes, it is.

5              THE COURT:  I assume we are going to get to

6    something that -- that directs itself to the issue of flight

7    risk, Mr. Morrissey?

8              MR. MORRISSEY:  Yes.

9    BY MR. MORRISSEY:

10   Q.   Agent Hebert, are we about to hear a statement from

11   Mr. Simpson directing Mr. Deng how he could pay for a trip

12   overseas?

13   A.   Yes.

14   Q.   Are we about to hear a statement from Mr. Simpson, "Bye

15   bye America"?

16   A.   Yes.

17              (A portion of Exhibit 1 was played.)

18   BY MR. MORRISSEY:

19   Q.   Agent Hebert, that last section we just heard, was that

20   a discussion of Jihad on the battlefields?

21   A.   Yes.

22   Q.   And in context, were they talking about somebody else or

23   some speaker who had spoken of that concept?

24   A.   That's correct.

25              MR. MORRISSEY:  No further questions, Your Honor.

1  Your Honor, can I ask a legal point?

2       THE COURT:  You can ask.  I don't know if I'll

3  give you an answer.

4       MR. MORRISSEY:  Okay.  Because the evidence of

5  flight, of the trip to go to South Africa, and the immediacy

6  of that, the proof of that, because it necessarily invokes

7  the tape that I just played, which does speak about fighting

8  overseas and danger, it's the Government's view that I'm

9  actually entitled to argue for detention on both bases,

10  flight risk and danger because my primary argument is

11  certainly flight risk.  But my evidence of flight risk does

12  invoke danger.  And I don't know how this Court would close

13  its ears to the statements involving danger overseas, which

14  is why I did cite the Hir case to this court.

15       And the Court had indicated before did the

16  Government or could the Government prove that this charge

17  initially was a crime of violence for purposes of detention.

18  And the answer is I think so.  The Court has ruled against

19  me.  But I would make the legal argument now to the Court

20  that having proven up flight with evidence that also goes to

21  danger, that the Court should consider danger as well as a

22  basis for detention.

23       THE COURT:  Okay, I'm not going backwards.  I'm

24  not going to consider the issue of dangerousness.  And quite

25  frankly, Mr. Morrissey, I didn't close my ears to what I

heard on the tape.  But I'm following my oath that I gave

that I will follow the law.

        And let me ask you this:  I'm not sure that

Ms. Sitton was able to understand what we just heard.  But I

don't know if she's been provided a transcript of this tape

recording or a copy so she could verify the transcript.  Has

she done that -- have you done that for her?

        MR. MORRISSEY:  I have not given her a

transcript.  I did bring an extra copy of the disk.  And I

can't remember if I gave it to her.  Did I give you the

disk?

        MS. SITTON:  Yes, just now.

        MR. MORRISSEY:  I gave her the disk.  But, Judge,

she has not had an opportunity to play the disk in its

entirety.

        THE COURT:  Is there any reason why you can't

provide the Court and Ms. Sitton with a transcript that we

can read along as we try to understand what's said on the

tape?

        MR. MORRISSEY:  I would have liked to,

Your Honor.  And I think that's by far the better practice.

There was a string of people from the FBI who were absent or

sick today.  And so we couldn't get it off their Desktop.

But there is a cleaned-up version of the transcript that I

would be happy to provide to the Court and to counsel.

1       THE COURT:  I did not hear him say, "Bye bye

2 America."  If it was on there, it was too garbled and I

3 couldn't understand what he said.

4       Here's what I'm thinking.  I think Ms. Sitton

5 needs to have some time to fairly be able to cross-examine

6 Special Agent Hebert.  This is an important issue to the

7 Government.  And I'm going to give you, maybe -- I'm

8 thinking about continuing this detention hearing until

9 Thursday so that you can provide to Ms. Sitton and myself a

10 transcript of the tape that you just played or the portion

11 that you just played.  And -- and then that will also give

12 you some time to file a brief on whether or not the crime

13 charged, one of false statement to an FBI agent, is a crime

14 of violence.

15       And I think that's the fairest way to proceed.

16 It -- it is a relatively short time.  And, of course, I know

17 that Mr. Simpson is anxious to get out of custody, but I

18 think if it's worth doing, it's worth doing right.  So we

19 are going to continue this.  Do you have any objection to

20 that, Mr. Morrissey?

21       MR. MORRISSEY:  I don't.  And I would like to,

22 when it's appropriate, provide the Court and counsel with

23 the time stamp that will get them exactly to where I was.

24       THE COURT:  Okay.  But a transcript is --

25       MR. MORRISSEY:  It is even more helpful.

1           THE COURT:  Yeah.

2           MR. MORRISSEY:  But to corroborate it on the

3    tape.

4           THE COURT:  Okay, can that be put on the

5    transcript?

6           MR. MORRISSEY:  Yes.  Yes.

7           THE COURT:  Can do you it within the next 48

8    hours so we have a chance not only to read it, but to try to

9    compare it with the actual copy of the tape?

10          MR. MORRISSEY:  Absolutely, Your Honor.  And I

11   apologize for not having the clean transcript today.  In the

12   age of computer passwords, when somebody is sick, it's hard

13   to get it off their computer.

14          THE COURT:  No, I understand.

15          Ms. Sitton is conferring with more senior

16   counsel.  Ms. Sitton, do you have an objection to a two-day

17   continuance for you to get this discovery to help you

18   cross-examine this special agent?

19          MS. SITTON:  Your Honor, I, to be honest with the

20   Court, I don't have much cross-examination for the agent.  I

21   have Mr. Simpson's passport right here.  This is the one

22   that was recently issued.

23          His family is here.  I don't think that any of

24   the statements in there are really even closely relevant to

25   the issue of flight.  And given that the Court has already

1  made its ruling on the danger issue, I think that -- I would

2  ask that we just continue to go forward.  I don't have much

3  to ask and I was just going to make a proffer to the Court.

4        THE COURT:  Are you willing to stipulate that

5  your client said "Bye bye America" in the tape for purposes

6  of today's detention?

7        MS. SITTON:  Well, Your Honor, I can't hear it.

8  But I am certainly able to argue against that fact if the

9  Court -- but, I mean, I can't stipulate that for purposes of

10  future hearings.

11        THE COURT:  I want to make sure you meant what

12  you said and you said what you meant.  You can hear the

13  conversation.  You just can't understand it.  Is that right?

14        MS. SITTON:  That's correct.

15        THE COURT:  That's exactly my point.

16        MS. SITTON:  And I don't know if it would be made

17  any more clear by me reviewing a transcript from the

18  Government.  I would have to send it out to my own, of

19  course, independent transcriptionist.  And that's not going

20  to happen within the next 48 hours.

21        I think that's an issue of fact that can be

22  determined at a jury trial whether or not he said that.  If

23  the Court's willing to accept the proffer of the Government,

24  which we can proceed that way at this detention hearing by

25  way of proffer, then I'm certainly able to argue against

1  that at this time.  I just don't know why we would have to

2  continue it for that reason.

3         THE COURT:  Mr. Morrissey?

4         MR. MORRISSEY:  Your Honor, I'm happy to replay

5  the section where he says, "Bye bye America."

6         THE COURT:  Well, can you read to me here on the

7  record what your transcript -- you're the only one that has

8  a copy of -- that it says.

9         MR. MORRISSEY:  Yes.

10         THE COURT:  And put it in context.

11         MR. MORRISSEY:  Judge, at approximately Section

12  13-51 and 21 seconds is where Mr. Simpson makes the

13  statement, "I'm telling you, man, we can make it to the

14  battlefield, aqui, it's time to roll."  Then approximately

15  two sentences later Mr. Simpson explains, "Hey, it's like if

16  you pay off the car or something, you can just sell the car

17  and that's a plane ticket right there."

18         Mr. Deng says, "yeah."  And the next statement by

19  Mr. Simpson, in a singing type voice, is "Bye bye America."

20         Mr. Deng then says, "Bye, I'm out."  And

21  Mr. Simpson laughs.

22         THE COURT:  Okay.

23         MR. MORRISSEY:  Let me be clear about one thing.

24  The date of this conversation is May 29th, 2009.  Regarding

25  the flight risk, Mr. Simpson's intent was to leave last

1  Friday for at least six years.

2        THE COURT:  Okay.  Ms. Simpson -- Sitton, are you

3  willing to agree that what you heard Mr. Morrissey say in

4  reading the transcript, that the Government's proffer was to

5  the effect, "Bye bye America."  Are you willing to accept

6  that that's his proffer?

7        MS. SITTON:  Yes, Your Honor.

8        THE COURT:  Okay.  All right, then, and I'm

9  assuming that you -- that you don't need any time on this

10  issue of danger, Mr. Morrissey.  As a senior litigator or

11  Assistant U.S. Attorney, I'm sure that this was an issue

12  that you thought about before today's hearing.

13        MR. MORRISSEY:  It is, Your Honor.  I did not

14  have the Montoya cite.  But I don't have authority besides

15  the Hir case which we have discussed was a material support

16  charge which is, I believe, a listed charge for a crime of

17  violence.  That's my best authority.  I'm asking the Court

18  to, in some ways, extend here on the dangerousness grounds.

19        THE COURT:  Okay.  And I've already ruled and I'm

20  not going backwards in that.

21        Let me ask you, Mr. Morrissey, since we're going

22  to start argument right now, Mr. Simpson appears to have

23  been born in the United States.  He's lived in Phoenix when

24  his family relocated to Phoenix.  His parents live here.  He

25  has a brother, an older sister residing in the District of

1  Arizona.  He has contact, frequent contact with each of

2  them.

3         The only evidence I heard that he's traveled

4  outside of the United States or had intended to go outside

5  the United States was a trip to Rocky Point in 2003.  He's

6  been working on and off until December, right before

7  Christmas, in preparation for his trip.

8         You have his U.S. passport.  A drug test was

9  taken, and it was negative.  I believe he has no criminal

10  history whatsoever.  Why doesn't this case cry out for

11  release with conditions, Mr. Morrissey?

12         MR. MORRISSEY:  Because, Your Honor, Mr. Simpson

13  is so extraordinarily motivated to leave this country, the

14  fact that he is a flight risk is absolutely clear.  Now he

15  has additional motivation to flee this country and not

16  defend on these charges.  Pending cross-examination, it's

17  absolutely not contradicted that he had a visa, a passport,

18  and a plane ticket to go to South Africa where he intended

19  to remain for five or six years.

20         The Court has indicated you don't want to go

21  backwards on the other issue.  And so I won't.  But that the

22  other issue, what he intends to do if he goes overseas,

23  certainly goes to motivation to flee and to remain outside

24  the reach of the U.S.

25         THE COURT:  Okay.  So he's in a criminal history

1    category I.  Maximum of five years, worst-case scenario.

2              MR. MORRISSEY:  No.  No.  Maximum of eight years,

3    Your Honor.

4              THE COURT:  Eight years, okay.  And so if

5    convicted, what would the offense level be?

6              MR. MORRISSEY:  26.

7              THE COURT:  He's likely in a criminal history

8    category I?

9              MR. MORRISSEY:  Absolutely.

10             THE COURT:  26 is 63 to 78 months in prison,

11   assuming he pleads guilty, correct?

12             THE WITNESS:  That's the guideline, yes.

13             THE COURT:  All right.  Thank you, Mr. Morrissey.

14             Ms. Sitton, why isn't your client sufficiently

15   motivated to flee the United States if he's looking at a

16   prison sentence of over eight years and his intent -- you

17   may step down sir -- and his intent, from his own words, is

18   to bye bye America.

19             MS. SITTON:  Well, Your Honor, first I would like

20   to correct, based upon my interpretation of the guidelines,

21   the 26 level would be if he were to lose at trial.  If he

22   were to enter into a plea, of course, and accept

23   responsibility, then two or three levels could be subtracted

24   depending on whether the Government so moved, which lowers

25   the guidelines substantially, number one.

1          Number two, while the Government has indication

2     that he traveled -- was planning on traveling to South

3     Africa, there's no indication to the contrary; however,

4     there's no indication and the Government has provided no

5     proof that he actually intended to go to Somalia.  If it

6     did, I suppose or I would guess that the Government would

7     have presented that evidence by the special agent.  And in

8     this case, what we have --

9          THE COURT:  Hold on just a second.

10          MS. SITTON:  And I didn't get to proffer --

11          THE COURT:  Hold on a second.  As you know, 3142

12     lists four factors to consider.  And I think what you're

13     raising now is the strength of the Government's case, which

14     the least important condition to consider.

15          You're saying that they presented no evidence as

16     to what their evidence is that his plans were to go to

17     Somalia and engage in violent Jihad.  Is that right?

18          MS. SITTON:  That's correct.

19          THE COURT:  Okay.

20          MS. SITTON:  And also I think going to the weight

21     of the evidence, the Government was very adamant that the

22     defendant is so motivated to go, that he waited eight months

23     from the time that he said this statement.  If he was so

24     motivated, and in fact, I'm assuming that they verified his

25     flight and -- but it was cancelled.  I didn't proffer any

1    information, but Mr. Simpson's father is here, did cancel

2    that flight, obviously. He didn't make it on to that

3    flight.

4          So in this case, what we have, as the Court

5    noted, is a person with no criminal history. And so no --

6    nothing in his past that would suggest any sort of fleeing,

7    nothing in his past that would suggest any sort of not

8    complying with any court order, including, it doesn't even

9    look like there are any traffic offences, criminal traffic

10    offenses in his past.

11          And so with this surrendering of his passport,

12    which his father brought here and perhaps, I believe, what

13    Pretrial Services had recommended, electronic monitoring, if

14    the Court is so inclined, there are more than adequate

15    conditions that can assure that he not flee and that he come

16    to court as ordered.

17          THE COURT: Has he received his visa from South

18    Africa yet?

19          MS. SITTON: Your Honor, I believe that that is

20    what is on the back of his passport. But I will also note

21    that this is -- this is his passport, it's a brand new

22    passport. There are no travels outside of the U.S. and that

23    the endorsement on the inside is for a study permit, if the

24    Court would like to see.

25          THE COURT: Okay, let me just have Mr. Morrissey

1  confirm that, that what's in his passport is the visa to

2  South Africa.  Is that right?

3          MR. MORRISSEY:  I believe that's correct.  And if

4  that's what counsel is proffering, I'll accept that proffer,

5  Your Honor.

6          THE COURT:  Okay.  Thank you.  Anything else,

7  Ms. Sitton?

8          MS. SITTON:  No, Your Honor.

9          THE COURT:  Mr. Morrissey, you have the last

10 word.

11         MR. MORRISSEY:  Your Honor, the basic facts here

12 are but for his arrest, this individual would already be in

13 South Africa for five or six years.  All the statements

14 about his family support, his checking in with his family,

15 none of that was deterring him from his desire to leave this

16 country for five or six years.  He wishes to go abroad for

17 his studies.  A trial issue will be whether or not he was

18 truthful about everything he intended to do once he went

19 abroad.

20         But on these facts, where there is really no

21 dispute of his intent to leave this country, he is a flight

22 risk.

23         THE COURT:  Mr. Morrissey, how about answering

24 what Mr. -- Ms. Sitton mentioned, that if he's alleged to

25 have made these statements in May of last year, why does the

1    Government wait until January 13th, 2010, to indict him?

2            MR. MORRISSEY:  Because he lies on January 7th,

3    2010.  That's when they interviewed him, that's when he

4    lied.

5            THE COURT:  You mean the Government could not

6    have interviewed him in June, shortly after the statements

7    were allegedly made?

8            MR. MORRISSEY:  Oh, Judge, at trial, we will have

9    more than one tape to play.  If -- but that gets into

10   strength of the government's case, which this Court has

11   noted is the least important issue.

12           I always appreciate -- well, it will be a trial

13   issue what the Government puts on to prove its case.  But

14   the fact is, it was prudent work by the FBI to go interview

15   this individual eight days before he was supposed to leave.

16   He voluntarily talked to them.  He didn't have to lie.  He

17   did, and he's very motivated to flee this country.

18           THE COURT:  All right.  Thank you very much,

19   Mr. Morrissey.  The Court finds that the Government has

20   failed to demonstrate by a preponderance of the evidence

21   that Mr. Simpson is a serious flight risk.  I do think there

22   are conditions that are available that would reasonably

23   assure his appearance at future court proceedings.  The Bail

24   Reform Act does not provide there must be ironclad

25   guarantees that Mr. Simpson would appear at future court

1 proceedings.

2       I'm going to order that he be released upon the

3 posting of $100,000 cash bond.  And conditions would also

4 include electronic monitoring.

5       And once that cash bond has been posted,

6 Ms. Sitton, then and, of course, I want the -- I'm going to

7 take the passport as a condition of release.  And why don't

8 you hang on to that, Mr. Morrissey.

9       Who's got the passport, you do?

10       MS. SITTON:  I have it, Your Honor.

11       MR. MORRISSEY:  I think it goes to Pretrial.

12       MS. SITTON:  Well, if he's not being released.

13       THE COURT:  Will you keep it in your possession,

14 Ms. Sitton, or are you more comfortable turning it over to

15 Sherise?

16       MS. SITTON:  Well, Your Honor, at this point if

17 he's not going to post a bond, I don't think that anyone

18 really has the authority to hold it besides the defendant.

19       THE COURT:  Well, I just don't want it to be

20 lost.

21       MS. SITTON:  Right.

22       THE COURT:  Or given back to him, okay?  So I'm

23 ordering you to be the custodian, then, of the passport

24 until further order by the Court.  And upon the posting of

25 the cash bond, I'll set the remaining conditions of release.

1          Anything else, Mr. Morrissey?

2          MR. MORRISSEY:  Yes, Judge, as a matter of

3   housekeeping, shall I mark the exhibit so that Sherise can

4   determine it and return it to me just so we have a record of

5   what was the exhibit?

6          THE COURT:  Yes.  That is the procedure that I'd

7   request that you follow.

8          Anything else Ms. Sitton?

9          MS. SITTON:  No, Your Honor.

10          THE COURT:  All right.  We are adjourned.

11

12                    *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    C E R T I F I C A T E

5

6

7

8

9        I, MERILYN A. SANCHEZ, court-approved transcriber,

10   certify that the foregoing is a correct transcript from the

11   official electronic sound recording of the proceedings in

12   the above-entitled matter.

13

14

15       DATED at Phoenix, Arizona, this 21st day of January,

16   2010

17

18

19                    S/Merilyn A. Sanchez

20                    MERILYN A. SANCHEZ, CRR

21

22

23

24

25