DENNIS K. BURKE
United States Attorney
District of Arizona

MICHAEL T. MORRISSEY
Assistant U.S. Attorney
Arizona State Bar No. 012531
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
mike.morrissey@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Elton Simpson,<br><br>　　　　Defendants. | CR-10-055-PHX-MHM<br><br>**GOVERNMENT'S TRIAL MEMORANDUM** |

I. <u>Government's Case In Chief</u>

The government anticipates calling four witnesses at trial; three FBI agents and Dabla Deng, who had many contacts with defendant while acting as an informant for the FBI. The three FBI agents are 1) Jeff Hebert, 2) Lance Turner, and 3) Wyatt Storm. The government will also play excerpts from approximately 6 recording of meetings that defendant had with Dabla Deng.

As of 2009, FBI Phoenix had an open criminal investigation into whether defendant, and certain of his associates, might travel to foreign countries, in particular Somalia, to fight jihad. On February 26, 2008, Secretary of State Rice designated "al-Shabaab" as foreign terrorist organization pursuant to section 219 of the Immigration and Nationality Act. As of 2009, al-Shabaab was engaged in a fighting targeting all aspects of the Transitional Federal Government, the government of Somalia established in 2004 under international auspices. Al-Shabaab has declared has its ultimate goal the imposition of Sharia, or strict Islamic law, throughout Somalia. In May, 2009, Osama Bin Laden released an audiotape entitled "Fight On, Champions of Somalia," calling on individuals to support jihad in Somalia.

During meetings between defendant and Deng, a frequent topic was jihad and the obligation to fight jihad overseas. On July 31, 2007, in a recorded conversation, defendant spoke about fighting the kaffir (non believers) for Allah, while "going out" from America, "because the brothers in like Palestine, and stuff they need help." Defendant noted that "just the whole thing is how you get there, though," and spoke about "wherever the Muslims are at," but first "Palestine" because of Jewish oppression of Muslims; defendant also spoke of Afghanistan and Iraq. Defendant specifically criticized those people who "don't believe that they should be over there fighting." On the subject of fighting, when Deng stated that "I know we can do it man. But you got to find the right people that," defendant stated "Gotta have connects."

On May 29, 2009, in a recorded conversation, defendant stated in part:

Defendant: *Akee, it's time to go to Somalia, brother.*

Deng: Insha'Allah.

Defendant: Eh, we know plenty of brothers from Somalia, akee.

Defendant stated that if the "kuffar" are "fighting against us it's because they don't want us to establish sharia." Defendant and Deng discussed connections with Somalia, and defendant stated:

> It's time (singing). I'm telling you, man. *We gonna make it to the battlefield, akee, its time to roll.*

At that point Deng agreed he could leave America; defendant advised Deng on how to pay for his travel by selling his car, "that's a plane ticket right there. Bye-bye America."

On June 17, 2009 defendant met with Deng again, and talked about his having sent to an associate a link discussing "the permissibility of doing the martyrdom operations," about "how they gonna use the car with bombs on it;" according to defendant, after he sent the link, the FBI visited the person he sent the link.

On October 23, 2009, in a meeting with Deng and Roberto Yong, defendant stated:

> *me and Yahya was talking about uh, me going to South Africa and then, uh, I make my way up to Somalia, and uh, he said, he said, what if you go to Somalia and you waiting*

2

*on one of the brothers come pick you up,* what if it's me, hey that'll be UI. I'd start crying.

Deng stated that if Deng went to the Sudan, defendant and Yong were welcome to come there; defendant stated that "Somalia likes 8 countries away from South Africa," and "that's a lot of travelling."

On November 7, 2009, defendant, Deng, and Yong discussed fighting jihad; defendant asserted he was "going to school;" when Deng pointed out that you never know who is going to be a scholar or a mujahid, defendant stated: "Yeah, that's the whole point. School is just a front. School is a front and if I am given the opportunity to bounce... ." Shortly after that, Yong stated the group needed to come up with "what we gonna say" if authorities stopped them. Defendant talked about he would "be real," that they had to be "relaxed" and he would say "I'm just trying, trying to travel, trying to see the world."

*The January 7, 2010 interview of Defendant*

As of January 7, 2010, defendant did, in fact, have a plane ticket to travel to South Africa, as well as his passport. FBI Agents Hebert, Turner, and Storm visited defendant at his residence in Avondale, Arizona and asked to speak with him; defendant agreed and went outside, where the interview took place.

Defendant was asked whether he had any plans to travel outside the United States. Defendant stated that he planned to travel to South Africa to study Islam at a madrassa; according to defendant he would be gone for about five years and did not have firm plans for what he would do after he completed his studies. When asked whether, once in South Africa, defendant planned on staying in South Africa, defendant questioned why the FBI would ask him that. Defendant was asked whether he had discussed with anyone traveling to Somalia; again defendant questioned why he would be asked that. Agent Hebert asked defendant, in a yes or no question, whether defendant had discussed traveling to Somalia. Defendant said no. Agents asked whether Yong had plans to travel abroad; defendant stated that he did not know of such plans.

3

The FBI showed defendant pictures of Roberto Yong, John Sabari, and Saabir Nurse. Defendant acknowledged knowing those individuals, and that the group got together, but stated that the FBI should not have a concern about the group. As the FBI agents were shaking defendant's hand, and preparing to leave, defendant asked agents about Hassan Abu Jihad. Specifically, defendant asked about the status of Abu Jihad's appeal of his federal conviction. Abu Jihad was convicted in March, 2008 in federal district court in Connecticut, in <u>United States v. Abu Jihad</u>, CR 07-057-MRK, of providing material support to terrorists and of communicating national security information to persons not entitled to receive it. Abu Jihad had been sentenced on April 3, 2009 to ten years in prison for communicating national security information count, after the district court granted a post verdict motion of acquittal on the material support count. On January 7, 2010, after asking about Abu Jihad, defendant stated he was concerned about Abu Jihad's future. Defendant and Abu Jihad knew each other from Abu Jihad's previous time in Phoenix; Abu Jihad had been arrested in Phoenix in March, 2007 on the federal charges leading to his conviction.

II. <u>Elements of the Offense</u>

Excluding the element that defendant's statement involved international terrorism, the elements of a false statement are:

1) A statement
2) falsity
3) materiality
4) agency jurisdiction

*United States v. Jiang*, 476 F.3d 1026, 1029 (9th Cir. 2007).

In the case at bar, the false statement offense is a lesser included of the offense of false statement involving international terrorism, as the indictment charged an additional element – that defendant's statement:

involved international and domestic terrorism, in that defendant falsely stated to Special Agents of the FBI that he had not discussed traveling to Somalia, when in fact defendant had discussed with others, on or about May 29, 2009 and thereafter, traveling to Somalia for the purpose of engaging in violent jihad.

(CR 3). The statute itself, 18 U.S.C. § 1001, provides that one who makes a false statement:

shall be fined under this title, imprisoned not more than 5 years, *or if the offense involves international or domestic terrorism* (as defined in section 2331), imprisoned not more than 8 years, or both.

(emphasis added.) In turn, 18 U.S.C. § 2331(1) states that the term "international terrorism" means activities that—

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended–
　(i) to intimidate or coerce a civilian population;
　(ii) to influence the policy of a government by intimidation or coercion, or
　(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or.... [where perpetrators seek asylum]

Legislative history makes clear why Congress added the international terrorism provisions to Section 1001. *See* 150 Cong. Rec. S 11997, stating:

*S11997 James Jarboe, Section Chief, Counterterrorism Division, Domestic Terrorism, FBI; and James Reynolds, Chief, Terrorism and Violent Crime Section, Criminal Division, Department of Justice. H.R. 3209 was reported by the House Judiciary Committee on November 29, 2001. The Judiciary Committee issued Report No. 107-306 for H.R. 3209 on the same day. H.R. 3209 was unanimously approved by the House of Representatives on December 12, 2001.

A provision similar to 6702 also was introduced as H.R. 1678 in the 108th Congress by Representative Lamar Smith on April 8, 2003. H.R. 1678 was the subject of a hearing before the House Subcommittee on Crime, Terrorism, and Homeland Security on July 10, 2003. Witnesses included Susan Brooks, the U.S. Attorney for the Souther District of Indiana; James McMahon, Superintendent, New York State Police; and Danny Hogg, a target of a war-time hoax about a family member serving in Iraq. H.R. 1678 was ordered reported by the House Judiciary Committee by voice vote on May 12, 2004. The Judiciary Committee issued Report No. 108-505 for H.R. 1678 on May 20, 2004. The key provisions of section 6702 also were introduced as S. 2204 by Senator Hatch on March 11, 2004.

**Subtitle H, section; 84348;843486703, Increased Penalties for Obstruction of Justice in Terrorism Cases, this section increases from 5 years to 8 years the penalty for**

> **obstruction of justice in terror investigations. It also instructs the Sentencing Commission to increase the guidelines range for making false statements in relation to a terrorism investigation. A provision similar to section ;84404;844046703, albeit increasing the penalty to 10 years instead of just 8, has in the past been included as part of the above-described anti-hoax bills.**

(Emphasis added.) Put simply, where the prosecution proves that defendant's material false statement in an ongoing terrorism investigation, relates to, in the language of Section 2331(1)(A),(B), and (C), violent acts intended to intimidate a civilian population or a government, which occur outside the territorial jurisdiction of the United States, then the additional element of false statement involving international terrorism is satisfied.

At trial, the government's proof will be that, at the time defendant made his false statement, he was being investigated by the FBI regarding his potential plan to do exactly what he lied about – go fight jihad in Somalia. The activities defendant discussed with Deng and others, but lied about to the FBI, satisfy Section 2331's definition of international terrorism. The statements were material to the FBI's mission of disrupting and deterring international terrorism, even if the FBI agents knew that defendant's statements denying having discussed travel to Somalia, were false, as defendant's denial made necessary further investigation and assessment of defendant, including efforts to prevent his departure from the United States, and investigation of the threat posed by others with whom defendant had discussed traveling to Somalia. *See United States v. Gaudin*, 515 U.S. 506, 512 (1995)(whether statement is material depends on what decision an agency was trying to make). *See also United States v. Ashqar*, 582 F.3d 819 (7th Cir. 2009), where the Court, dealing *not* with Section 1001 but with the U.S.S.G. §3A1.4, noted that:

> The government counters that obstructing an investigation into a crime can be one way of promoting that crime. Thus, intent to obstruct an investigation is enough, at least where obstructing the investigation promotes the crime. We agree. Promoting a crime includes helping and encouraging that crime, and one way of furthering a crime is to try to prevent the government from finding out about it.

*Id*. at 826. In *Ashqar*, Ashqar had refused, despite a grant of immunity, to provide testimony to a grand jury investigating Ashqar's role "as a communication and financial conduit for the

terrorist organization Hamas." *Id*. at 821-22. In the case at bar, defendant could have chosen not to speak with FBI about his plans. Instead, he chose to make false statements involving his own activities, relating to the FBI's investigation of international terrorism. Those actions meet the elements of the crime charged in the indictment.

Respectfully submitted this 20th day of October, 2010.

DENNIS K. BURKE
United States Attorney
District of Arizona

s/ *Michael T. Morrissey*
MICHAEL T. MORRISSEY
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing:

Gerald Williams
Kristina Sitton
850 W. Adams Street, Suite 201
Phoenix, Arizona 85007
attorneys for defendant Elton Simpson

7