JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2700

KRISTINA L. SITTON, #023467
GERALD A. WILLIAMS, #013115
Asst. Federal Public Defenders
Attorneys for Defendant
kristina_sitton@fd.org
gerald_williams@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No.  CR-10-055-PHX-MHM |
| Plaintiff, | |
| vs. | **DEFENDANT'S TRIAL MEMORANDUM** |
| Elton Simpson, | |
| Defendant. | |

Defendant, through counsel, submits the following as his Trial Memorandum pursuant to the Court's Order.  Defendant maintains his plea of not guilty and will argue to the Court that he did not commit the offense listed in the Indictment.

**I.     FACTS**

*A.     Defendant's Background*

Born in Illinois, Mr. Simpson moved to the Phoenix area and converted to the Muslim religion at a young age.

*B.     The Investigation*

For unknown reasons, the Government began investigating Mr. Simpson in 2006 by recording conversations between him and Dabla Deng, an informant who was paid $132,000 by the FBI to gather information on Mr. Simpson.

The Government has disclosed recordings of conversations between Mr. Deng and Mr. Simpson, gathered through the use of a body wire.  Overall, the investigation includes 225 compact discs that cover 327 days of conversations between Mr. Deng and Mr. Simpson in the period between March of 2007 and November of 2009. Most consist of conversations between Mr. Deng and Mr. Simpson regarding the Muslim religion, various daily events and their favorite eating establishments.  The Government's evidence supporting the charge will include snippets of six (6) recordings, for a total of 17 minutes and 31seconds of dialogue over the course of well over 1500 hours of conversation.

The recordings do not contain even one instance wherein Mr. Simpson speaks about or even implies he knows anything about, believes in, is affiliated with, has connections to or wishes to fight with al-Shabaab, the Somalian foreign terrorist organization mentioned in the Government's trial memorandum. There is likewise no evidence wherein Mr. Simpson referenced Osama Bin Laden or his call for individuals to support jihad in Somalia.

The Government states in its memo that a "frequent topic" of conversation between Mr. Deng and Mr. Simpson "was jihad and the obligation to fight jihad overseas."  The defense has found no evidence of these "frequent" conversations while perusing the body wires.  Thus far, the Government has failed to show even one instance where Mr. Simpson mentions "violent jihad" in Somalia. That phrase is one made up by the Government, likely because it is aware that the word jihad in the Muslim religion does not necessarily imply violence.  Instead, jihad signifies a struggle between two forces.  Muslims use the word "jihad" to signify one of three types of struggles: 1. An internal struggle to maintain faith, 2. The struggle to improve the Muslim society, or 3. The struggle in a holy war. In fact, the prophet Muhammad characterized an armed struggle to be a "little jihad"

2

but considered the spiritual, individual version of holy war, otherwise known as the war within a Muslim person, as the "great jihad." For example, fornication is prohibited by the Muslim culture. When a member of the Muslim faith sees a woman who is attractive, that individual suffers a jihad, an internal struggle between his faith and his desire.

### C.    The alleged offense

On May 27, 2009, Mr. Simpson told Mr. Deng, "We need to go to Somalia. We can make it to the battlefield. It's time to roll." Nearly eight months later and just two weeks after Umar Farouk Abdulmutallab attempted to blow up a plane in Detroit on Christmas Day, agents arrived at Mr. Simpson's house to stop him from proceeding to South Africa, where he had enrolled in school to study Islam. Agents have verified that Mr. Simpson purchased a ticket to South Africa and also that he had a visa allowing him to travel to South Africa. (The distance from South Africa to Somalia is roughly 2300 miles and would require travel through several countries. This is longer than the distance between San Diego, California and Jacksonville, Florida, which is about 2100 miles.)

Agent Hebert testified under oath at the grand jury proceeding and described his contact with Mr. Simpson on January 7, 2010, as follows:

> Throughout the conversation, we had basically *intimated* to him that we knew he had talked to others on other occasions about traveling not only to South Africa but also to Somalia. Even though we asked in *round about* ways, [Mr. Simpson] continued to deny any sort of discussions of traveling to Somalia.
>
> Towards the end of the conversation, I specifically said, "I want a 'yes' or 'no' answer. **Have you discussed traveling to *or* are you planning to travel to Somalia?**"
>
> [Mr. Simpson] said, "No."

· · ·

· · ·

· · ·

3

1

## II.   APPLICABLE LAW

2

3

The Government misstates the law the Court must follow in arriving at its verdict.

4

    *A.*    *18 U.S.C. §1001*

5

6

In order for the defendant to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:

7

    1.    First, the defendant made a statement,

8

9

    2.    Second, that statement was false,

10

    3.    Third, the defendant acted willfully, that is deliberately and with knowledge that the statement was untrue,

11

12

    4.    Fourth, the statement was material to the government agency's activities or decisions, and

13

14

    5.    Fifth, the matter is within the jurisdiction of the federal investigating agency.

15

16

*United States v. Jiang*, 476 F.3d 1026, 1029 (9th Cir. 2007) *citing United States v. Camper*, 384 F.3d 1073, 1075 (9th Cir. 2004).  *See also* 9th Circuit Model Jury Instruction 8.66.

17

18

19

A statement is material if it could have influenced the agency's decisions or activities.

20

21

If a question is ambiguous, it is up to the trier of fact to determine whether the defendant understood the question as the government did and answered falsely.  *United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir. 2003).  The trier of fact determines which of the plausible interpretations of an ambiguous question the defendant comprehended and responded to.  *Id.*, *United States v. Matthews*, 589 F.2d 442, 445 (9th Cir. 1978).

22

23

24

25

26

27

28

4

Other courts have found that a defendant's intent to mislead the agency is required, simply being untrue or incorrect is not enough. *United States v. Lange*, 528 F.2d 1280 (1976).

## 2. *International Terrorism and 18 U.S.C. § 2331*

The remainder of 18 U.S.C. §1001 states as follows: "[i]f the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

There is no controlling law in the 9th Circuit as to what evidence the Government must show to prove that the false statement "involves international terrorism" in order to increase the maximum sentence to eight years and the applicable Guideline range from 0-6 months to 46-57 months in the case of an individual with no criminal history like Mr. Simpson. However, it is very clear that the Government must prove more than just an investigation into international terrorism for this part of the statute to apply.  When interpreting a statute, if the plain meaning of the statute is unambiguous, that meaning is controlling and the Court of Appeals will not examine the legislative history as an aid to interpretation unless the legislative history clearly indicates that Congress meant something other than what it said. *Zuress v. Donley*, 606 F.3d. 1249 (9th Cir. 2010); *See also INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213, n. 12, 94 L.Ed.2d 434 (1987) (holding that when plain language appears to settle a question, only clearly expressed contrary intention in legislative history may overcome "strong presumption" that Congress expresses its intent through the language it chooses).

The plain language of the statute increases the maximum term of imprisonment to eight years "If the *offense* involves international or domestic terrorism (as defined in section 2331)."  This statute is completely unambiguous. The statute clearly criminalizes a false statement that itself involves domestic or

international terrorism.  Nowhere in the statute is even a suggestion that only an investigation involving terrorism is required.   The Court should use the plain language of the statute when deciding Mr. Simpson's guilt or innocence.

In order to fulfill the statutory definition of "international terrorism," conduct must satisfy a three-prong test of the statute. 18 U.S.C. § 2331.  The first prong is that the conduct must "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or any State."  18 U.S.C. § 2331(1)(A).  The second prong is that the violent or criminal activity "appears to be intended" to "intimidate" or  "coerce" any civilian population or government.  18 U.S.C.  § 2331(1)(B). The third prong requires that the activities "occur primarily" outside of the United States or "transcend boundaries in the means by which they are accomplished."  18 U.S.C.  § 2331(1)(C)

"International terrorism," by definition, requires the investigation of activities that constitute crimes."  *See United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (citing 50 U.S.C. § 1801(c)(1) (1988), the statute providing the definition of "international terrorism" under  FISA, which included language substantially similar to the statutory definition of terrorism under 18 U.S.C. § 2331 (1)).  Conduct could "involve" "violent acts," without the actual conduct being violent or criminal in nature.  *Boim v. Quranic Literacy Institute[1]*, 291 F.3d 1000, 1009 (7th Cir. 2002).  Because, taken literally, "involving violent acts" could

---

[1] There were three 7th Circuit decisions involving the plaintiffs in *Boim*. *See Boim v. Quranic Literacy Institute* (*Boim I*) 291 F.3d 1000 (7th  Cir. 2002) (the defendants sought an  interlocutory appeal to a 7th  Cir. Panel, seeking to overturn a the district court's determination that providing financial assistance to a terrorist is an act of international terrorism. The 7th  Circuit panel affirmed the district court's determination); Boim v. *Quranic Literacy Institute* (*Boim II*) 511 F.3d 707 (7th Cir. 2007) (after *Boim I*, the  case resumed in district court, and the jury assessed  jointly and severally liable for $52 million in damages against all defendants. The damages were trebled and attorneys' fees added. In *Boim II, t*he defendants appealed the final judgment; the panel vacated the judgment and directed the district court to redetermine liability.); *Boim v. Holy Land Foundation* (*Boim III*) 549 F.3d 685 (7th Cir. 2008) (After *Boim II*, the plaintiff petitioned for a rehearing en banc; the full court granted the petition to consider the elements of the suit under 18 U.S.C. § 2333) in *Boim III.)*

"attribut[e] almost unlimited liability to any act that had some link to a terrorist act, Congress could not have meant to attach unlimited liability to even remote acts." *Id.* Therefore, in order for conduct to fulfill the first prong of the statutory definition of "involving international terrorism," the conduct must be against the law. *Id*.

The District of Arizona has only prosecuted one other individual for a violation of this statute. The Defendant in that case, Akram Abdallah lied about participating in fundraising activities for a Specially Designated Terrorist organization (SDTO) by the name of Holy Land Foundation for Relief and Development (HLF). The evidence was unrefuted that Mr. Abdallah knew that HLF was an SDTO and also that he knew the organization was pending trial for crimes including providing material support to Hamas, a foreign terrorist investigation. In that case, Mr. Abdallah knowingly made a false statement and that false statement, that he had not helped raise funds for the SDTO, clearly involved international terrorism. Another case prosecuted under this statute is the case of Ahmad Afzali, an imam who was a confidential informant for the FBI and prosecuted in the Eastern District of New York. After being briefed by the FBI that they believed someone from his mosque was planning on blowing up the New York subway system, Mr. Afzali advised one of the suspects that he was being investigated by the FBI. When questioned later by the FBI, Mr. Afzali falsely stated that he had not tipped the suspect off to the FBI investigation. In that case, as in the case of Mr. Abdallah, the false statement clearly involved domestic terrorism.

Respectfully submitted: October 22, 2010.

JON M. SANDS
Federal Public Defender


*/s/Kristina L. Sitton*
KRISTINA L. SITTON
Asst. Federal Public Defender

7

1   Copy of the foregoing transmitted
    by ECF for filing this 22nd day
2   of October, 2010, to:

3   CLERK'S OFFICE
    United States District Court
4   Sandra Day O'Connor Courthouse
    401 W. Washington
5   Phoenix, Arizona 85003

6   MICHAEL MORRISSEY
7   Assistant U.S. Attorney
    United States Attorney's Office
8   Two Renaissance Square
    40 N. Central Avenue, Suite 1200
9   Phoenix, Arizona 85004-4408

10  Copy mailed to:

11  ELTON SIMPSON
    Defendant
12

13     s/  *S. B.*
14  S. B.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8