**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. **CR 10-55 PHX-MHM** |
| ) | |
| **ELTON SIMPSON,** ) | Phoenix, Arizona |
| ) | October 26, 2010 |
| ) | 9:25 a.m. |
| Defendant. ) | |
| ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**(Bench Trial)**

**BEFORE THE HONORABLE MARY H. MURGUIA**

APPEARANCES:

For the Plaintiff:     **Michael T. Morrissey,** Esq.
                       Assistant U.S. Attorney
                       Two Renaissance Square
                       40 N. Central Avenue, Suite 1200
                       Phoenix, Arizona  85004-4408

For the Defendant:     **Gerald A. Williams,** Esq.
                       **Kristina L. Sitton,** Esq.
                       Assistant Federal Public Defenders
                       850 W. Adams Street, Suite 201
                       Phoenix, Arizona  85007

Court Reporter:        Merilyn A. Sanchez, CRR
                       Sandra Day O'Connor U.S. Courthouse
                       401 W. Washington Street SPC-37
                       Phoenix, Arizona  85003-2118
                       (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription I N D E X

```
 1   WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS   VD

 2   JEFFREY HEBERT
     By Mr. Morrissey    23
 3   By Mr. Williams             66
     By Mr. Morrissey                     106
 4
     LANCE D. TURNER
 5   By Mr. Morrissey   129
     By Mr. Williams            142
 6   By Mr. Morrissey                     157

 7   DABLA DENG
     By Mr. Morrissey   168
 8

 9

10                       E X H I B I T S

11   NO.       DESCRIPTION                        ID    EVD

12
     1         Tape recording  7/31/07            47    48
13   2         Tape recording  5/29/09            47    48
     3         Tape recording  6/17/09            47    48
14   4         Tape recording  10/23/09           47    48
     5         Tape recording  11/7/09            47    48
15   6         Tape recording                     47    48
     101       Grand jury transcript              85
16   103       Form 302                           98

17

18

19

20

21

22

23

24

25
```

1                     P R O C E E D I N G S

2

3              THE COURTROOM DEPUTY CLERK:  Criminal 2010-55, United

4    States of America versus Elton Simpson, on for criminal bench

5    trial.

6              MR. MORRISSEY:  Good morning, Your Honor, Mike

7    Morrissey for the Government.

8              MR. WILLIAMS:  Good morning, Your Honor, Gerald

9    Williams and Kristina Sitton on behalf of Mr. Elton Simpson.

10             THE COURT:  Good morning.  You may be seated.

11             We are ready to proceed with trial.  There was a

12   couple issues I just wanted to raise with you before we

13   actually started and you wanted to present opening statements.

14             I received a motion regarding a passport.  Has that

15   resolved or do you need anything more from me on that?

16             MS. SITTON:  No, Your Honor, we received the passport.

17   I believe the clerk has it.

18             THE COURT:  You are going to need to move the

19   microphone over.

20             MS. SITTON:  I apologize.  We did receive the

21   passport, and your clerk has it.

22             THE COURT:  And you are just using it for purposes as

23   an exhibit; is that correct?

24             MS. SITTON:  That's correct.

25             THE COURT:  And you are not asking for it to be

1   remanded back to your -- the passport to your client?

2           MS. SITTON:  No, not at this time.

3           THE COURT:  Is there anything else that we need to

4   resolve before we begin?

5           MR. WILLIAMS:  Your Honor, we believe that there is.

6   We were informed yesterday that the informant, Dabla Deng, who

7   has been paid, I believe, approximately $132,000 over the

8   previous five years or so, has not filed or claimed taxes in

9   regards to that income.  We believe that he should be advised

10  that that is a criminal offense and that he's entitled to a

11  lawyer.

12          It is also our understanding that Mr. Deng is not a

13  citizen of the United States and is here -- or at least

14  attempting to obtain a green card, is here on some other legal

15  status.  And I believe he should also be informed that a

16  conviction for failing to pay his taxes may effect his status

17  here in the United States.

18          And we would also ask that we be provided, and I don't

19  have any reason to believe it hasn't been the case, that any

20  agreements in regard to that be turned over to the defense.

21          MR. MORRISSEY:  Your Honor, to the last point, there

22  are no agreements regarding Mr. Deng's application to become a

23  United States citizen and his tax status.  There is nothing

24  where the FBI has agreed to assist him to get his green card

25  and to somehow overlook the absence of the tax filings.

1          As has been turned over to defense, the FBI did make a

2    phone call and seek to move up the scheduling of his interview

3    to get his green card.  That's the only benefit he received

4    with respect to his attempt to gain United States citizenship.

5          Regarding the tax issue, Mr. Deng is here.  I do

6    believe we should have inquiry of this by the Court.  I

7    anticipate Mr. Deng will tell the Court what he's told me,

8    which is that he understands that he should have filed his tax

9    returns, but that he wishes to testify.

10          Whatever admonitions the Court may wish to give are

11    fine with the Government.  But I also think they need to be

12    legally accurate.  And the statement that he would necessarily

13    be subject to criminal penalties is only a potential, civil

14    penalties is a possibility.  And this should not be an attempt

15    to scare Mr. Deng into not testifying by saying that this could

16    affect his application to become a U.S. citizen.

17          Maybe it would be considered, but as phrased by

18    defense counsel, that's not an appropriate manner of inquiring

19    into that because it's not at all clear that this would have

20    any affect on his ability.

21          And finally, as a factual point, Mr. Deng did -- I

22    believe would testify that he did in 2007 file his taxes.  He

23    may have in '08, but he clearly did not in 2009.

24          Either way, even for the years for which he did file

25    his tax returns, he did not claim the money that he received

1    from the FBI on those tax returns.

2          THE COURT:  Well, I'm not sure I understand your

3    phrase, Mr. Morrissey, when you say that -- you said "but as

4    phrased by defense counsel, that's not an appropriate manner of

5    inquiring into that because it's not all clear that this would

6    have an" -- "any affect on his ability."

7          Sometimes when people don't pay their taxes, I have

8    about five cases, I can point to you right now that your office

9    has brought against individuals.  They are brought -- they

10   pursue them criminally.  Do you dispute that?

11         MR. MORRISSEY:  No, Judge, that's not my point.

12         THE COURT:  I guess I'm not understanding.  What is

13   not appropriate about what Mr. Williams is saying?

14         MR. MORRISSEY:  What I was trying to say, Your Honor,

15   I expect the Court to make inquiry.  I expect inquiry to be

16   wide ranging.  I expect it to cover:  Mr. Deng, do you

17   understand that you could face civil penalties for failure to

18   file tax turns?  Do you understand that you could also face

19   criminal penalties?

20         I think it was phrased by Mr. Williams in a very

21   shorthand fashion.  And my point was there are more questions

22   than:  Do you realize this could prevent you from becoming a

23   United States citizen?  I think that may be one question the

24   Court asks.

25         But my point is that it is not such a limited inquiry

1    to that, that the Court covers all aspects of this in a

2    complete colloquy.  That's all I was trying to say.

3              THE COURT:  Have you talked to Mr. Deng, and has he

4    indicated or did you -- have you informed him of any of these

5    items here?

6              MR. MORRISSEY:  Yes.

7              THE COURT:  And you say he still is willing to testify

8    and you don't think he needs a lawyer based on your inquiry?

9              MR. MORRISSEY:  I don't think -- well, if Mr. Deng

10   answers the question under oath whether or not he has filed tax

11   returns for at least two years, for one year, let's take 2009,

12   and Mr. Deng says --

13             THE COURT:  That he hasn't?

14             MR. MORRISSEY:  That he has not.  If Mr. Deng says

15   under oath that he has not filed tax returns, is that statement

16   a potential link in the chain that could be used later to

17   incriminate Mr. Deng for failure to file a tax return?  The

18   answer is yes.

19             THE COURT:  It's a significant link in the chain.

20             MR. MORRISSEY:  I'm sorry?

21             THE COURT:  I think it's a significant link of the

22   chain.

23             MR. MORRISSEY:  That's fine, too.  To me the test, the

24   link doesn't have to be that significant for his Fifth

25   Amendment right against self-incrimination to be present.  So

1    do I think a truthful answer to that question is or could be a

2    link in the chain of incrimination for Mr. Deng?  Yes, I do.

3            Do I think Mr. Deng can waive that right and testify

4    today?  Yes, I do.

5            But I think he would have to tell the Court that and

6    if he changes his mind from what he told the FBI and from what

7    he's told me and says, yes, Judge, I want a lawyer, then I

8    think we would have to address that.

9            THE COURT:  Well, I guess I'm not sure why, based on

10   what you have you told me, just what you told me, I wouldn't

11   give him a lawyer before I even inquired of him.

12           MR. MORRISSEY:  Judge, I don't have a -- I don't have

13   a disagreement with that.  It would delay these proceedings,

14   which is not what the Government wants.  But I don't have a

15   disagreement with that.

16           THE COURT:  Well, I just, based on just what you have

17   proffered, and what you communicated to me, it seems like I

18   need to give him a lawyer right now before I have him swear

19   under oath and see if he wants to testify, what he would say if

20   asked about the tax issue.  And he could waive his --

21           MR. MORRISSEY:  Yes, Judge, I think you and I both

22   agree, he could waive without consulting a lawyer.  But what I

23   hear you saying, Judge, is your preference is that for that

24   waiver, if he -- if he does that, would be upon advice of

25   counsel, independent counsel.

1              THE COURT:  Yes.  I mean, he could waive without a

2     lawyer.  But based on what you told me so far, I mean,

3     sometimes we don't have as much information as you have given

4     me.  But you've given me some information that clearly this

5     could implicate him in the possible criminal proceeding.

6     Again, it's possible.  But nonetheless, it could result in

7     that.

8              And so I think that I would rather he just go ahead

9     and get counsel now and then we can have that discussion with

10    him after he has consulted with his lawyer.

11             THE COURT:  Can he afford a lawyer?

12             MR. MORRISSEY:  No, Your Honor.

13             THE COURT:  Then we need to give him counsel.

14             So let me order that Mr. -- what's his name?

15             MR. MORRISSEY:  Dabla Deng, D-e-n-g.

16             THE COURT:  -- Dabla Deng receive court-appointed

17    counsel in this case to consult regarding the tax matter that

18    has been brought to my attention.  I will -- I'm still happy to

19    have the colloquy with him and he can waive if he wishes.  But

20    I would rather have him have counsel in light of what was

21    raised and what was discussed.  I don't know why I would have

22    two discussions with him, one without counsel and one with

23    counsel.

24             MR. MORRISSEY:  I agree with the Court that --

25             THE COURT:  Then let's go ahead and do that.  I'm

```
1    going to try to do that on an expedited basis, so I'll direct
2    the courtroom deputy --
3          MR. WILLIAMS:  Your Honor, I don't know if it would
4    help if it's appropriate.  I anticipated the issue.  I notified
5    my office of the potential and asked that they try to contact
6    someone and have them available.  I don't know if they've done
7    that or they are waiting to hear.
8          THE COURT:  Who's the point person over there?
9          MR. WILLIAMS:  Patricia Trujillo.
10         THE COURT:  I think the courtroom deputy has dealt
11   with Ms. Trujillo in the past.  So I'll ask the courtroom
12   deputy to do what she needs to do, either send an e-mail or
13   call to see what can be done in terms of getting counsel.  And
14   then we will go ahead and proceed.
15         You have -- I notice you have other witnesses, so --
16         MR. MORRISSEY:  I do, Your Honor.  We may -- we may
17   hit a wall quickly.  My first agent is -- my first witness is
18   Special Agent Hebert of the FBI.  The second witness is
19   Mr. Deng.  Obviously I could push him to the third witness.
20   Agent Turner will also testify.  Agent Storm, as I have advised
21   counsel this morning, is not going to testify.  So I only have
22   three witnesses.  I can put on the two FBI witnesses first.
23         THE COURT:  All right.  If we get the lawyer here, it
24   shouldn't take long for Mr. Deng to consult with him.
25         But let's go ahead and proceed with the trial.
```

1          Is there anything else at this time?

2          MR. WILLIAMS:  I don't believe so, Your Honor.

3          MR. MORRISSEY:  No, Your Honor.

4          THE COURT:  It is Mr. Mitchell, Tyrone Mitchell has

5    been tapped as the lawyer, and he will come over as soon as

6    possible.

7          MR. MORRISSEY:  Your Honor, I learned of this

8    information, it was either Saturday or Sunday, about the

9    nonfiling of the tax returns.  And then in breaking down the

10   numbers of what Mr. Deng was paid on a yearly basis, I received

11   that information very recently.  And it is clear to me that

12   some of those amounts were substantial.  For some years, they

13   are likely well under any filing threshold.  But for some

14   years, they are substantial.

15         THE COURT:  Okay.  And how is it you just learned

16   about that?

17         MR. MORRISSEY:  I knew the numbers.  In meeting with

18   Mr. Deng, he had been, and the testimony would be at best, the

19   FBI told him to pay -- to include these on his tax returns.

20   Over the course of the weekend, it occurred to me to confirm

21   that that had in fact happened in viewing the trial prep.  And

22   the answer was that had not happened.

23         THE COURT:  The amount paid you've known for a while?

24         MR. MORRISSEY:  I knew the aggregate, I didn't know

25   the breakdown for year by year until very recently.

1          THE COURT:  And what is the aggregate?

2          MR. MORRISSEY:  100 -- over approximately a five-year

3    period, $132,000 approximately.  And I can break those down by

4    years, Judge, if you would like that.

5          THE COURT:  Well, if you have that right now, why

6    don't you go ahead.

7          MR. MORRISSEY:  I do, Your Honor.  The information

8    would be that in 2005, Mr. Deng was paid approximately $1300 by

9    the FBI.

10          THE COURT:  1300?

11          MR. MORRISSEY:  1300.

12          In 2006, Mr. Deng was paid approximately $6,750.

13          In 2007, Mr. Deng, the information would be he was

14    paid approximately $46,000.

15          In 2008, the information would be that Mr. Deng was

16    paid approximately $33,000.

17          In 2009, the information would be that Mr. Deng was

18    paid approximately $42,000.

19          In 2010, for which obviously there's not yet an

20    obligation to file, Mr. Deng was paid approximately $3,000.

21          THE COURT:  Okay.  Thank you.  Let's go ahead and

22    proceed.  You have an opening statement?

23          MR. MORRISSEY:  Yes, Your Honor.

24          THE COURT:  Please come forward.

25          MR. MORRISSEY:  By executive order it is within the

1    FBI's jurisdiction to deter and disrupt American citizens

2    traveling to foreign countries to engage in fighting that

3    involves material support to terrorists, that appear to be

4    intended to influence a government by intimidation or coercion,

5    and which would occur primarily outside the United States.

6    Those activities are the definition of international terrorism.

7         From 2007 on, but especially by 2009, the FBI had a

8    criminal investigation into whether Elton Simpson and others

9    were going to travel to Somalia to engage in fighting against

10   the government there, to establish sharia law, which is strict

11   Islamic law, by force.

12        Through a witness, Dabla Deng, who had worked for the

13   FBI, the FBI had knowledge that Elton Simpson, since 2007,

14   talked about fighting and dying overseas in jihad.

15        On July 31st, 2007, Mr. Simpson met with Dabla Deng.

16   In recorded conversation, Mr. Simpson stated that the best way

17   to die was for Allah, and he spoke about the fighting jihad.

18        Mr. Simpson said that if you get shot or get killed,

19   it's jannah straight away.  Jannah is heaven.  According to

20   Mr. Simpson, that's what we are here for on earth.

21        Mr. Simpson specifically stated that in doing this, he

22   was talking about going out from America, leaving America to go

23   and fight jihad.

24        But Mr. Simpson raised that, the whole issue, the

25   whole thing is how you get there.  And as Mr. Simpson said in

1    his words, "You gotta have connects."  You have to have

2    connections to get overseas to fight jihad.

3          Mr. Simpson stated that the brothers who do not

4    believe they should be over there fighting, overseas fighting,

5    have a disease in the heart.

6          By 2009, the battlefield, the foreign country that

7    Mr. Simpson was focused upon and where he wished to fight was

8    Somalia.  On May 29th, 2009, Mr. Simpson said specifically to

9    Mr. Deng in a recorded conversation:  Akee -- and Akee means

10   friend.  Akee, it's time to go to Somalia, brother.

11         Mr. Simpson said:  We know plenty of brothers from

12   Somalia.  Mr. Simpson stated that the kuffar, the nonbelievers,

13   are fighting against us because they don't want us to establish

14   sharia.

15         Mr. Simpson and Mr. Deng discussed connections with

16   Somalia, and Mr. Simpson stated again:  We gonna make it to the

17   battlefield, Akee, it's time to roll.

18         Mr. Deng agreed that he also could leave America, that

19   he had nothing better to do, and that he could leave America.

20   Mr. Simpson advised Mr. Deng on how to pay for his travel

21   overseas by selling his car.  In Mr. Simpson's words, "That's a

22   plane ticket right there.  Bye bye, America."

23         Mr. Deng, playing his role on behalf of the FBI, as

24   somebody interested in jihad, said to Mr. Simpson:  Jihad is

25   not bad.  And Mr. Simpson laughs and says, "It's bad to the

1     kaffir."  It is very clear from context, from recordings that

2     we will play for you, that jihad, for Mr. Simpson, is not a

3     peaceful inner struggle, that it is a violent jihad intended to

4     be on the battlefield overseas.

5             In fact, in the May 29th, '09 conversation, in the

6     context of jihad, Mr. Simpson then specifically speaks with

7     Mr. Deng about a beheading video in which a man is beheaded.

8     That video had been provided to Mr. Simpson by John Sabari, one

9     of the group of associates of Mr. Simpson that Mr. Deng also

10    met with.

11            On June 17th, 2009, Mr. Simpson, again to Mr. Deng,

12    spoke of the need for getting up out of here.  And he talked

13    about having sent -- he told Mr. Deng about having sent an

14    associate a computer link discussing, and this is a quote, "The

15    permissibility of doing the martyrdom operations."  And he

16    spoke about how they gonna use the car with bombs on it.

17            And according to Mr. Simpson, after he sent that link

18    to his associate, the FBI went and spoke with that associate.

19    Mr. Simpson speaks again that day about sharia law and if the

20    caliph, the leader, tells you you have to fight in Iraq, that's

21    what you do.  And what Mr. Simpson says, that's what we are

22    trying to get back to is to sharia law.

23            So, again, in the context of getting up out of here

24    and leaving America, Mr. Simpson is discussing violence

25    overseas.

1          On October 23rd, 2009, in a meeting with Mr. Deng and

2    a Roberto Yong, Y-o-n-g, Mr. Deng stated that he would be

3    bouncing soon.  And "bouncing," Mr. Deng will tell you, means

4    leaving.  Mr. Deng is from the Sudan and he had talked about

5    leaving America and going oversees.  And when Mr. Deng says he

6    will be bouncing soon, Mr. Simpson talks about, oh, you'll be

7    going on missions.

8          And he says specifically that he and Yahya, which was

9    the nickname of John Sabari, and this is a quote, were talking

10   about me going to South Africa and then, uh, I make my way up

11   to Somalia.  And he said -- he said what if you go to Somalia

12   and you're waiting on one of the brothers to come pick you up,

13   what if it's me and I would start crying.

14         Mr. Simpson speaks specifically of going to

15   South Africa and then from South Africa traveling specifically

16   to Somalia.

17         They go on to discuss the way to get or the ability to

18   get to Somalia, because Mr. Deng says if he goes back to the

19   Sudan and his homeland, that Mr. Simpson and Mr. Yong are

20   welcome to go visit him.  And Mr. Simpson says Somalia is like

21   eight countries away from South Africa.

22         On November 7th, 2009, Mr. Simpson, Mr. Deng, and

23   Mr. Yong are again discussing fighting jihad.  When they speak

24   specifically about whether or not Mr. Simpson is going to

25   school, Mr. Simpson states:  School is just a front.  School is

1    a front and if I am given an opportunity to bounce -- bounce,

2    of course, means travel overseas.  He does not finish the

3    sentence.

4            They discuss, the group does, what they would do if

5    they were questioned by authorities on why they were traveling.

6    And Mr. Simpson says:  Well, he would just be relaxed and

7    question why he was being questioned by police and just say he

8    was traveling to try to see the world.

9            On January 7th, 2010, exactly two months after

10   Mr. Simpson has stated that school is a front, and two months

11   and two weeks after stating it to the informant, to Mr. Deng,

12   that he had talked to John Sabari about going to South Africa

13   and then making his way to Somalia, Mr. Simpson is interviewed

14   by the FBI.

15           As of that date, January 7, 2010, Mr. Simpson did in

16   fact have a plane ticket to travel to South Africa as well as

17   his passport.

18           The FBI asked Mr. Simpson that day whether he had any

19   plans to travel outside the United States.  Mr. Simpson

20   confirmed that he did plan to travel to South Africa to study

21   Islam at a madrassa.

22           According to Mr. Simpson, he would be gone for about

23   five years.  And then he did not have firm plans as to what he

24   would do.

25           He was asked whether once he was in South Africa, he

planned on staying in South Africa.  And Mr. Simpson questioned

why the FBI would ask him that, consistent with how he told the

group on November 7th, 2009, he would behave if questioned.

He was asked specifically by the FBI whether or not he

had discussed with anyone traveling to Somalia.  And again,

Mr. Simpson questions why he would be asked that.

He is asked multiple times whether or not he has

discussed traveling overseas to Somalia.  At one point he is

asked in straight "yes" or "no" fashion by Agent Hebert:  Did

you discuss with anyone about traveling to Somalia, and

Mr. Simpson says no.

Mr. Simpson was not in custody that day.  He

voluntarily chose to talk to the FBI and make a false

statement.

Previously in March 2007, he had also been contacted

by the FBI.  Again, in a noncustodial setting, where he was

voluntarily free to choose to talk or not to talk to the FBI.

And on that day, in March 2007, Mr. Simpson chose not to talk

to the FBI.  He said, "I don't want to talk to you."  And they

did not question him further.

Mr. Simpson's false statement on January 7th of 2010

was a voluntary choice on his part with specific intent to make

a false statement to the FBI about whether he had discussed

with anyone traveling to Somalia.  That statement and his false

statement, despite the fact that the FBI knew that it was

1    untrue, had a natural tendency, or was certainly capable of

2    influencing the FBI's actions.

3         In particular, after that discussion, that date of

4    that discussion, as I said, was January 7th, 2010.  Mr. Simpson

5    was scheduled to leave on January 15th, 2010.  The FBI took

6    steps subsequent to that discussion to have Mr. Simpson placed

7    on the no fly zone so that he could not leave the

8    United States.

9         But those efforts were not successful, but it is an

10   example of the way in which the FBI was not only capable of

11   being influenced by Mr. Simpson's lies but was in fact

12   influenced.

13        The FBI also had to reassess their investigation into

14   Mr. Simpson's associates in terms of whether or not they

15   themselves, if the group was concealing their plans to travel

16   to Somalia, presented a greater risk than was previously

17   anticipated.

18        The FBI also had to anticipate whether it would

19   provide information to the government of South Africa if

20   Mr. Simpson was able to succeed in leaving the country and

21   traveling to South Africa first.

22        Based on this evidence and these elements, the

23   Government would ask you, Judge, to find the defendant guilty

24   beyond a reasonable doubt of making a false statement involving

25   international terrorism.

1          THE COURT:  All right.

2          MS. SITTON:  I hope this doesn't fall.  I apologize.

3          The question is what is this case really about.  What

4   is the Government really getting at in these criminal charges?

5          The FBI knew that Mr. Simpson had briefly spoken about

6   Somalia eight months prior to their contact with him on

7   January 7th, 2010.  And the evidence will show that the defense

8   won't dispute that Mr. Simpson did in fact talk about Somalia

9   in May of 2009.  But that's not what this case is about.  This

10  case is about whether or not on January 7th, 2010, Mr. Simpson

11  knowingly and willfully made a material false statement to the

12  agents.

13         And in this case, it's all about the numbers:  The

14  number three, which is the number of years that Mr. Deng

15  recorded conversations between him and Mr. Simpson.

16         330, the number of conversations he recorded between

17  the two of them.

18         Six, the number of short snippets that the Government

19  will offer in support of its assertion that Mr. Simpson had

20  talked about -- often about waging jihad.

21         Thousands, the number of minutes of conversations

22  recorded during the course of the investigation.

23         17, the number of minutes the Government will offer in

24  support of its charge.

25         And eight, the number of those 17 minutes that come

1     from a conversation prior to the date listed in the Indictment.

2          And $132,000, the amount of money the young Sudanese

3     informant was paid to keep this investigation going.

4          In this case, the question is and what we have to

5     remain focused on is whether Mr. Simpson made a knowing,

6     willful false statement to law enforcement; and second, whether

7     or not those statements, the offense as listed in the

8     Indictment, involves international terrorism.

9          The evidence will show that on the date listed in the

10    Indictment, that Mr. Simpson was asked whether or not he ever

11    discussed traveling to Somalia or was planning to travel to

12    Somalia.  The evidence will show that the agents intimated,

13    several times, that they knew that he had done so.  And they

14    asked him, in a roundabout way, whether or not he had done so.

15    They didn't ask him whether or not he had discussed traveling

16    to Somalia on any particular day.

17         The evidence will not show that an agent asked him

18    whether or not he said anything specific.  The -- anything

19    specific that they knew he had already said eight months prior

20    in an hour's long conversation with Dabla Deng.  It won't show

21    that.  In fact, there won't be any evidence that Mr. Simpson

22    was in fact traveling to Somalia.

23         The evidence will show in fact that Mr. Simpson has a

24    passport and that in that passport is a study visa allowing him

25    to stay in South Africa and study.  South Africa, not Somalia.

1           And the evidence will show that the FBI knew this

2      information and that they verified the information that

3      Mr. Simpson was planning on traveling with an appropriate

4      government agency.

5           The evidence will also show that when given the

6      opportunity by Dabla Deng, through the FBI, to travel overseas

7      by showing Mr. Simpson a ruse that Mr. Deng had gotten $10,000

8      and that they could use this money to go over and travel

9      overseas, that Mr. Simpson immediately said, no, we can't use

10     that money, because of how devout his faith is, and because the

11     Muslim faith does not allow gambling.  And because Mr. Deng had

12     apparently won that money in a lottery or that was the ruse was

13     that Mr. Deng had won that money in a lottery.

14          And the evidence will also show that on the day of --

15     that he was questioned, that Mr. Simpson gave truthful answers

16     to every question, questions that could hurt him, questions

17     about other friends, associates, where he was going.

18          And so at the end of the trial, you will be wondering

19     what is this case really about.  It is not about any alleged

20     false statement.  It can't be.  They know the answer.  It's

21     about a lot of time and a lot of money.  And at the end of this

22     case, we will ask that you find Mr. Simpson not guilty.

23          THE COURT:  Thank you.

24          You may present your first witness.

25          MR. MORRISSEY:  Thank you, Your Honor.  The Government

1    calls Jeff Hebert to the stand.

2              (The witness, Jeffrey Hebert, was duly sworn.)

3              THE COURTROOM DEPUTY CLERK:  Would you please state

4    your name and spell it for the record.

5              THE WITNESS:  My name is Jeffrey Hebert, last name

6    spelled H-e-b-e-r-t.

7

8                        JEFFREY HEBERT,

9    called as a witness herein, having been first duly sworn, was

10   examined and testified as follows:

11

12                      DIRECT EXAMINATION

13   BY MR. MORRISSEY:

14   Q.  Agent Hebert, who do you work for?

15   A.  I work for the FBI.

16   Q.  And how long have you worked for the FBI?

17   A.  Almost six years.

18   Q.  What is your assignment for -- with the FBI?

19   A.  I'm assigned to investigate counterterrorism matters.

20   Q.  If you've been with the FBI for six years, how much of that

21   time have you spent assigned to counterterrorism?

22   A.  About five and a half.

23   Q.  And has that five and a half years all been in Phoenix?

24   A.  Yes.

25   Q.  Within your particular squad of the FBI and your assignment

1    to counterterrorism, what is your squad focused on?

2    A.  My squad is focused on Islamic extremists, particularly

3    focused on East Africa and South Asia.

4    Q.  Is Somalia in East Africa?

5    A.  Yes.

6    Q.  In your five and a half years with the FBI on

7    counterterrorism, have you also been a supervisor in the

8    counterterrorism section?

9    A.  Yes.  I'm currently acting as a supervisor for -- to our

10   squad, and over the last 18 months or so I've been supervisor

11   about 12 of those.

12   Q.  As part of your assignment to counterterrorism, have you

13   received training on what is called radical Islam?

14   A.  Yes, I have.

15   Q.  What has been your training?

16   A.  My training has taken various forms.  For example, several

17   years ago, I attended a week-long seminar in San Francisco that

18   was presented by the Counterterrorism Center, which is

19   affiliated with the West Point Military Academy.  It's

20   affiliated with the U.S. Army.

21          The seminar focused mainly on what -- somewhat on the

22   history of Islam in general but mainly on radical Islam,

23   Various events that gave rise to that school of thought as well

24   as those groups that have risen from that school of thought.

25          In addition to that seminar, I have also attended

1    in-house seminars in Phoenix, various counterterrorism subjects

2    such as recruitment of sources within this arena as well as

3    history of radical Islam in Arizona itself.

4    Q.  Okay, let me see if I understand.  In addition to the

5    week-long seminar affiliated with the United States military

6    through West Point, you've taken in-house seminars?

7    A.  Yes.

8    Q.  Those in-house seminars have dealt with recruitment of

9    sources?

10   A.  Yes.

11   Q.  But they've also dealt with the history in Arizona of

12   radical Islam?

13   A.  Yes.

14   Q.  Have you -- have you yourself taught on the subject of

15   counterterrorism?

16   A.  Yes.  Earlier this year I presented about an hour block

17   presentation on the FBI counterterrorism mission to a group

18   that's titled the FBI Citizens Academy, which is individuals

19   from the Phoenix community who are interested in learning more

20   about the FBI.  We present a six-week training course for them.

21   I taught the block on counterterrorism.

22   Q.  Focusing again on East Africa, have you participated in

23   investigation outside of Arizona dealing with American citizens

24   traveling to Somalia to fight jihad?

25   A.  Yes.

1   Q.  As part of your job, have you become familiar with

2   indictments in other jurisdictions arising out of those

3   investigations?

4   A.  Yes.

5           MR. WILLIAMS:  Objection, relevance.

6           THE COURT:  Overruled.  I'll allow it.

7   BY MR. MORRISSEY:

8   Q.  As part of your job, have you learned the recent history of

9   conflicts in Somalia?

10  A.  Yes.

11  Q.  Is the issue of American citizens either funding terrorism

12  overseas in Somalia or participating themselves in arms

13  struggle in Somalia, is that topic a subject of active

14  investigations within the FBI in Arizona and elsewhere?

15  A.  Yes.

16  Q.  Now, to participate in those investigations, have you had

17  to learn the recent history of conflicts in Somalia?

18  A.  Yes.

19  Q.  What is the Transitional Federal Government in Somalia?

20  A.  The Transitional Federal Government --

21          MR. WILLIAMS:  Objection, foundation.

22          THE COURT:  Just one moment.  Can you lay more

23  foundation on that?

24          MR. MORRISSEY:  Yes.

25  BY MR. MORRISSEY:

1   Q.  You've participated in investigations within Arizona

2   relating to whether individuals would travel to Somalia for

3   purposes of fighting jihad, correct?

4   A.  Yes, I have.

5   Q.  You've participated in investigations in another

6   jurisdiction, correct?

7   A.  Yes, I have.

8           MR. WILLIAMS:  Objection, leading.

9           MR. MORRISSEY:  Your Honor, I'm just establishing a

10  foundation.

11          THE COURT:  Overruled.

12  BY MR. MORRISSEY:

13  Q.  And what was that jurisdiction?

14  A.  It was Minneapolis, Minnesota.  I think that's the District

15  of Minnesota.

16  Q.  And have there been, to your knowledge, if you know, have

17  there been indictments arising out of the District of Minnesota

18  on the subject of either funding or American citizens actively

19  going to Somalia to fight?

20  A.  Yes, there have.  Over the last two to three years, there

21  have been several --

22          MR. WILLIAMS:  Objection, nonresponsive, calls for a

23  "yes" or "no" answer.

24          THE COURT:  He participated in that investigation.  Is

25  that what you're trying to establish to lay the foundation for

1     the question?

2              MR. MORRISSEY:  Yes.

3              THE COURT:  Okay.  He answered that.  This question

4     asks about that investigation.

5              MR. MORRISSEY:  Judge, if it's -- I can ask another

6     question.

7              THE COURT:  Okay.

8     BY MR. MORRISSEY:

9     Q.  From your participation in those investigations, have you

10    had to take steps to learn about the history of conflicts in

11    Somalia?

12    A.  Yes.

13    Q.  What type of steps -- well, let me back up.

14             In your training within the FBI on counterterrorism,

15    which we've established includes the week-long course at

16    West Point, do you recall that?

17    A.  Yes.

18    Q.  Did the course at West Point cover the subject of Somalia?

19    A.  Briefly.

20    Q.  Did in-house training within the Arizona division of the

21    FBI cover the conflict in Somalia?

22    A.  Yes.

23    Q.  And who covered that, and what was the type of teaching you

24    received?

25    A.  The teaching was presented by other agents within the

1  bureau, specifically within Phoenix, who have worked at this

2  location longer than I have.  The training was provided in a

3  small, informal seminar setting, where we met at a bureau

4  conference room and the subject matter expert, if you will,

5  within the bureau presented it to agents who were willing to

6  learn about the subject.

7  Q.  And the subject broadly, is that East Africa?

8  A.  Yes.

9  Q.  And in particular was Somalia one of the subjects as you

10  were taught about the counterterrorism efforts of the FBI?

11  A.  Yes.

12  Q.  Did the speakers include in their teaching the recent

13  history of conflicts in Somalia?

14  A.  Yes.

15  Q.  In addition to in-house seminars, have you also on your

16  own, for your job focusing on East Africa, researched the

17  conflicts in Somalia?

18  A.  Yes, I have.

19  Q.  What methods and sources have you used to do that?

20  A.  I've read various books, read various papers and done

21  research on the Internet.

22  Q.  When you speak about doing research on the Internet, do

23  Islamic groups in Somalia issue press releases?

24  A.  Yes, they do.

25  Q.  Have you reviewed their claims of responsibility for

  1   certain acts?

  2   A.  I have.

  3           MR. WILLIAMS:  Objection, relevance.

  4           THE COURT:  Well, are you still laying foundation or

  5   have you gone --

  6           MR. MORRISSEY:  I'm laying foundation for why he is

  7   able to speak about what is the Transitional Federal Government

  8   in Somalia.

  9           THE COURT:  All right.  Go ahead and proceed.

 10   BY MR. MORRISSEY:

 11   Q.  In your research, have you reviewed videotapes by Osama

 12   Bin Laden with respect to Somalia?

 13   A.  One on Islam.

 14   Q.  Based on your training within the FBI, including in-house

 15   training, and your own efforts, including reading of books,

 16   what is the Transitional Federal Government in Somalia?

 17           MR. WILLIAMS:  Objection, foundation.

 18           THE COURT:  Overruled.

 19           THE WITNESS:  The Transitional Federal Government is

 20   the U.S. and U.N. recognized and backed legitimate government

 21   of Somalia.

 22   BY MR. MORRISSEY:

 23   Q.  And when was that installed?

 24   A.  That was established in 2004.

 25   Q.  What is the capital of Somalia?

1    A.  Mogadishu.  It's spelled M-o-g-a-d-i-s-h-u.

2    Q.  From your research into the conflict in Somalia, have

3    Islamic militants targeted the Transitional Federal Government?

4    A.  Yes, they have.

5    Q.  Would you describe that?

6    A.  In approximately 2005, a loose coalition of Islamic groups

7    in Somalia established an organization called the Islamic

8    Courts Union.  That union used armed conflict to fight

9    Transitional Federal Government, TFG as we call it, and were

10   successful in actually pushing TFG out of Mogadishu in 2005.

11   Q.  Did the Transitional Federal Government, if pushed out of

12   Mogadishu, still remain in Somalia?

13   A.  Yes, they --

14          MR. WILLIAMS:  Objection, foundation.

15          THE COURT:  Well, what is the relevance?

16          MR. MORRISSEY:  Your Honor, I need to show the

17   definition of international terrorism, that Mr. Simpson's

18   activities dealt with activities involving violence overseas

19   that targeted either a government or a civilian population.  So

20   I need to show what the situation was in Somalia so that this

21   Court can make a determination whether or not Mr. Simpson, if

22   he made a false statement, made a false statement involving

23   international terrorism within definition of 18 U.S.C. Section

24   2331.

25          THE COURT:  Do you want to respond?

1          MR. WILLIAMS:  I would object.  This is information

2    that Agent Hebert may be aware of through his experience, but

3    there's no indication that this can be attributed to

4    Mr. Simpson.  And I don't believe that this testimony is

5    relevant.

6          THE COURT:  Overruled.  You may proceed.

7    BY MR. MORRISSEY:

8    Q.  Did the Islamic Courts Union announce its goals for

9    Somalia?

10   A.  The goal of the Islamic Courts Union was to establish

11   sharia law for all of Somalia.

12   Q.  From your training within the FBI, do you know what sharia

13   law is?

14         MR. WILLIAMS:  Objection, foundation.

15         THE COURT:  Overruled.

16         THE WITNESS:  Yes.  Sharia law is an all encompassing

17   set of rules that includes criminal, civil, and day-to-day

18   living that a true Muslim must live by to follow the path of

19   Islam.

20   BY MR. MORRISSEY:

21   Q.  Did the Islamic Courts Union have a faction called

22   Al Shabaab?

23   A.  Yes, they did.

24   Q.  Would you spell Al Shabaab?

25   A.  A-l space S-h-a-b-a-a-b.

1   Q.  And what does Al Shabaab translate to?

2            MR. WILLIAMS:  Objection, foundation.

3            THE COURT:  Well, that's sustained.

4   BY MR. MORRISSEY:

5   Q.  Agent Hebert, in your research into the conflict in

6   Somalia, as well as your efforts to learn about East Africa,

7   have you had to become familiar with certain terms of Islam

8   that have a specialized meaning?

9   A.  Yes, I have.

10  Q.  Was the phrase 'sharia' one of those terms?

11  A.  Yes, it was.

12  Q.  Have you, in your counterterrorism, had to learn the names

13  of groups engaged in targeting the United States or its allies?

14  A.  Yes, I have.

15  Q.  Is Al-Qaeda one of those names?

16  A.  Yes, it is.

17  Q.  What does "Al-Qaeda" means?

18  A.  It means the base.

19           MR. WILLIAMS:  Objection, foundation.

20           THE COURT:  Overruled.

21  BY MR. MORRISSEY:

22  Q.  From what source -- when you learn the translations of

23  words such as Al-Qaeda, or sharia law, how do you learn what

24  those words mean?

25  A.  I learn in various methods.  The easiest way is we have

1   Arabic linguists on staff with the FBI.  If need be, I can ask

2   them to translate for me.  Also usually these translations are

3   either available on the Internet or from context of other

4   readings, it's apparent what they mean.

5   Q.  Have you learned the translation of the word Al Shabaab

6   from such a source?

7   A.  Yes.

8   Q.  What does Al Shabaab mean?

9          MR. WILLIAMS:  Objection, foundation, hearsay.

10          THE COURT:  And this is the translation of what word?

11          MR. MORRISSEY:  Al Shabaab.

12          THE COURT:  Overruled, you may answer.

13          THE WITNESS:  Al Shabaab means the youth.

14  BY MR. MORRISSEY:

15  Q.  Has the Transition Federal Government maintained in control

16  since 2004?

17  A.  In Somalia, yes.

18  Q.  Have there been any foreign interventions in Somalia --

19  A.  Yes.

20  Q.  -- in the last five years?

21  A.  Yes, there have.

22  Q.  Describe that.

23          MR. WILLIAMS:  Objection, relevance.

24          MR. MORRISSEY:  Your Honor.

25          THE COURT:  Overruled.

1          MR. MORRISSEY:  You may answer.

2          THE WITNESS:  In 2006, the Ethiopian government with

3     their Army invaded Somalia with the blessing of the TFG in

4     order to help reestablish the TFG within Mogadishu with the

5     ultimate goal of establishing a government for the entire

6     country.

7     BY MR. MORRISSEY:

8     Q.  Since 2006 to the present day, has armed conflict remained

9     in Somalia between the TFG and Islamic militants?

10    A.  Yes, it has.

11    Q.  Have Islamic militants used killings and violence in that

12    armed conflict to target the government?

13         MR. WILLIAMS:  Objection, leading, foundation.

14         THE COURT:  Well, it is leading.  I'm going to allow

15    it, but at this point, Mr. Morrissey, if you could not lead as

16    much, but go ahead and answer this question.

17         THE WITNESS:  Would you repeat the question, please.

18    BY MR. MORRISSEY:

19    Q.  The question was have Islamic militants used killings and

20    violence to target the government of Somalia?

21    A.  Yes, they have.

22    Q.  Would you give examples from recent history of attacks that

23    targeted either the government or the civilian population?

24    A.  Examples of both most recently, Islamic militants in

25    Somalia --

 1            MR. WILLIAMS:  Objection, relevance.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  Militants in Somalia used a suicide

 4    bomber to plant a bomb outside of the parliament building in

 5    Mogadishu targeting the Somalia parliament.  That is part of

 6    the TFG.

 7            In addition, militants have often targeted civilian

 8    journalists who reported negatively on their activities.

 9            They've also been NGOs --

10            THE COURT REPORTER:  I didn't hear that, Your Honor.

11            THE WITNESS:  Nongovernmental organizations.

12    BY MR. MORRISSEY:

13    Q.  And the civilian population as well, have there been

14    attacks within the past six months?

15    A.  Yes, there have.

16    Q.  Could you -- other than the journalists, are there any

17    other examples that you can give?

18    A.  Yes, Al Shabaab recently claimed responsibility for

19    multiple suicide bomber attacks in the country of Uganda.  The

20    attack was targeted at two groups that were engaged in watching

21    World Cup soccer matches.  The stated purpose of this attack

22    against civilian populations was to try to force Ugandan

23    troops, who are backing the TFG, to leave Somalia.

24    Q.  You spoke before about review of at least one recording by

25    Osama Bin Laden; is that correct?

1    A.   That's correct.

2    Q.   Was that on the subject of Somalia?

3    A.   Yes, it was.

4    Q.   What was the date of that recording?

5    A.   I believe the date was May 19th, 2009.

6    Q.   And what was the title of that recording?

7    A.   The title was fight on, champion of Somalia.

8    Q.   And what was the message of that recording?

9    A.   In the recording, Osama Bin Laden was encouraging all --

10             MR. WILLIAMS:  Objection, relevance, hearsay.

11             THE COURT:  Well --

12             MR. WILLIAMS:  Confrontation.

13             THE COURT:  He's talking about the recording that he

14   heard?

15             MR. MORRISSEY:  He listened to the recording.  He can

16   state what the recording said.

17             THE COURT:  Overruled.  You may allow -- you may --

18             THE WITNESS:  The recording stated in Bin Laden's

19   voice that all true Muslims should try to support --

20             MR. WILLIAMS:  Your Honor, I would object, foundation

21   as to whether or not this was in English or Arabic.

22             THE COURT:  Can you ask?

23   BY MR. MORRISSEY:

24   Q.   Agent Hebert, does the FBI track the recordings released by

25   Osama Bin Laden?

1    A.  Yes.

2    Q.  Are those publicized not just in the public, but within the

3    FBI?

4    A.  Yes.

5    Q.  Have you -- do you have access to those audio tapes once

6    they are released?

7    A.  Yes.  Although audio tape, listened on You Tube.

8    Q.  And not within the FBI?

9    A.  Correct.

10   Q.  So you did research on You Tube and you found the tape?

11   A.  Yes.

12   Q.  Did you know whether or not the May 2009 Bin Laden audio

13   tape on the subject of Somalia has been deemed authentic?

14   A.  Yes.

15   Q.  And what is the answer?

16   A.  It has been deemed authentic.

17   Q.  Having reviewed that video, the -- or the audio tape, was

18   it in translation that you listened to it?

19   A.  No.  The audio tape was in a language I think was Arabic

20   with English subtitles.

21   Q.  English scrolling subtitles?

22   A.  Correct.

23   Q.  What was the message in English scrolling subtitles of

24   Bin Laden's May 2009 message on Somalia?

25        MR. WILLIAMS:  Objection, foundation, and hearsay.

1          THE COURT:  Well, overruled.  You may --

2          THE WITNESS:  The message was it is urging all true

3    Muslims to support the jihad in Somalia in any way possible,

4    preferably by joining the battle themselves.  But if that was

5    not possible, then through any other means, whether financially

6    or anything else.

7    BY MR. MORRISSEY:

8    Q.  Is it within the FBI's jurisdiction to deter and disrupt

9    American citizens potentially traveling to engage in jihad

10   overseas or terrorist acts?

11   A.  Yes, it is.

12   Q.  What is the source of that authority for the FBI?

13   A.  The main source is through executive order.  I believe the

14   two that pertain the most is Executive Order 12333 and 12444.

15   But there are others that pertain as well.

16   Q.  Does the FBI's jurisdiction extend to investigations into

17   violations of the United States Criminal Code?

18   A.  Yes, it does.

19   Q.  Does that include the portions of the United States

20   Criminal Code dealing with counterterrorism?

21   A.  Yes, it does.

22   Q.  Does that include violations against providing material

23   support to terrorists?

24   A.  Yes.

25   Q.  Does that jurisdiction include investigations whether a

1    potential terrorist group is designated by the State Department

2    or not?

3    A.  It doesn't matter whether it's designated or not.

4    Q.  Okay.  Is an American citizen who provides himself as a

5    fighter to a group seeking to coerce the civilian population or

6    target a foreign government, is that considered material

7    support to terrorists?

8    A.  Yes, it is.

9    Q.  Is that a violation of 18 U.S.C. Section 2339(a) or

10   2339(b)?

11   A.  One of the two.

12   Q.  Okay.  Is the difference one of those sections deals with

13   designated terrorist groups?

14   A.  Yes.

15   Q.  And the other one does not?

16   A.  Correct.

17   Q.  As of 2009, were you part of a criminal investigation into

18   whether or not Mr. Simpson or his associates intended to travel

19   to foreign countries to fight jihad?

20   A.  I was.

21   Q.  Prior to 2009, had you met Mr. Simpson personally?

22   A.  I had.

23   Q.  When was that?

24   A.  That was in March 2007.

25   Q.  And when you had contact with Mr. Simpson in March 2007,

 1   what was the purpose of that contact?

 2   A.  The purpose of the contact was to interview Mr. Simpson

 3   regarding his knowledge of the activities of Hassan Abu Jihaad.

 4   Q.  Who was Hassan Abu Jihaad?

 5   A.  Hassan Abu Jihaad was an individual that we, the FBI in

 6   Phoenix, had recently arrested on charges of material support

 7   to terrorism.

 8   Q.  Material support to terrorists?

 9   A.  Correct.

10   Q.  Where did you have contact with Mr. Simpson on that day?

11   A.  We contacted Mr. Simpson at an associate's house, the

12   residence of Abdul Khabir Hyman.

13   Q.  Would you spell that name, please.

14   A.  Abdul is A-b-d-u-l.  Khabir, is K-h-a-b-i-r.  Hyman is

15   H-y-m-a-n.

16   Q.  Was the date of that contact March 8th, 2007?

17   A.  Yes.

18   Q.  And would you describe what happened on that day?

19   A.  Myself and four other agents went to Mr. Hyman's house.  We

20   had information that Mr. Hyman and Mr. Simpson were both there.

21   When we arrived at the house, Mr. Hyman led us into the house.

22   Mr. Hyman, along with two other agents, went into another room

23   to talk.  Myself and Agent Lance Turner and Agent John Volby

24   attempted to interview Mr. Simpson.

25   Q.  And did you tell -- you identified yourself as FBI?

1    A.  Correct.  Mr. Volby is an agent with ICE.  Mr. Turner and I

2    are both FBI agents.

3    Q.  Did yourself and Mr. Turner identify yourselves as FBI

4    agents?

5    A.  Yes, we did.

6    Q.  Did you tell Mr. Simpson what you wanted to talk to him

7    about that day?

8    A.  Yes.  We indicated that we would like to discuss Hassan Abu

9    Jihaad with him.

10   Q.  What did Mr. Simpson say?

11   A.  Mr. Simpson said Hassan Abu Jihaad is a good brother, and

12   that's all he had to say about that subject.

13   Q.  So was Mr. Simpson willing to have a discussion with you on

14   that day about Mr. Abu Jihaad?

15   A.  No, once he made that statement to us, he did not say

16   anything else at that point.

17   Q.  Did you honor his refusal to discuss that subject?

18   A.  Yes.

19   Q.  Was -- was that the end of any questioning by you on that

20   day about Mr. Hassan Abu Jihhad?

21   A.  Yes.

22   Q.  Did anybody talk about any other subjects that day?

23   A.  Yeah.  We -- we waited several minutes.  We were waiting

24   for the other agent to finish the interview of Mr. Hyman.

25   During that time, Agent Volby and Mr. Simpson had a general

1    discussion about Islam.

2    Q.  Okay.

3            THE COURT:  Just a second, I'm just going to ask you

4    to pause here because I think I saw Mr. Mitchell.

5            MR. JEFF WILLIAMS:  He just went downstairs.  Do you

6    want me to go get him?

7            THE COURT:  Please.  I didn't want to interrupt

8    earlier, but I think I would like to go ahead and have him

9    confer.

10           MR. MORRISSEY:  I would too, Your Honor.  To

11   facilitate that, is -- is a very short break appropriate?

12   Because Mr. Deng doesn't know Mr. Mitchell.  He does know

13   certain agents that he's with.  I don't anticipate them sitting

14   in on that discussion, but at least the introduction.

15           THE COURT:  Let's go ahead and go for another ten

16   minutes and then we will take our break.

17           MR. MORRISSEY:  Okay.

18   BY MR. MORRISSEY:

19   Q.  On -- on January 7th, 2010, did you know whether or not

20   Mr. Simpson had plans to travel outside the United States?

21   A.  Yes, we did.

22   Q.  From what sources did you know whether he had plans?

23   A.  We knew from Mr. Dabla Deng who told us as well as through

24   a check of Customs' and Border Protection's database which

25   maintains airline reservations into and out of the U.S.

1  Q.  And is that accessible by agents of the Federal Bureau of

2  Investigation?

3  A.  It is through a task force officer assigned to our Joint

4  Terrorism Task Force.

5  Q.  And is that how you accessed it?

6  A.  Yes.

7  Q.  Mr. Deng, as of that time, was Mr. Deng acting as a

8  confidential informant for the FBI?

9  A.  Yes, he was.

10  Q.  Who was the handling agent for Mr. Deng?

11  A.  I was.

12  Q.  With respect to Mr. Simpson, what did you ask Mr. Deng to

13  do?

14  A.  We first showed Mr. Deng a photo of Mr. Simpson with no

15  label or name attached.  Mr. Deng indicated that he had seen

16  Mr. Simpson before.

17        MR. WILLIAMS:  Objection, as to time, foundation.

18        MR. MORRISSEY:  Certainly.

19  BY MR. MORRISSEY:

20  Q.  When did you first meet Mr. Deng?

21  A.  I first met Mr. Deng in May 2005.

22  Q.  When did you first have a discussion with Mr. Deng

23  regarding Mr. Simpson?

24  A.  It would have been fall, 2006.

25  Q.  In fall of 2006, what did you ask Mr. Deng to do with

1  respect to Mr. Simpson?

2  A.  We asked Mr. Deng to become friends with Mr. Simpson, get

3  to know him better.

4  Q.  And how was he to do that?

5  A.  Mr. Deng indicated that he had seen Mr. Simpson at the

6  mosque.  We asked him to attempt to introduce himself to

7  Mr. Simpson and to offer himself as a recent convert to Islam

8  who was willing to learn more from somebody who had more

9  experience.

10  Q.  As part of Mr. Deng getting to know Mr. Simpson, was

11  Mr. Deng going to make recordings of his contact with

12  Mr. Simpson?

13  A.  Yes.

14  Q.  And describe the process by which recordings were made and

15  if you would include how you would then take custody of those

16  recordings and what you would do with them.

17  A.  Yes.  Prior to Mr. Deng meeting with Mr. Simpson, he and I

18  would meet and I would give Mr. Deng a body recording device.

19  Then Mr. Deng would be instructed to start the recording device

20  and record a time and date stamp essentially prior to his

21  meeting with Mr. Simpson.  He would then turn the recording off

22  and turn it back on again before meeting with Mr. Simpson.

23        Once his meeting with Mr. Simpson concluded, he again

24  turned that device off.  He would then call me to let me know

25  that he had met with Mr. Simpson.  Usually within the next day

1    or two, Mr. Deng and I would meet.  Mr. Deng would give me the

2    recording device and I would give him a new clean recording

3    device for his next meeting.

4    Q.  Okay, let me stop you there and ask, when you were given

5    the recording devices that had been used by Mr. Deng, what

6    would you do with them?

7    A.  I would then take them to our electronic evidence

8    technicians.  They would download the digitally recorded

9    conversations from the device onto either CD or DVD.

10   Q.  Those digital recordings, do those have a -- a date and

11   time stamp?

12   A.  Yes, they do.

13   Q.  So Mr. Deng was instructed most of the time to say what day

14   it was?

15   A.  Correct.

16   Q.  But even if he did not, they were time stamped?

17   A.  Correct.

18   Q.  Once you gave it to the electronic evidence unit, what

19   would happen to the digital recordings?

20   A.  Like I said, the digital recordings would be downloaded to

21   a CD or DVD.  The techs in the evidence room would play

22   snippets of the CD or DVD to ensure that it was properly

23   transferred to that storage media.  Once that was done, they

24   would erase the original recording device so it could be

25   reused.

1           MR. MORRISSEY:  May the witness be shown what has been

2    marked as Exhibits 1 through 6?

3           THE COURT:  Yes, he may.

4    BY MR. MORRISSEY:

5    Q.  Agent Hebert, you may need to open up the envelopes and

6    determine the dates on those exhibits, if you could do that.

7    A.  Do you want me to read them out to the Court?

8    Q.  No, I want you to read them to yourself.

9           Agent Hebert, have you listened to each of those

10   recordings?

11   A.  I've listened to at least portions of these recordings.

12   Q.  And has your review been of large portions of most of those

13   recordings?

14   A.  Yes.

15   Q.  From your contact with Mr. Deng, are you able to recognize

16   Mr. Deng's voice?

17   A.  Yes.

18   Q.  From contact with Mr. Simpson, are you able to recognize

19   Mr. Simpson's voice?

20   A.  Yes.

21   Q.  From your -- oh, when the electronic evidence people at the

22   FBI make the recordings, what do they do to determine that the

23   transfer has gone appropriately and that there was not a

24   malfunction?

25   A.  As I said, they listened to snippets of that conversation

1    on the storage media.

2    Q.  To make sure it recorded?

3    A.  Correct.

4    Q.  From your review of Exhibits 1 through 6, did any of those

5    recordings ever malfunction and not produce a recording?

6    A.  No.

7          MR. MORRISSEY:  Your Honor, at this point I will offer

8    Government's Exhibits 1 through 6.

9          MR. WILLIAMS:  No objection.

10          THE COURT:  All right.  They are admitted.

11    BY MR. MORRISSEY:

12    Q.  Agent Hebert, going back to approximately January 2010, you

13    stated as of January 7th you had researched in the Customs and

14    Border Patrol system --

15    A.  Customs and Border Protection.

16    Q.  Okay.  Where Mr. Simpson had a flight to.

17    A.  Yes.

18    Q.  Do you recall that?

19    A.  Yes.

20    Q.  Where did he have a flight to?

21    A.  South Africa.

22    Q.  Did he have a passport?

23    A.  Yes.

24    Q.  Is Mr. Simpson an American citizen?

25    A.  He is.

1    Q.  As of January 7th, 2010, were you continuing to investigate

2    whether or not Mr. Simpson or his associates might travel to a

3    foreign country for material support of terrorism?

4    A.  We were.

5    Q.  Did you go see Mr. Simpson that day?

6    A.  Yes.

7    Q.  Who were you with?

8    A.  I was with Agent Turner and Agent Storm.

9    Q.  Where did you speak to Mr. Simpson that day?

10   A.  We spoke to Mr. Simpson in front of his parents' house

11   where he was living.

12   Q.  Could you tell us how the contact began that day?

13   A.  Yes.  Agent Turner knocked on the door.  Mr. Simpson

14   answered.  We identified ourselves as FBI agents.  We asked

15   Mr. Simpson if we had a minute -- or if he had a minute of time

16   to spare to speak with us.  He indicated that he would speak

17   with us.  We asked if we could come into the house.  He said

18   no, but he offered to come outside and speak with us, which he

19   did.

20   Q.  Mr. Simpson wanted to speak outside?

21   A.  Yes, he actually took the time to close the door, put on

22   his shoes, and come outside.

23   Q.  When Mr. Simpson came outside, where was the group?

24   A.  Approximately 10 or 15 feet from the front door.

25   Q.  And it was yourself, Agent Turner, Agent Storm and

1    Mr. Simpson?

2    A.  Correct.

3    Q.  Anybody else there?

4    A.  No.

5    Q.  Did you or any other agent make any promises to Mr. Simpson

6    that day to induce him to speak with you?

7    A.  No.

8    Q.  Did you threaten him in any way so that he would speak to

9    you?

10   A.  No.

11   Q.  Did you coerce him in any way?

12   A.  No.

13   Q.  Was he in your custody on that day?

14   A.  No.

15   Q.  What was Mr. Simpson asked that day?

16   A.  We asked Mr. Simpson first if he knew or had any idea why

17   we would want to speak to him that day.

18   Q.  What did Mr. Simpson say?

19   A.  He said he had no idea.

20   Q.  Well, after that, what did you talk about?

21   A.  We asked if he had plans to travel to South Africa.  He

22   said he planned on leaving the next week.  He told us he had

23   his passport and his plane ticket and was waiting on his visa.

24   Q.  Did he tell you what the purpose of his travel was to

25   South Africa?

1    A.  He indicated that he wanted to -- or he was planning on

2    going there to study at the madrassa and study Islam.

3    Q.  Did you ask Mr. Simpson how long he was going to be gone?

4    A.  Yes.  He indicated that he would be gone approximately five

5    years.

6    Q.  Was Mr. Simpson asked the name of the school?

7    A.  Mr. Simpson was asked that name.  He refused to give it to

8    us.  He said since we were with the FBI, we should know that

9    information already and he wasn't going to make our job any

10   easier.

11   Q.  Just on that point, and maybe to get out of order here,

12   Mr. Simpson declined at that point to give you the name of the

13   school?

14   A.  Yes, he did.

15   Q.  Did Mr. Simpson later provide that information to the FBI?

16   A.  Yes.  He later left a message on Agent Storm's answering

17   machine with the name of the school.

18   Q.  When you asked Mr. Simpson on whether he had plans to

19   travel to South Africa, he confirmed he did?

20   A.  Yes.

21   Q.  Was Mr. Simpson asked whether, once he got to South Africa,

22   he planned on staying in South Africa?

23   A.  Yes.

24   Q.  And what did he say?

25   A.  He said he had no firm plans on what he would do once he

1    finished his studies.

2    Q.  Did you have a follow-up question on that topic?

3    A.  Well, just to clarify, it was Mr. -- Agent Turner that was

4    doing most of the questioning at that point.

5    Q.  Okay.  And where were you standing?

6    A.  I was standing next to Agent Turner.

7    Q.  Could you hear every question directly asked by Agent

8    Turner?

9    A.  Yes.

10   Q.  Could you hear every answer given by Mr. Simpson?

11   A.  Yes.

12   Q.  Is every answer that you've given us about what Mr. Simpson

13   said based on the fact that you heard that answer?

14   A.  Yes.

15   Q.  Was there a follow-up to the question about what

16   Mr. Simpson -- whether Mr. Simpson planned on staying in

17   South Africa?

18   A.  Yes.

19          MR. WILLIAMS:  Your Honor, I would object as to the

20   form of the question and to hearsay of -- if Agent Hebert is

21   not the one asking the questions.

22          MR. MORRISSEY:  May I respond, Your Honor?

23          THE COURT:  Well, can you clarify that in your

24   question?

25          MR. MORRISSEY:  Yes.  But if I can respond?

1            THE COURT:  Yes.

2            MR. MORRISSEY:  If Agent Hebert hears and he's

3    standing next to Agent Turner asking the question, the

4    question -- Mr. Hebert's question, though, that does not go to

5    the truth the matter.  The answer hough is the defendant's own

6    statement.  That's why Agent Hebert can testify about what he

7    heard Agent Turner ask Mr. Simpson.

8            MR. WILLIAMS:  Your Honor, I'm sorry, this charge is

9    about false statements.  And I believe the truth of the matter

10   is relevant and that this individual, he did not ask the

11   question.  And that testimony would be hearsay.

12           THE COURT:  Well, Mr. Hebert is going to testify,

13   Agent Hebert?

14           MR. MORRISSEY:  Hebert is here.

15           THE COURT:  I'm sorry, Mr. Turner is going to testify?

16           There's been no rule invoked so everybody is here.  So

17   the issue regarding that --

18           MR. MORRISSEY:  I think we have informally followed

19   that.  I don't have any witnesses of mine in the courtroom.

20           THE COURT:  The confidential informant is not here?

21           MR. MORRISSEY:  Not in the courtroom.

22           THE COURT:  Okay.  All right.  I just wanted to make

23   sure about that.  So he can testify, this witness can testify

24   to what he heard the question to be, and the response.  Please

25   proceed.

1          THE WITNESS:  Repeat the question, please.

2    BY MR. MORRISSEY:

3    Q.  The -- you and I have just discussed that Mr. Simpson was

4    asked whether or not while he was in South Africa he planned on

5    staying in South Africa.

6    A.  Correct.

7    Q.  And just repeat, what did Mr. Simpson say?

8    A.  He told us after he finished his studies, he had no firm

9    plans on what he would do next.

10   Q.  Did Agent Turner ask a follow-up question at that point?

11   A.  Yes, Mr. Turner asked if Mr. Simpson had discussed with

12   anyone traveling to Somalia from South Africa.

13   Q.  What did Mr. Simpson say in response?

14   A.   Mr. Simpson did not give a direct answer.  Instead he

15   responded, and I don't remember the exact words he used, but

16   something to the effect of I don't know why you would ask me

17   that, or I don't know where you're getting that, something like

18   that.

19   Q.  Was -- did Agent Turner ask Mr. Simpson more than once

20   whether he had discussed with anyone traveling to Somalia?

21   A.  He did ask that several times in various formats.

22   Q.  And you said that Mr. Simpson at that point questioned why

23   he was being questioned?

24   A.  Yes.

25   Q.  Did that habit repeat itself?

1    A.  Yes.

2    Q.  At some point did you ask Mr. Simpson a question yourself?

3    A.  Yes.  Prior to that, though, just to clarify, Mr. Turner

4    also asked Mr. Simpson if he would know of any reason why

5    somebody else would tell the FBI that Mr. Simpson had discussed

6    traveling to Somalia.  Again, he answered that he had no idea

7    why the FBI would ask him that or why anybody would say that

8    about him.  It was at that point that I then took over

9    questioning Mr. Simpson.

10           I asked him several times if he had discussed with

11   anyone traveling to Somalia.  Again, Mr. Simpson did not want

12   to give a direct answer or I should say did not give a direct

13   answer.

14           At that point, I told Mr. Simpson it's a simple

15   question, I want a "yes" or "no" answer.  "Yes" or "no," did

16   you discuss traveling to Somalia.

17   Q.  With anyone?

18   A.  With anyone.

19   Q.  And what did Mr. Simpson say?

20   A.  No.

21   Q.  He said, no, he had not?

22   A.  Correct.

23   Q.  Did you ask, once Mr. Simpson had denied discussing with

24   anyone traveling to Somalia, did you ask a follow-up question?

25   A.  Yes, I asked:  So you don't want to participate in a

1   violent jihad?  To which he responded no.

2   Q.  He said no, he did not?

3   A.  Correct.

4   Q.  What happened at that point in the interview?

5   A.  Two things happened.  One, Mr. Simpson's father returned to

6   the residence.  So Agent Storm left our interview to go speak

7   with Mr. Simpson's father.  In addition, Mr. Turner resumed

8   questioning and showed Mr. Simpson several photographs.

9   Q.  And do you know what photographs were shown to Mr. Simpson?

10  A.  Yes.  He was shown photographs of Dabla Deng, John Sabari,

11  Roberto Yong, and Saabir Nurse.

12  Q.  With regard to Mr. Deng, did Mr. Simpson recognize

13  Mr. Deng?

14  A.  Yes, he did.

15  Q.  Was Mr. Simpson asked anything about Mr. Deng?

16  A.  Yes.  He was asked if Mr. Deng had a ticket to Africa, why

17  would he have that.  Mr. Simpson responded that he would likely

18  be returning to his homeland to live.

19  Q.  And to be clear, Mr. Simpson was not told on that day that

20  Mr. Deng had been cooperating with the FBI, correct?

21  A.  Correct.

22  Q.  What did -- did Mr. Simpson recognize John Sabari?

23  A.  Yes, he did.

24  Q.  How do you spell Sabari?

25  A.  S-a-b-a-r-i.

1   Q.  And what did he say about Mr. Sabari?

2   A.  He said Mr. Sabari is a good Muslim that he knows from the

3   community, and to his knowledge, Mr. Sabari had no plans to

4   travel outside the U.S.

5   Q.  Did Mr. Simpson recognize Mr. Yong?

6   A.  Yes, he did.

7   Q.  How do you spell Yong?

8   A.  Y-o-n-g.

9   Q.  And what did Mr. Simpson say about Mr. Yong?

10  A.  He also said Mr. Yong was a Muslim that he knew from the

11  community.  He was currently unemployed and Mr. -- to

12  Mr. Simpson's knowledge, he also had no plans to travel.

13  Q.  Did Mr. Simpson recognize Saabir Nurse?

14  A.  Yes, he did.

15  Q.  What did he say about Mr. Nurse?

16  A.  He said Mr. Nurse is another Muslim that he knows.  He had

17  actually known Mr. Nurse since high school, but at the time he

18  did not know that Mr. Nurse was a Muslim.

19  Q.  Was there any discussion -- did you or Mr. Turner ask

20  Mr. Simpson for his assessment of that group, Mr. Deng,

21  Mr. Sabari, Mr. Yong, as a whole?

22  A.  We didn't ask for an assessment.  We asked if Mr. Simpson

23  got together with everybody at the same time.  He indicated

24  that he did approximately three times a month to discuss

25  current events and spend time together.  He then volunteered

1    that the FBI would have nothing to worry about in that group.

2    Q.  What happened at this time in the interview?

3    A.  We were preparing to leave.  We thanked Mr. Simpson for his

4    time.  We were in the process of shaking his hand.  He then

5    inquired of us if we knew anything about Hassan, who we took to

6    mean Hassan Abu Jihaad.

7    Q.  Let me stop you there.  When Mr. Simpson asked about

8    Mr. Hassan, did you confirm that he meant Hassan Abu Jihaad?

9    A.  Yes.

10   Q.  And what was his question about Mr. Hassan Abu Jihaad?

11   A.  He asked if we knew anything about his appeal.

12   Q.  And were you able to give him any information about that

13   appeal?

14   A.  No, I -- we -- neither Agent Turner nor myself knew

15   anything about it, so we did not.

16   Q.  Did he tell you why he was asking about Abu Jihaad?

17   A.  I don't recall.

18   Q.  At -- was this essentially the end of the interview?

19   A.  Yes.

20   Q.  When Mr. Simpson denied to you that he had discussed

21   traveling to Somalia, did you feel that was a truthful

22   statement?

23   A.  No, we felt he was lying.

24   Q.  If you believed that that was not a truthful statement, did

25   Mr. Simpson's statement have any effect or was it capable of

1   influencing what the FBI was going to do in its investigation?

2   A.  Yes, we felt due to his deception, that he really did

3   truly -- he had talked about obviously going to Somalia, and if

4   given the opportunity, he would go.  As such, it was our

5   responsibility, given our investigative priorities, to try to

6   prevent or disrupt that travel any way we could.

7           As such, we attempted to have Mr. Simpson added to the

8   TSA no fly list.  We were unsuccessful in doing that.  Our next

9   step would have been to request authority to notify the

10  South African authorities that he was in fact traveling there.

11  Q.  Let me stop you there.  With respect to the attempt to

12  place Mr. Simpson on the no fly zone, you spoke to him on

13  January 7th, 2010?

14  A.  Correct.

15  Q.  When was he scheduled to leave?

16  A.  January 15th, 2010.

17  Q.  Is placing somebody on the no fly zone, can it be a

18  time-consuming process?

19  A.  Yes.

20  Q.  You attempted to do that?

21  A.  Yes.  And although the time wasn't really a factor, we were

22  actually denied authority for that.

23  Q.  With respect to permission to tell the South African

24  government about Mr. Simpson, who would you have had to have

25  sought authority from?

1    A.  The Attorney General.

2    Q.  Was that a step that was being considered after the

3    interview with Mr. Simpson?

4    A.  Yes.

5    Q.  Were there steps that needed to be taken with respect to

6    Mr. Simpson's associates after the interview?

7    A.  Yes.

8    Q.  And describe that.

9    A.  We felt that it was likely that -- if Mr. Simpson had been

10   successful in leaving the U.S., it's possible that his

11   associates would have been inspired to follow in his footsteps.

12   As such, we were moved to begin interviewing his associates in

13   the same manner that we interviewed Mr. Simpson.

14           MR. MORRISSEY:  No further questions.

15           THE COURT:  All right.  We are going to take a recess.

16   But if somebody could step outside and see if Mr. Mitchell is

17   there.

18           Mr. Williams -- I'm sorry, Mr. Mitchell, if you could

19   come forward.

20           MR. MORRISSEY:  Your Honor?

21           THE COURT:  Yes.

22           MR. MORRISSEY:  May the witness step down or do you

23   want him to remain?

24           THE COURT:  Yes, he may step down, thank you.

25           Mr. Mitchell, we just began a trial this morning

1   involving an allegation of a false statement.  And it's alleged

2   that Mr. Elton Simpson made a false statement to the FBI in

3   violation of Title 18 of the United States Code Section

4   1001(a)(2).  You were called because an issue has developed

5   with a witness or potential witness in this case.  I don't know

6   how much you have been told in this case, what you have been

7   told here.

8        MR. MITCHELL:  I don't know, Your Honor, I have a

9   little bit of knowledge.  I need to speak to the AUSA at some

10  point.

11       THE COURT:  Can you speak into the microphone.

12       MR. MITCHELL:  I would like to speak with the AUSA to

13  at least get some background before I meet with my client.

14       THE COURT:  I would like you to do that.  If you wish

15  to speak to Mr. Williams or Ms. Sitton, you may do that as

16  well.  But you can speak to Mr. Morrissey.  He's the prosecutor

17  in this case.  And Mr. Williams and Ms. Sitton are the defense

18  counsel.

19       But there is an issue that has arisen on whether or

20  not one of the witnesses who was being used as a confidential

21  informant, he was given money for his services that he was

22  providing to the FBI as a confidential informant.  Apparently,

23  I think the Government concedes, that he -- the confidential

24  informant by the name of Mr. Deng did not report or pay taxes

25  on the money -- some of the moneys that he received throughout

1    his time working for the FBI.  And Mr. Morrissey maybe can give

2    you more detail.

3           But since Mr. Deng is listed as a witness, and

4    intended to be called, there was some concern raised that

5    perhaps he should be informed that that could subject him not

6    just to civil penalties, but potentially to criminal penalties

7    as well.

8           So I could have had a discussion with him alone, but

9    in light of what I heard, that it's clear that he has received

10   moneys and over the past five years and some of those years or

11   the majority of those years it appears he is not paying taxes,

12   I don't know if he's eligible for each of those years, there's

13   some question of that, as to whether or not he would have

14   needed to report that.  But you can look into that further.

15          I just wanted to make sure before I had a discussion

16   or colloquy with him, that he was informed of the potential

17   possibilities that might -- he might face as a result of any

18   testimony on that issue.

19          MR. MITCHELL:  Judge, do you intend to allow defense

20   counsel to inquire on those issues with regards to Mr. Deng,

21   whether he in fact did pay income taxes?

22          THE COURT:  I don't think it's disputed, but certainly

23   you can inquire.  I don't know what he will tell you, but just

24   based upon the discussion that we had here, which is one of the

25   reasons I went ahead and contacted an attorney or wanted an

1    attorney, I don't know that it's in dispute.

2              MR. MITCHELL:  Oh, okay.  I will, Judge.

3              THE COURT:  So if you could please discuss with him

4    and then I think that he's listed as a witness for the

5    Government.  I don't know if they are trying to use him

6    sometime this afternoon, probably.

7              So if you could have that discussion, then we will see

8    where we are later this afternoon.

9              MR. MITCHELL:  Yes, Your Honor.

10             THE COURT:  All right.  Because who's your next -- we

11   are going to do cross-examination and that will probably take

12   us close to lunch.  And then who's your witness after that?

13             MR. MORRISSEY:  I can call Agent Turner, Your Honor.

14             THE COURT:  That's how we will proceed.  So you will

15   have some time.

16             Is there anything else regarding Mr. Mitchell and his

17   representation of Mr. Simpson?

18             MR. MORRISSEY:  I don't think so.  I think the Court

19   has laid out the scope of the issues.  Procedurally, if

20   Mr. Mitchell and I are going to have an opportunity to talk

21   prior to cross, we will need a short break before cross begins.

22             THE COURT:  Okay.

23             MR. MITCHELL:  I mean that's all well and good.  I've

24   got a different responsibility to my witness.  I appreciate it,

25   that we have more time to talk other than before defense

1    counsel gets ready to cross my client, just because I want a

2    better landscape of what my client's dealing with here, Judge.

3              MR. MORRISSEY:  That's not what I meant.  I was

4    concerned we are going to go directly into the cross of Agent

5    Hebert which I would like to be present for.  So I don't          10:52:51

6    anticipate calling this witness until the afternoon, which I

7    thought Mr. Mitchell wanted time to talk right now prior to the

8    cross of Agent Hebert.  If you want us to talk over the lunch

9    break, I can do that.

10             THE COURT:  I'm not sure I understand.  We are taking    10:53:04

11   a break right now.

12             MR. MORRISSEY:  That's all I'm asking.

13             MR. MITCHELL:  That's fine.

14             THE COURT:  That's all we need.

15             Ms. Sitton.                                              10:53:11

16             MS. SITTON:  Your Honor, just two brief issues, just

17   to let Court and counsel know that the defense would be

18   intending on crossing Mr. Deng on this and his credibility is

19   at issue.  And so we would be intending on bringing that in.

20             And also I believe the Court, or we should let          10:53:23

21   Mr. Mitchell know that Mr. Deng is not a resident of the

22   United States, that he is seeking residency in the

23   United States.  And that the possible immigration consequences

24   should also be discussed.

25             THE COURT:  Thank you.  That's why I'm asking the        10:53:42

 1    lawyers.  I appreciate you offering that as well.

 2              So there's your information, Mr. Mitchell.

 3              MR. MITCHELL:  Thank you, Your Honor.

 4              THE COURT:  I appreciate your response.  And I'll wait

 5    to hear from you.                                        10:53:56

 6              We are going to take about a 15-minute break.  We will

 7    resume and then go for about an hour and then break for lunch.

 8    And so that's how we will proceed.

 9              And then you can give me and Mr. Mitchell an idea of

10    maybe what time you might be calling Mr. Deng so he can know to  10:54:11

11    be back here that hour.

12              MR. MORRISSEY:  Yes, Your Honor.

13              THE COURT:  All right.  Thank you.  We will be in

14    recess.

15              (A recess was taken.)                          11:09:16

16              THE COURT:  It looks like we are ready to resume with

17    the trial.  The record should reflect the presence of the

18    defendant, his counsel, and counsel for the United States.

19              Agent, if you could resume taking the stand here.  And

20    as you take the stand, I will just remind you you are still  11:09:43

21    under oath.

22              THE WITNESS:  Okay.

23              THE COURT:  And, Mr. Williams, whenever you are ready

24    to proceed, you may proceed with your cross-examination.

25              MR. WILLIAMS:  Thank you, Your Honor.          11:10:01

1                           CROSS-EXAMINATION

2    BY MR. WILLIAMS:

3    Q.  Agent Hebert, I wanted to talk to you about your meeting

4    with Mr. Simpson on January 7th of 2009.

5    A.  Okay.                                              11:10:12

6    Q.  And I want to make sure that I'm correct about your

7    description of what happened.

8              MR. MORRISSEY:  Objection, form.  January 7th, 2010.

9              MR. WILLIAMS:  2010, I'm sorry.  Okay?

10             THE WITNESS:  Yes.                            11:10:26

11   BY MR. WILLIAMS:

12   Q.  Is it fair to say that in terms of talking to Mr. Simpson

13   about traveling to Somalia, the majority of that questioning

14   came from Agent Turner?

15   A.  That's fair.                                        11:10:43

16   Q.  And when Agent Turner asked Mr. Simpson whether or not he

17   had discussed traveling to Somalia, Mr. Simpson did not answer

18   in a direct -- or gave an indirect answer?

19   A.  Correct.

20   Q.  You did not testify that he denied that conversation,     11:10:57

21   right?

22   A.  When Mr. Turner asked, no.

23   Q.  And Mr. Turner asked him that, according to your testimony,

24   a number of times?

25   A.  Yes.                                                11:11:08

1    Q.  And in each instance, Mr. Simpson did not deny that he had

2    discussed traveling to Somalia, correct?

3    A.  Right.  He didn't give a direct answer.

4    Q.  Okay.  He just did not give a direct answer?

5    A.  Correct.                                                      11:11:21

6    Q.  And then it's your testimony that you asked two questions

7    of Mr. Simpson regarding Somalia?

8    A.  I asked Mr. Simpson, I believe, more than two questions.

9    Again, he refused to give direct answers at first.

10   Q.  But he did not deny it?                                       11:11:39

11   A.  At first, correct.

12   Q.  And it is your testimony that he gave one denial?

13   A.  No, he ended up giving two.

14   Q.  One, whether he discussed it, and, two, whether he intended

15   to engage in jihad?                                              11:11:55

16   A.  Correct.

17   Q.  And that was the extent of the questioning of Mr. Simpson

18   regarding Somalia?

19   A.  Yes.

20   Q.  Now, you have testified twice before --                      11:12:05

21   A.  Yes.

22   Q.  -- regarding this.

23          One was at the grand jury on January 13th of 2010,

24   correct?

25   A.  I believe that's the date.                                   11:12:18

1    Q.  And you were asked several questions about that

2    conversation that you had with Mr. Simpson, correct?

3    A.  Yes.

4    Q.  And you were asked whether or not he had denied having the

5    discussions about traveling to Somalia, correct?                    11:12:37

6    A.  Correct, yes.

7    Q.  And it was your testimony at the grand jury that he had

8    done that several times, correct?

9    A.  Yes.

10   Q.  That's not true according to what you testified to today,       11:12:50

11   is it?

12   A.  Yeah, I may have misspoke at the grand jury.  My -- at the

13   grand jury, I meant that I asked -- or he had been asked

14   several times and refused to answer.  Although you are

15   absolutely correct, that he denied it one time.                     11:13:04

16   Q.  And you were -- you knew how important it was for him to --

17   for you to testify at the grand jury, correct?

18   A.  Yes.

19   Q.  And you knew that it was important for you to be truthful?

20   A.  Yes.                                                            11:13:19

21   Q.  Correct?

22   A.  Yes.

23   Q.  And it's your testimony that you were not truthful?

24   A.  No.

25   Q.  You were not, correct?                                          11:13:26

1   A.  I was -- I misspoke.  But I believe I still told the truth.

2   Q.  And, well, there is certainly a difference between a denial

3   and an indirect answer; would you agree?

4   A.  Agree.

5   Q.  And that's not -- I mean, they are completely different?      11:13:41

6   A.  I agree.

7   Q.  And it is your testimony that when you said that he denied

8   several times at the grand jury that that was a misspeak?

9   A.  Right.  If you also look at the grand jury transcript --

10  Q.  Is that your answer?                                          11:13:58

11  A.  That I misspoke?  Yes, that's my answer.

12  Q.  Now, what you testified at the grand jury is that through

13  the conversation we had, basically we intimated to him that we

14  had talked to others on other occasions about traveling not

15  only to South Africa, but also to Somalia.  Even though we       11:14:18

16  asked him in roundabout ways, he continued to deny any sort of

17  discussions of traveling to Somalia.

18  A.  That's correct.

19  Q.  Correct?  And that's your misspeak?

20  A.  Yes, I should have said he refused to answer directly.        11:14:32

21  Q.  You then -- did you misspeak anytime else, at any other

22  time at the grand jury?

23  A.  At the grand jury, not that I'm aware of.

24  Q.  Are you sure about that?

25  A.  I said not that I'm aware.                                    11:14:50

1   Q.  So the testimony you gave other than your misspeak about

2   his denials is the truth?

3   A.  As far as I know.

4   Q.  Now, there is a statement by you at the grand jury under

5   oath that says towards the end of the conversation, I                    11:15:03

6   specifically said I want a "yes" or "no" answer.  You said

7   that?

8   A.  Correct.

9   Q.  And you said that to Mr. Simpson on January 7th of 2010?

10  A.  Yes.                                                                  11:15:17

11  Q.  And then the question was:  Have you ever discussed

12  traveling to or are you planning to travel to Somalia?

13  A.  Again, I misspoke there.

14  Q.  I asked you earlier if you had misspoke again, and you said

15  no.                                                                      11:15:27

16  A.  I have not memorized the grand jury testimony, gone through

17  it with a fine-tooth comb.  So I don't dispute that that's what

18  I said, but I don't recall exactly everything I said word for

19  word.

20  Q.  And when you say you don't recall everything you said word            11:15:41

21  for word, are you talking about at the grand jury or to

22  Mr. Simpson?

23  A.  Both.  I don't recall word for word the conversation with

24  Mr. Simpson.

25  Q.  So you don't recall what he told you word for word or what            11:15:51

1   you -- or what was told to him, correct?

2   A.   For the entire interview?  Not the entire interview.

3   Q.   And this was several months ago, you would agree?

4   A.   Yes, sir, in January.

5   Q.   Did you take any notes of the interview with Mr. Simpson?      11:16:04

6   A.   Yes.

7   Q.   What was included in those notes?

8   A.   Those were memory prompts for me to draft the report of our

9   interview.

10  Q.   Did you simply write the word "no" in your notes?      11:16:19

11  A.   No, I wrote various things.  I wrote -- I would have to

12  look at my notes to see exactly what I wrote.  Again, I didn't

13  memorize them.

14  Q.   Did you disclose those notes or give those notes to

15  Mr. Morrissey?      11:16:32

16  A.   Yes.

17  Q.   When did you give him those notes?

18  A.   I believe it was last week.

19          MR. WILLIAMS:  Your Honor, we would ask that those

20  notes be produced.      11:16:39

21          THE COURT:  Mr. Morrissey?

22          MR. MORRISSEY:  Your Honor, they are not a Jencks Act

23  statement.  As I understand, Agent Hebert testified that he

24  took notes as memory prompts.  But they are certainly not any

25  type of Jencks Act statement.  I don't -- I don't know that      11:16:58

 1    they are discoverable.  If I can find them, I will disclose

 2    them.

 3              THE COURT:  Well, why don't you find them and then

 4    disclose them.  I'm pretty sure the laws regarding the

 5    disclosure of agent notes are -- is they are incorporated into     11:17:12

 6    his 302.  I don't know if he made a 302 with regard to that.

 7              MR. MORRISSEY:  He did, Your Honor.  And the testimony

 8    will be these -- these notes are not a substantially close

 9    recording of what was said, that they were memory prompts for

10    his 302.                                                            11:17:34

11              THE COURT:  And so I can't tell, are you objecting to

12    giving the notes or not?

13              MR. MORRISSEY:  I do have an objection.  But if I

14    could have a minute to attempt to locate them.

15              Your Honor, can we inquire whether Agent Hebert has       11:17:57

16    them with him.

17              THE WITNESS:  I don't have them.

18              THE COURT:  He just said that he gave them to you last

19    week.

20              MR. MORRISSEY:  Not the originals, Your Honor, I have     11:18:05

21    a copy.

22              I do have it.

23              Your Honor, could I have the Court review them to

24    determine whether or not these are producible?

25              THE COURT:  Yes, but I'm going to need a copy of the     11:18:45

1    302 as well.

2              MR. MORRISSEY:  That's fine.

3              I withdraw that, Your Honor.  I don't think they are

4    producible.  In the interests of Mr. Williams being able to

5    conduct his cross-examination, he can have a copy of the notes.    11:19:03

6              THE COURT:  All right.  Thank you.

7              MR. WILLIAMS:  Your Honor, if I could continue on.

8              THE COURT:  You may.

9    BY MR. WILLIAMS:

10   Q.  Agent Hebert, you had indicated that you had misspoke at    11:19:59

11   the grand jury; is that correct?

12   A.  That's correct.

13   Q.  Did you realize -- or when did you realize that you had

14   misspoke at the grand jury?

15   A.  Just the other day when I reviewed the transcript.    11:20:10

16   Q.  And when you say "the other day," what do you mean?

17   A.  I don't know, Sunday.

18   Q.  And did you disclose that to Mr. Morrissey?

19   A.  I think Mr. Morrissey and I discussed it.

20   Q.  You told him that you misspoke at the grand jury?    11:20:25

21   A.  Yes.

22   Q.  When did you -- did you write a 302 or report or anything

23   to indicate that you had misspoke at the grand jury?

24   A.  No.

25   Q.  Did you do anything to ensure that perhaps we, as    11:20:38

1    Mr. Simpson's lawyers, had that information?

2    A.  Did I personally?  No.

3    Q.  Yes.  Now, you also spoke at the detention hearing,

4    correct?

5    A.  Correct.                                                   11:20:53

6    Q.  And you misspoke then, too, didn't you?

7    A.  Yes.

8    Q.  And again, you were under oath at that time, correct?

9    A.  Yes.

10   Q.  Now, so twice you've misspoke about what Mr. Simpson said  11:21:00

11   in this case; is that correct?

12   A.  Yes.

13   Q.  And you did not realize it until a couple of days ago?

14   A.  Yes.  I mean, when you say "misspoke," in my mind, it's

15   semantics.  It's the similar -- it's discussion of traveling,  11:21:14

16   plans of traveling.  It's substantially similar to me in my

17   mind.

18   Q.  And that's important in a case like this where in your

19   mind, you may be thinking about one thing and someone else may

20   be thinking about something else, correct?                     11:21:29

21   A.  I know what I'm thinking, I can't tell what anybody else is

22   thinking.

23   Q.  Two people could be talking, having a conversation, and be

24   on two completely different pages, correct?

25   A.  Sure.                                                       11:21:41

1   Q.  And you don't know, in light of the fact that you had

2   misspoke, whether or not that occurred on January 7th?

3   A.  No, I specifically remember asking Mr. Simpson if he had

4   discussed with anyone traveling to Somalia.

5   Q.  Well, you testified under oath that you specifically asked     11:21:52

6   him whether or not he had discussed with anyone or planned on

7   traveling to Somalia.  That's specifically what you testified

8   you said, right?

9   A.  True.

10  Q.  And when you spoke at the detention hearing, you testified     11:22:06

11  again specifically what you had asked Mr. Simpson, correct?

12  A.  Yes.

13  Q.  And what you said was specifically, we asked him if he

14  planned on traveling from South Africa to Somalia, correct?

15  A.  That was part of a compound question, yes.     11:22:22

16  Q.  Different question than what you testified to today,

17  correct?

18  A.  That is a different question, yes.

19  Q.  So we have now several different questions that you claim

20  you asked Mr. Simpson?     11:22:33

21  A.  Well, I did ask Mr. Simpson several different questions.

22  Q.  You testified you only asked him two regarding Somalia.

23          MR. MORRISSEY:  Objection, misstates the testimony.

24          THE COURT:  Well, I think he just clarified it there

25  at the end.  Mr. Williams, can you restate your question?     11:22:47

1    BY MR. WILLIAMS:

2    Q.  You testified earlier that you only asked him two questions

3    regarding Somalia.

4    A.  Yes, sir, those questions.

5    Q.  So you asked him other questions?                          11:22:58

6    A.  Correct.

7    Q.  Regarding Somalia?

8    A.  Yes.

9    Q.  In this case you were asked, at least at the detention

10   hearing, whether he had planned to travel from South Africa to   11:23:08

11   Somalia, and you were asked whether or not he was asked that

12   multiple times.

13   A.  Correct.

14   Q.  And you said yes?

15   A.  He was asked multiple times.                               11:23:18

16   Q.  Mr. Simpson also asked whether or not he had -- excuse me.

17   I withdraw that question.

18           Now, you had testified earlier that an investigation

19   of Mr. Simpson dated back to 2006; is that correct?

20   A.  That's correct.                                            11:23:49

21   Q.  And you initiated that conversation -- that investigation

22   with Dabla Deng; is that correct?

23   A.  No, not with Dabla Deng.

24   Q.  It had started prior to that?

25   A.  Yes.                                                       11:24:00

1    Q.  How did it start?

2    A.  Mr. Simpson came under investigative interest to us due to

3    his association with Hassan Abu Jihaad.

4    Q.  And that was one that they had attended mosque together?

5    A.  That was not the --                                          11:24:13

6              THE COURT REPORTER:  I didn't hear that, Your Honor.

7              THE COURT:  Can you repeat that.

8              THE WITNESS:  I said that was not the predication for

9    the investigation.

10   BY MR. WILLIAMS:                                                  11:24:20

11   Q.  Well, they -- he and Mr. Simpson attended the same mosque,

12   correct?

13   A.  That's true.

14   Q.  They worked together?

15   A.  Yes.                                                          11:24:28

16   Q.  And may have socialized a couple of times outside of either

17   the workplace or the mosque?

18   A.  It's my understanding that they socialized more than a

19   couple of times.

20   Q.  But socialized?                                               11:24:39

21   A.  Yes.

22   Q.  And based upon that, the investigation was initiated

23   against Mr. Simpson?

24   A.  No, the investigation was initiated against Mr. Simpson

25   because we had reason to believe that Mr. Abu Jihaad was in the  11:24:46

1    process of attempting to set up a terrorist cell in Arizona.

2    We feared that Mr. Simpson was part of that cell.

3    Q.  And when you say that, based on their association?

4    A.  Yes.

5    Q.  Okay, Mr. -- you had not had any phone calls or information        11:25:02

6    or evidence from Mr. Simpson, correct?

7    A.  I don't understand your question.

8    Q.  Well, you didn't have any evidence that he was posting on

9    sites that he was involved in some type of terrorism activity

10   or associated with some sort of terrorist organization?                11:25:20

11   A.  No.

12   Q.  Certainly no statements by him at that time?

13   A.  Not at that time.

14   Q.  So Mr. Deng was told to ingratiate himself with

15   Mr. Simpson, is that right, or befriend Mr. Simpson?                   11:25:33

16   A.  Befriend him.

17   Q.  And you were the handler of Mr. Deng?

18   A.  That's correct.

19   Q.  And as his handler, you are to ensure that -- well, there's

20   something called guidelines in dealing with informants; is that       11:25:53

21   correct?

22   A.  That's correct.

23   Q.  And those guidelines tell you or guide you in how you

24   handle your informant; is that correct?

25   A.  Correct.                                                           11:26:06

1    Q.  And one of the guidelines is that you advised your

2    informants that if they are paid money, that is their

3    responsibility to pay taxes --

4    A.  Yes.

5    Q.  -- on that money.                                            11:26:17

6           And Mr. Deng was paid money in this case?

7    A.  Yes, he was.

8    Q.  Over $130,000 over a five-year period?

9    A.  That's correct.

10   Q.  Could you tell us how that payment worked?  Was he paid by   11:26:27

11   the hour?  Was he paid by the contact?

12   A.  It -- there's no set standard if you deal with the subject

13   of an investigation five times, you get X amount of dollars.

14   It doesn't work that way.  It would basically come down to

15   approximately every month or so I would review the work that    11:26:46

16   Mr. Deng had done for us and then I would determine, along with

17   my supervisor, what we felt was fair remuneration for him at

18   that time.

19   Q.  And how would you make that determination?

20   A.  It would depend on the, essentially the work that he did     11:27:08

21   for us.  If I felt he was doing excellent work, then he

22   generally received additional money.

23   Q.  Now, when you say "excellent work," do you mean by content

24   or by, for example, the number of meetings he would have had

25   with Mr. Simpson?                                                11:27:30

1    A.  It's all of the above.  Mr. Simpson was an important

2    investigative person for us.  Mr. Deng we felt was doing more

3    than we really could expect from him.  As such, he was

4    compensated in accordance.

5    Q.  Now, you wrote a 302 regarding your interview with        11:27:50

6    Mr. Simpson, correct?

7    A.  Correct.

8    Q.  And you then also did reports on the summaries of the

9    recordings that Mr. Deng had generated; is that correct?

10   A.  That's correct.                                           11:28:06

11   Q.  You did not write any reports regarding your review of the

12   recordings, correct?

13   A.  I -- some of them I did.  Those that weren't in classified

14   format that we did not declassify for this proceeding.

15   Q.  So what you're saying is you wrote some reports about the  11:28:22

16   recordings, we don't have them because they are classified?

17   A.  Correct.

18   Q.  How many of those records did you write?

19   A.  15 or 20, possibly.

20   Q.  Do you remember when they were?                           11:28:42

21   A.  It varied throughout the investigation.

22   Q.  Mr. Deng produced over 300 recordings; is that right?

23   A.  That's right.

24   Q.  And so of those 300 recordings, you reviewed 15 or 20

25   recordings?                                                   11:29:01

1    A.  I did.  Other agents reviewed some as well.  But we did not

2    review all 330 recordings.

3    Q.  Did you review 200?

4    A.  Probably not.

5    Q.  Review 100?                                                    11:29:13

6    A.  I don't have an accurate number.

7    Q.  50?

8    A.  I don't know.

9    Q.  Less than 50?

10   A.  Probably.                                                      11:29:19

11   Q.  Less than 25?

12   A.  All totaled it was probably 25.  I did 15.  Other agents

13   did some as well.

14   Q.  Of over the 300 recordings, how many were reviewed by the

15   FBI?                                                               11:29:38

16   A.  I don't know exactly.

17   Q.  200?

18   A.  I believe we just covered this.  It was probably less than

19   50.

20   Q.  Okay.  Because you said that you reviewed some and other      11:29:44

21   agents reviewed some?

22   A.  Correct.

23   Q.  What's the total number?

24   A.  I don't know.

25   Q.  So your decision on whether or not Mr. Deng was doing good    11:29:57

 1   work was in part based on the information that he gave you?

 2   A.  Correct.

 3   Q.  And you did not, at least with the exception of the 20

 4   recordings that you reviewed, do anything to verify whether or

 5   not he was telling you the truth, did you?                          11:30:17

 6   A.  No.  We verified through other means as well.

 7   Q.  Well, you didn't do it through listening to the recordings,

 8   did you?

 9   A.  Again, but that was one of the methods that we used.

10   Q.  What other methods were there?                                  11:30:30

11   A.  We had other means that we were using.  Other sources,

12   various means that we had.

13   Q.  But you had an undercover agent that had contact with

14   Mr. Simpson, correct?

15   A.  That's correct.                                                 11:30:44

16   Q.  Is that the other source?

17   A.  He's one of them.

18   Q.  What were the others -- well, any of Mr. Simpson's phones

19   tapped?

20   A.  As far as a Title III, no.                                      11:30:54

21   Q.  As far as anything.

22   A.  If -- are you asking if we had any kind of FISA, Foreign

23   Intelligence Surveillance Act coverage?

24   Q.  That would be one question, yes.

25   A.  The FBI cannot confirm or deny anybody, whether they are or     11:31:09

1    aren't the target of FISA coverage.

2    Q.  Any other type of surveillance that you had on Mr. Simpson?

3    A.  We performed physical surveillance on Mr. Simpson at times.

4    Q.  And what would that consist of?

5    A.  Our surveillance team would essentially follow him around.      11:31:25

6    Q.  And so when you were -- and how often would he be followed

7    around?

8    A.  Towards the earlier part of the investigation, it was more

9    often.  Towards the end, we tailored off a little bit.  I don't

10   remember the exact numbers.                                         11:31:41

11   Q.  That surveillance, ability to monitor or hear conversations

12   that Mr. Simpson had in the presence of Mr. Deng?

13   A.  That was separate.  That was Mr. Deng recording the

14   conversations where they were together.  Our surveillance team

15   did not have that capability.                                       11:31:58

16   Q.  So when you said you had other capabilities to verify that

17   Mr. Deng was being truthful and you said -- well, the

18   surveillance team, they couldn't verify the conversations,

19   could they?

20   A.  The conversations themselves, no.  But they could verify       11:32:11

21   that Mr. Deng was with Mr. Simpson when he said he was.

22   Q.  For example, if they went to Kabob Palace, they could

23   verify that?

24   A.  Yes.

25   Q.  They went to Kabob Palace a lot, didn't they?                   11:32:21

1    A.  They did.

2    Q.  And that's an eating establishment?

3    A.  Yes.

4    Q.  And that's what your -- or the surveillance team could

5    verify that they actually went there?                        11:32:30

6    A.  Yes.

7    Q.  But in terms of conversations about, for example, if they

8    were engaging in jihad or doing anything, the surveillance team

9    couldn't verify, could they?

10   A.  The surveillance team, no.                               11:32:47

11   Q.  Specifically jihad, you testified to the grand jury about

12   jihad, didn't you?

13   A.  If it's in the record, then, yes, I did.

14   Q.  Did you misspeak about that?

15   A.  I don't remember what my exact words were.               11:33:07

16   Q.  You were asked what is jihad.  Do you recall that?

17   A.  Yes.

18   Q.  And let me ask you this:  You reviewed the transcripts

19   prior to trial, didn't you?

20   A.  I did.                                                   11:33:30

21   Q.  And you answered that jihad --

22          MR. MORRISSEY:  Objection to the form.  Could we have

23   a page number?

24          THE COURT:  I'm sorry, the objection is form?

25          MR. MORRISSEY:  Yes.                                  11:33:39

1          THE COURT:  Okay.  Page number.  What transcript are

2    you referring to?

3          MR. WILLIAMS:  Grand jury transcript.

4          THE COURT:  And what is the page number?

5          MR. WILLIAMS:  Page 5 and page 6.                        11:33:45

6          THE COURT:  And is that an exhibit for me?

7          MR. WILLIAMS:  We do have an exhibit if the Court --

8          THE COURT:  Well, I didn't know if you thought I was

9    following along or something with that, because I don't --

10          MR. MORRISSEY:  Your Honor, it is not in evidence.  As   11:33:57

11    I understand it's marked for identification for

12    cross-examination purposes.

13          MR. WILLIAMS:  And we have no objection if the Court

14    wants to view it.  It's Exhibit 101.  And I believe --

15          THE COURT:  Well --                                      11:34:10

16          MR. MORRISSEY:  I object to it being in evidence.

17    It's fine as a demonstrative exhibit to ask him what he recalls

18    on cross, and he can refresh his memory if he needs.  He hasn't

19    indicated any absence of memory as to whether he was asked

20    about jihad.                                                   11:34:26

21          MR. WILLIAMS:  I was just responding to the Court.  I

22    didn't intend to introduce --

23          THE COURT:  I just wanted to know if you all intended

24    that I have it because I didn't have it in front of me, that's

25    all.                                                          11:34:37

1    BY MR. WILLIAMS:

2    Q.  Do you recall being asked what is jihad?

3    A.  Yes.

4    Q.  And you gave an answer and that is jihad literally

5    translates as holy war within Islam?                          11:34:43

6    A.  Yes.

7    Q.  Did you misspeak about that?

8    A.  That's how I understand jihad to translate.

9    Q.  Others who are more knowledgeable about Islam would

10   translate differently?                                        11:34:59

11   A.  I don't know.

12          MR. MORRISSEY:  Objection, argumentative.

13          THE COURT:  Overruled.

14          THE WITNESS:  I don't know how others would translate

15   it as.                                                        11:35:07

16   BY MR. WILLIAMS:

17   Q.  Well, you've testified earlier that you had some classes.

18   A.  Um-hmmm.

19   Q.  Been taught about radical Islam?

20   A.  Correct.                                                  11:35:15

21   Q.  Other areas.  Would you agree or disagree with this

22   definition:  An Islamic term is a religious duty of Muslims.

23   In Arabic, the word jihad translates in English as struggle.

24   A.  I've heard that translation before.

25   Q.  You disagree with that translation?                       11:35:35

1   A.  In this context, yes.

2   Q.  Well, this context is your context, correct?

3   A.  My understanding of how Mr. Simpson viewed jihad was as a

4   holy war.

5   Q.  Not your understanding, you misspoke twice under oath,        11:35:47

6   correct?

7   A.  Yes.

8   Q.  You've testified that what you mean and what you're

9   thinking about may be different than what others think about,

10  correct?                                                          11:35:59

11  A.  People disagree all the time.

12  Q.  You never asked Mr. Simpson himself what jihad meant to

13  him?

14  A.  I didn't need to.

15  Q.  You never asked Mr. Simpson himself what jihad meant to       11:36:08

16  him, did you?

17  A.  That's correct.

18  Q.  It is your interpretation, and your opinion?

19  A.  I'm not sure what you're asking me now.

20  Q.  You testified that jihad translates into holy war?           11:36:23

21  A.  Correct.

22  Q.  That is not the only translation?

23  A.  Not the only translation, that's the translation that we

24  generally use.

25  Q.  But really what it means is just an internal struggle,        11:36:37

1    correct?

2    A.  Moderate Islam would generally define it as that, correct.

3    Q.  And in fact within Islam not only are there different

4    translations, there's different types of jihad?

5    A.  Yes.                                                    11:36:52

6            THE COURT:  I'm sorry, what kind of Islam did you say?

7            THE WITNESS:  I said moderate.

8            THE COURT:  Say it again?

9            THE WITNESS:  Moderate.

10           THE COURT:  Okay, thank you.                         11:37:04

11   BY MR. WILLIAMS:

12   Q.  And the majority of these types of jihad have nothing to do

13   with violence, would you agree with that?

14   A.  I don't know if I agree with the majority.

15   Q.  But you certainly agree with that there are types of jihad   11:37:28

16   that have nothing to do with violence?

17   A.  I agree that some people have made that distinction, yes.

18   Q.  Now, when you were handling Dabla Deng, did you -- and I

19   asked you whether or not you did anything to verify whether or

20   not the information that he gave you was reliable.  Did you      11:38:01

21   discuss with him whether or not he would pay or should pay his

22   taxes?

23   A.  Yes.

24   Q.  What did you tell him?

25   A.  I told him that he was obligated to pay taxes on the money   11:38:12

JEFFREY HEBERT - CROSS-EXAMINATION BY MR. WILLIAMS        89

1    that we gave him.

2    Q.  There's something called the -- a suitability review; is

3    that correct?

4    A.  We don't call them suitability reviews, but I know what you

5    mean, yes.                                                       11:38:32

6    Q.  Well, what would you call them?

7    A.  Call them validation, source validation.

8    Q.  And that's what you do with your informants?

9    A.  Yes.

10   Q.  Periodically?                                                11:38:39

11   A.  Yes.

12   Q.  Part of your review, did that include verifying whether or

13   not he was paying his taxes?

14   A.  No.

15   Q.  Did you tell him that he needed to do that more than once?   11:38:46

16   A.  Yes.

17   Q.  How many times did you tell him that?

18   A.  Multiple, at least once a year, and usually, I should say,

19   yeah, usually whenever we paid him.

20   Q.  Did you ask him whether or not he was paying his taxes?      11:38:58

21   A.  No.

22   Q.  I'm sorry?

23   A.  No.

24   Q.  Did he ever tell you that he was paying his taxes?

25   A.  We never discussed it.                                       11:39:04

1   Q.  You never discussed it other than you telling him that he

2   had to?

3   A.  Correct.

4   Q.  At the time that you were working with Mr. Deng, he had

5   reported to you a number of -- on a number of occasions?            11:39:37

6   A.  Yes.

7   Q.  I mean, he was meeting with Mr. Simpson about three or four

8   times a week?

9   A.  Yes.

10  Q.  Sometimes for hours at a time --                                11:39:48

11  A.  Yes.

12  Q.  -- correct?

13          And you had indicated earlier that you believed that

14  Mr. Simpson may -- or I think you said feared he may have been

15  part of some type of cell --                                        11:40:04

16  A.  Correct.

17  Q.  -- was your testimony.

18          So it would be fair to say that there was some concern

19  that he was going to be involved in some type of terrorist

20  activity?                                                           11:40:16

21  A.  That's right.

22  Q.  Whether it was domestic or international?

23  A.  Yes.

24  Q.  And you made clear to Mr. Deng that if he came across any

25  information that would suggest that he was a threat or could       11:40:29

1    harm someone or cause a problem, to notify you immediately,

2    correct?

3    A.  That's correct.

4    Q.  If he were to shoot up a mall or blow up something and

5    Mr. Deng came across this information, Mr. Deng was to notify        11:40:52

6    you immediately?

7    A.  Yes, that's right.

8    Q.  You never got that call from Mr. Deng, did you?

9    A.  That they were planning --

10   Q.  Or Mr. Simpson and his associates were planning on              11:41:02

11   immediately shooting up a mall or something along those lines?

12   A.  No.

13   Q.  And if there was, you would have made immediate attempts to

14   stop and arrest Mr. Simpson?

15   A.  That's correct.        11:41:17

16   Q.  And never have?

17   A.  No.

18   Q.  Never any information that he was planning to do anything

19   domestic?

20   A.  No.        11:41:24

21   Q.  And would you agree and in your mind, there's a difference

22   between discussing and planning?

23   A.  Yes.  There is a difference between discussing and

24   planning.

25   Q.  Just talking about something is not necessarily of concern        11:41:38

1   as planning?

2   A.   That's correct.

3   Q.   And you indicated that prior to going to speak with

4   Mr. Simpson, that you had verified that he had planned on

5   traveling, and I'm talking about January of 2010, traveling to        11:41:56

6   South Africa to study?

7   A.   Yes.

8   Q.   And you had indicated that when he was asked the name of

9   the school, he wouldn't provide you the name of the school?

10  A.   That's correct.                                                   11:42:12

11  Q.   Did you, before meeting with him, have the name of the

12  school?

13  A.   I personally didn't have it, but Agent Turner did.

14  Q.   Okay.  So you knew before going to speak with him the name

15  of the school he was going to be studying at?                         11:42:29

16  A.   Yes.

17  Q.   Did you or Agent Turner or anybody verify that that's what

18  he was going to do?

19  A.   We knew that he had a reservation at that school.

20  Q.   You also knew that he had a passport and was -- and a visa,      11:42:38

21  a study visa to travel to South Africa?

22  A.   We didn't know that he had a visa.  He told us that he

23  didn't have it at the time of our interview.  And we had no

24  reason not to believe him on that score.

25  Q.   But you knew he had applied for one?                             11:42:56

1   A.   Yes.

2   Q.   Or would need one.

3            Based on all of the information that you had talked

4   about your investigation on terrorism, if Mr. Simpson wanted to

5   simply fly to South Africa, would there be anything preventing        11:43:10

6   him from doing that?

7   A.   I'm sorry, I don't understand.

8   Q.   If Mr. Simpson had a valid passport --

9   A.   Yes.

10  Q.   -- and wanted to travel to South Africa just to visit.           11:43:18

11  A.   Okay.

12  Q.   Is there anything that you're aware of that would have

13  prevented him from being able to do that?

14  A.   No.

15  Q.   So Mr. Simpson did not have to, in essence, advertise that       11:43:30

16  he was going to South Africa for school, correct?  If he wanted

17  to go to South Africa and make his way to Somalia to engage in

18  a violent jihad, he could have simply gone to South Africa,

19  correct?

20  A.   Yes.                                                             11:43:49

21  Q.   He wouldn't have had to apply for a visa?

22  A.   Well, he needs a visa to go to South Africa.

23  Q.   I mean, he wouldn't have had to apply for a student visa,

24  he could have simply gone for a vacation?

25  A.   That's true.                                                     11:44:02

1  Q.  He wouldn't have had to go through the application or

2  process of applying to a school?

3  A.  That's true.

4  Q.  He could have simply gone to South Africa or any other

5  African nation that would have allowed him to come, correct?    11:44:09

6  A.  Yes.

7  Q.  And, in fact, South Africa is at the southern tip of the

8  continent?

9  A.  Yes.

10  Q.  About 2800 miles away from Somalia?                         11:44:21

11  A.  I don't know the distance.

12  Q.  Would you disagree with that?

13  A.  That sounds probably about right.

14  Q.  That's a long way?

15  A.  Yeah.                                                       11:44:31

16  Q.  And you had made references early on about I think it was

17  Al Shabaab and Al-Qaeda, correct?

18  A.  We made reference, is that what you're asking?

19  Q.  Yes.

20  A.  Yes, we did.                                                11:44:47

21  Q.  You didn't have any indication that he had any connections

22  to any of these organizations, do you?

23  A.  I don't know what you mean by connections.  I mean did he

24  know anybody in those organizations?  Then the answer is no.

25  Q.  Anything based on the surveillance that you can tell us     11:44:58

1    about and the surveillance that you can't tell us about?

2    There's no evidence that he reached out or tried to contact

3    anyone in any of these organizations either, is there?

4    A.  From what we know from Mr. Deng as well as some of the

5    other investigation, no.                                    11:45:14

6    Q.  Based on the thousands of hours that you recorded of

7    Mr. Simpson, never once did he indicate or say that he was

8    going to engage in a violent jihad, did he?

9    A.  He said he wanted to.

10   Q.  Violent jihad?                                          11:45:39

11   A.  Yes.

12   Q.  That word, "violent jihad"?

13   A.  That was my understanding when he referred to fighting the

14   kaffir or fighting to establish sharia, that's what it means.

15   Q.  Let me ask you this question again, because we seem to have   11:45:53

16   this misunderstanding problem.  He never said that he wanted to

17   engage in a violent jihad, correct?

18   A.  I can't say that for sure.  And if I were to review all

19   several thousand hours of conversation, I would find it likely

20   that at least one time he said that.                        11:46:09

21   Q.  But based on the little investigation that you did --

22          MR. MORRISSEY:  Objection, argumentative.

23          THE COURT:  Overruled.

24          THE WITNESS:  Based on what we've listened to, I don't

25   recall the words "violent jihad" together.                  11:46:23

1   BY MR. WILLIAMS:

2   Q.  And so the record is clear, Mr. Deng would wear a body

3   recorder and meet with Mr. Simpson and others?

4   A.  That's correct.

5   Q.  He would then turn that recording over to you and then he        11:46:41

6   would tell you what was on the recording?

7   A.  Correct.

8   Q.  And so you are not only relying on your interpretation of

9   what Mr. Simpson may have said, you're also relying on

10  Mr. Deng's interpretation; is that a fair statement?                 11:46:58

11  A.  I never tried to interpret what Mr. Simpson said.  I tried

12  to record faithfully what Mr. Deng told me about what

13  Mr. Simpson said.

14  Q.  And, again, you did very little to review whether or not

15  Mr. Deng was being truthful, correct?                               11:47:13

16  A.  I don't think I agree with very little.

17  Q.  15 times you reviewed a recording?

18  A.  Approximately.

19  Q.  And would it be fair to say you didn't review the entire

20  recording, just portions?                                          11:47:28

21  A.  No, when I review those, I review the entire thing.

22  Q.  Now I believe you testified on direct that you went to go

23  speak with a Mr. Sabari.

24  A.  Yes.

25  Q.  And it was your --                                             11:47:44

1          MR. MORRISSEY:  Objection, misstates the testimony, he

2    spoke to Mr. Sabari.  He didn't testify to that.

3          THE COURT:  He said yes.

4          THE WITNESS:  I misspoke, Your Honor.  I -- the

5    testimony was that we had planned to go see to Mr. Sabari.                11:47:53

6          MR. MORRISSEY:  And the question was whether he had

7    testified to that.

8          THE COURT:  Let him answer the question.  Ask the

9    question again.

10   BY MR. WILLIAMS:                                                           11:48:02

11   Q.  You had indicated --

12         THE COURT:  And you need to listen carefully before

13   you respond.

14         THE WITNESS:  I apologize.

15   BY MR. WILLIAMS:                                                           11:48:08

16   Q.  You had indicated on direct that you had spoke to someone,

17   I believe, on January 6th.

18   A.  No, I never said that.

19   Q.  Who did you speak to other than Mr. Simpson?

20   A.  We spoke with Mr. Sabari.                                             11:48:18

21   Q.  And prior to speaking with Mr. Sabari, you told him the

22   nature of the interview, why you wanted to speak?

23   A.  With Mr. Sabari?

24   Q.  Yes.

25   A.  Yes.                                                                  11:48:38

 1   Q.  And you in fact put that in your report?

 2   A.  Yes.

 3   Q.  And you also identified yourself and the other agents,

 4   correct?

 5   A.  Yes.                                                          11:48:48

 6   Q.  And when you went to go speak with Mr. Simpson, you didn't

 7   tell him the reason or the nature of the interview, did you?

 8   A.  You know, we told him the nature of the interview.

 9   Q.  Well, have you had a chance to review your 302?

10   A.  Yes.                                                          11:49:07

11   Q.  And in your 302, it simply states that we identified

12   ourselves as agents, correct?

13   A.  I would have to look at my 302.

14   Q.  Excuse me?

15   A.  I would want to look at the 302 to see exactly what it       11:49:18

16   says.

17           MR. WILLIAMS:  Could the witness see Exhibit 103.

18           THE WITNESS:  Go ahead.

19   BY MR. WILLIAMS:

20   Q.  You didn't advise Mr. Simpson why you were there to speak    11:49:53

21   with him?

22   A.  We advised Mr. Simpson that we wanted to speak with him.

23   Q.  So I'm going to ask you the question again.  You didn't

24   advise Mr. Simpson why you wanted to speak with him?

25   A.  I don't recall exactly what we said.                         11:50:05

1   Q.  And had you done that, just as you did with the report of

2   Mr. Sabari, you would have put that in the report, correct?

3   A.  Most likely, yes.

4   Q.  So you just went and met with Mr. Simpson, said:  We want

5   to talk to you?                                                11:50:22

6   A.  Correct.

7   Q.  Identified yourselves?

8   A.  Yes.

9   Q.  And started asking him things about traveling to

10  South Africa?                                                  11:50:28

11  A.  Well, we didn't launch right into it.  We asked him other

12  questions first.

13  Q.  Okay.  And you showed him some photographs?

14  A.  That was towards the end of the interview, yes.

15  Q.  But you asked some other questions.  Now this is a         11:50:39

16  terrorist investigation?

17  A.  Correct.

18  Q.  You are concerned that he may be traveling to another

19  country?

20  A.  Yes.                                                       11:50:52

21  Q.  You are concerned that because he has tickets to leave to

22  South Africa the next week, that he's going to be leaving and

23  you are going to lose an opportunity to at least question him

24  on United States soil?

25  A.  Yes.                                                       11:51:05

```
 1   Q.  So you are there not really to talk about discussions that
 2   he had, was that a fair statement?  He had his discussions?
 3   A.  I don't understand.  I'm sorry.
 4   Q.  Well, you were investigating whether or not he had
 5   discussions about Somalia?                                    11:51:23
 6   A.  No, that's not the purpose of the investigation.
 7   Q.  And that certainly wasn't the reason why you were there?
 8   A.  We were there to determine, if we could, what his future
 9   plans might be.
10   Q.  And you asked him about other individuals, correct?       11:51:50
11   A.  We showed him photos of other individuals.
12   Q.  Who did you show him photos of?
13   A.  We showed him a photo of Dabla Deng, John Sabari, Roberto
14   Yong, and Saabir Nurse.
15   Q.  And you asked him if he knew these individuals?           11:52:08
16   A.  Yes.
17   Q.  And you knew that he knew these individuals?
18   A.  Yes.
19   Q.  Certainly knew that he knew Mr. Deng, because Mr. Deng had
20   been surveilling?                                             11:52:17
21   A.  Yes.
22   Q.  And he answered truthfully?
23   A.  Yes.  Well, he answered that he knew them truthfully, yes.
24   Q.  And you asked him -- did you ask him whether or not they
25   were involved in some type of terrorist activity?            11:52:31
```

 1    A.  I don't believe we used the word "terrorist activity."  I

 2    asked him if there was any reason we should worry about these

 3    individuals and/or something to that effect.

 4    Q.  And he told you no?

 5    A.  Correct.                                                  11:52:48

 6    Q.  And you asked him whether or not he was planning to travel

 7    to South Africa?

 8    A.  Yes.

 9    Q.  Or he was asked that?

10    A.  Yes.                                                      11:52:56

11    Q.  And whether or not he was planning to go to school?

12    A.  We asked him the purpose of his travel to South Africa.

13    And he told us he was going there to study.

14    Q.  And then someone asked him whether -- the name of the

15    school?                                                       11:53:08

16    A.  Yes.

17    Q.  You already knew the answer?

18    A.  Yes.

19    Q.  And he refused to give you that answer?

20    A.  That's correct.                                           11:53:12

21    Q.  But later on, he did call back and give an answer?

22    A.  He called Agent Storm, yes.

23    Q.  And did he answer truthfully then?

24    A.  At that time he did.

25    Q.  And then at some point did you tell him that or did anyone 11:53:25

1    tell him that Dabla Deng had been arrested trying to enter into

2    Canada?

3    A.  I don't recall.  We may have.

4    Q.  Is there a reason why you can't remember?

5    A.  I don't remember specifically.  And it's not in my 302.    11:53:45

6    Q.  So if you -- if it's not in your 302 and you don't remember

7    specifically, you're not sure?

8          MR. MORRISSEY:  Is that -- objection, form, that's not

9    a question.

10         THE COURT:  Well, restate your question.              11:54:02

11   BY MR. MORRISSEY:

12   Q.  Are you saying that if it's not in your 302 and you don't

13   recall?

14   A.  What we asked Mr. Deng -- Mr. Simpson about Mr. Deng was

15   not pertinent to the investigation.  That's why it was not   11:54:14

16   included in the 302.

17   Q.  And also because you don't remember?

18   A.  I don't remember now ten months later exactly what we asked

19   him.

20   Q.  And is it your statement that the reason why it's not in   11:54:28

21   the 302 is because it's not -- wasn't important to you?

22   A.  No.  That's not what I said.  I said what we asked

23   Mr. Simpson about Mr. Deng was not pertinent to our

24   investigation of Mr. Simpson.

25   Q.  So you didn't put it in the 302?                         11:54:49

JEFFREY HEBERT - CROSS-EXAMINATION BY MR. WILLIAMS   103


1    A.  That's correct.

2    Q.  And is it because of that you don't remember what --

3            MR. MORRISSEY:  Objection, calls for speculation.

4            THE COURT:  Well, overruled.  If he knows, you can --

5    you can answer.                                                    11:55:03

6            THE WITNESS:  Can you ask again, please?

7    BY MR. WILLIAMS:

8    Q.  Well, you don't have anything to refresh your recollection,

9    and it was several months ago.  And I think it's your testimony

10   that it wasn't pertinent.                                          11:55:13

11   A.  That's correct.

12   Q.  So as a result today, you can't really recall?

13   A.  I remember there was a discussion of some kind regarding

14   Mr. Deng going to Canada.  I don't remember exactly what we

15   asked Mr. Simpson about that.                                      11:55:28

16   Q.  Mr. Simpson indicated that he knew that Dabla Deng may have

17   been going to Sudan or may have been trying to get to Sudan?

18   A.  We asked a question regarding that subject, yes.

19   Q.  And he answered that?

20   A.  We asked Mr. Simpson, I believe the way the question was      11:55:58

21   phrased, and I don't remember exactly, but something to the

22   effect if Mr. Deng had a ticket to Africa, why would he be

23   going there.  And Mr. Simpson's response to that was if he's

24   going to Africa, it's going to live in his homeland.  I don't

25   think he mentioned Sudan specifically as far as why he would go   11:56:18

1    to Africa.

2    Q.  Mr. Deng was not under a -- an informant contract; is that

3    correct?

4    A.  That's correct.

5    Q.  What is an informant contract?                          11:57:09

6    A.  It's an agreement between the FBI and an informant that in

7    return for their work on behalf of the bureau, they would

8    likely receive a set amount of money, usually on a monthly

9    basis.

10   Q.  And does it spell out their requirements and             11:57:35

11   responsibilities?

12   A.  To be honest, I've never actually used one, so I can't tell

13   you what it spells out.

14   Q.  And why not?

15   A.  I haven't needed one.                                    11:57:43

16        MR. WILLIAMS:  If I could have one minute, Your Honor.

17   BY MR. WILLIAMS:

18   Q.  Agent Hebert, did you have an opportunity to review your

19   notes prior to testifying today?

20   A.  I briefly looked at them, yes.                           11:59:00

21   Q.  When you, Agent Turner, and the other agent spoke with

22   Mr. Simpson, were you always present?

23   A.  No.  Yes, on both occasions, I was present for the entire

24   interview.

25   Q.  Okay, never left?                                        11:59:44

 1    A.  No.

 2    Q.  Do you know what a compound question is?

 3    A.  Yes, a two-part question.

 4    Q.  In your testimony to the grand jury, you asked him -- you

 5    said that you asked Mr. Simpson a compound question.          12:00:18

 6            MR. MORRISSEY:  Objection, misstates the testimony.

 7            MR. WILLIAMS:  I did.  And I apologize.  Let me

 8    rephrase that.

 9    BY MR. WILLIAMS:

10    Q.  You testified specifically, "I want a 'yes' or 'no' answer. 12:00:30

11    Have you discussed traveling to or are you planning to travel

12    to Somalia," correct?

13            MR. MORRISSEY:  Objection, is this in the grand jury?

14            MR. WILLIAMS:  It is page 13.

15            THE COURT:  What page?                                 12:00:48

16            MR. WILLIAMS:  13, second paragraph.

17            THE WITNESS:  I said that in the grand jury.  I see

18    what I said.

19    BY MR. WILLIAMS:

20    Q.  And that would be a compound question?                    12:00:57

21    A.  Yes.

22    Q.  And that's what you testified you asked Mr. Simpson?

23    A.  In the grand jury, that's what I testified, yes.

24            MR. WILLIAMS:  I don't believe I have any further

25    questions.                                                    12:01:30

1        THE COURT:  All right.  You may redirect.

2                    REDIRECT EXAMINATION

3   BY MR. MORRISSEY:

4   Q.  Agent Hebert, on January 7th, 2010, did you ask Mr. Simpson

5   a noncompound question specifically "yes" or "no," whether or      12:02:20

6   not he had discussed with anyone traveling to Somalia?

7   A.  Yes, that's what I asked.

8   Q.  And what did Mr. Simpson say?

9   A.  He said no.

10  Q.  Now, you were asked on cross about supposed inaccuracies in     12:02:35

11  your grand jury testimony.  Do you remember that?

12  A.  I recall that.

13  Q.  In grand jury on page 12, were you asked whether or not

14  Mr. Simpson specifically denied that he had ever discussed with

15  anyone traveling to Somalia?                                       12:02:57

16  A.  Yes.

17  Q.  And you said that he did deny that?

18  A.  Yes.

19  Q.  And you were asked, "Was he asked that multiple times?"

20  A.  Yes.                                                           12:03:08

21  Q.  And do you recall saying that he was asked that?

22  A.  Yes.

23  Q.  Is that truthful testimony?

24  A.  That's true.

25  Q.  Were you asked whether or not he was asked, Mr. Simpson was     12:03:13

1   asked that question in a "yes" or "no" format?

2   A.  Yes.

3   Q.  And you testified that he was?

4   A.  That's correct.

5   Q.  In fact, was he asked that question in a "yes" or "no,"          12:03:22

6   have you discussed with anyone traveling to Somalia?

7   A.  Yes, he was asked that.

8   Q.  Any inaccuracies in that testimony?

9   A.  No.

10  Q.  He was in fact asked multiple times whether he had             12:03:35

11  discussed traveling to Somalia?

12  A.  That's correct.

13  Q.  In his responses, you were asked on cross about whether or

14  not he multiple times refused to answer.  Do you recall that?

15  A.  That's correct.                                                12:03:50

16  Q.  Did Mr. Simpson multiple times refuse to answer that

17  question?

18  A.  Yes, he did.

19  Q.  Did you consider his refusal to answer the question an

20  acknowledgment that he had in fact discussed it with several       12:04:04

21  people?

22  A.  That's how I interpreted it.

23          MR. WILLIAMS:  Objection.

24          THE COURT:  What's the objection?  Was there an

25  objection?                                                         12:04:14

1              MR. WILLIAMS:  There was.  Speculation.

2              THE COURT:  Sustained.

3    BY MR. MORRISSEY:

4    Q.  Agent Hebert, you've been asked about your supposed

5    misspeaking in grand jury and detention hearing.  Do you recall     12:04:32

6    that cross-examination?

7    A.  I do.

8    Q.  When Mr. Simpson -- you testified that he refused to answer

9    or was indirect multiple times on the subject of whether or not

10   he had discussed traveling to Somalia, correct?                     12:04:52

11   A.  Correct.

12   Q.  When you testified in grand jury, did you tell the grand

13   jurors about Mr. Simpson's reluctance to answer that question?

14   A.  Yes.

15   Q.  When you testified in both grand jury and at the detention      12:05:15

16   hearing, did you testify that Mr. Simpson had refused -- I'm

17   sorry, had denied that he had specifically discussed traveling

18   to Somalia?

19   A.  Yes.

20   Q.  Was that inaccurate?                                            12:05:28

21   A.  No.

22   Q.  The -- you testified that "jihad" means "holy war,"

23   correct?

24   A.  Correct.

25   Q.  Is that an accurate translation?                                12:05:49

1    A.  Yes.

2    Q.  Is there other translations of jihad?

3    A.  Yes.

4    Q.  In grand jury, did you draw a distinction between jihad and

5    violent jihad?                                              12:06:00

6    A.  Yes.

7    Q.  In your review of Mr. Simpson's statements on tapes, does

8    Mr. Simpson use the word "fighting"?

9    A.  Yes.

10        MR. WILLIAMS:  Objection, foundation as to which       12:06:20

11   tapes.

12        MR. MORRISSEY:  Your Honor, on cross-examination he

13   was asked multiple times about his review of less than 50, less

14   than 25 tapes.

15        THE COURT:  Well, there were a number of tapes, some    12:06:30

16   that weren't reviewed.  Can you be specific with him so we

17   know?

18        MR. MORRISSEY:  Sure.

19   BY MR. MORRISSEY:

20   Q.  Agent Hebert, on the tapes that you reviewed, and we     12:06:38

21   established a number of probably under 25.

22   A.  Agreed.

23   Q.  Specifically in preparation for this trial, did you review

24   discussions that Mr. Simpson had on July 31st, 2007?

25   A.  Yes.                                                     12:06:57

1   Q.  Did you review discussions that Mr. Simpson had on

2   May 29th, 2009?

3   A.  Yes.

4   Q.  How about June 17th, 2009?

5   A.  Yes.                                                    12:07:10

6   Q.  How about October 23rd, 2009?

7   A.  Yes.

8   Q.  How about 11-6-09?

9   A.  Yes.

10  Q.  Not saying -- my question is not on every one of those  12:07:18

11  tapes, but just taking that universe of the recordings, does

12  Mr. Simpson use the word "jihad"?

13  A.  I don't recall "jihad."  He definitely mentioned fighting.

14  Q.  Okay.  Now, you were asked about the recordings that you

15  reviewed.  Do those recordings speak for themselves?          12:07:45

16  A.  Yes.

17  Q.  When Mr. Deng would describe what was on recordings, you

18  would write a summary based on his description?

19  A.  That's correct.

20  Q.  At any time while you were preparing for trial or in your  12:07:59

21  investigations, have you found that Mr. Deng's descriptions

22  were inaccurate?

23  A.  No.  Occasionally we do get background noise or other

24  reasons we might not have been able to hear the entire

25  conversation that was recorded.  But we never found Mr. Deng's,  12:08:24

1  you know, relay of what they discussed to be inaccurate.

2  Q.  Now, you were asked about what you said to Mr. Simpson on

3  January 7th, 2010, about Mr. Deng.  Do you recall that?

4  A.  Yes.

5  Q.  Just in the tapes that you've referenced, the May 29th, '09     12:08:51

6  tape, the January 31st, '07, the June 17th, the October 23rd,

7  and the November 7th tapes, had Mr. Deng, from your review of

8  those tapes, presented himself as someone who might go fight

9  overseas?

10  A.  First to clarify you said January 31st, '07, I think you     12:09:16

11  meant July 31st, '07.

12  Q.  Thank you for the clarification.

13  A.  But within those recordings, Mr. Deng offered himself as a

14  person who would be willing to go fight jihad overseas.

15  Q.  In those recordings, not every one, but taken collectively,     12:09:32

16  had Mr. Yong indicated that he was a person that might go fight

17  overseas?

18        MR. WILLIAMS:  Objection, this is outside the cross

19  and relevance of what Mr. Yong said.

20        MR. MORRISSEY:  No, Your Honor, he was specifically     12:09:48

21  crossed in his interviews with Mr. Yong, Mr. Sabari and what he

22  told Mr. Simpson about those.

23        THE COURT:  Overruled.  You may answer.

24        THE WITNESS:  Repeat the question, please.

25  BY MR. MORRISSEY:     12:09:57

1   Q.  Add Mr. Yong in the July 31st, '07, May 29th, '09, June 17,

2   '09, October 23rd, '09 and 11-7-09, just that universe of

3   recordings, had Mr. Yong presented himself as someone who might

4   be interested in fighting jihad overseas?

5   A.  Yes.                                                        12:10:18

6   Q.  When you asked Mr. Simpson about Mr. Yong and Mr. Deng,

7   were you testing Mr. Simpson's truthfulness with respect to

8   their plans?

9   A.  Yes.

10  Q.  Did Mr. Simpson tell you that Mr. Deng and Mr. Yong had     12:10:31

11  both discussed fighting overseas?

12  A.  He did not tell us that.

13  Q.  In your view, was Mr. Simpson truthful as to that part of

14  your interview?

15        MR. WILLIAMS:  Objection.  Calls for a legal -- Your      12:10:47

16  Honor, I'm going to object to that line of questioning.  There

17  was nothing on cross-examination about Mr. -- or Agent Hebert's

18  questioning of Mr. Simpson about Mr. Yong and Mr. Sabari's

19  willingness to engage in jihad.  That's outside the scope of

20  cross-examination.  We would ask that it be stricken.           12:11:11

21        THE COURT:  Well, there was some questioning about

22  jihad and what meaning would have been given to Mr. --

23        MR. MORRISSEY:  And he was specifically asked --

24        THE COURT:  -- Simpson -- let me finish,

25  Mr. Morrissey -- Mr. Simpson's statements regarding it.  And so  12:11:29

1    I think there's enough with respect to those questions that

2    were brought out to allow this line of questioning.  So you may

3    continue.

4    BY MR. MORRISSEY:

5    Q.  And you may answer.  And the question is:  Did you believe          12:11:44

6    Mr. Simpson had been truthful to you when you asked about

7    Mr. Yong and Mr. Deng and their plans?

8    A.  No.

9         MR. WILLIAMS:  Objection to what the agent believes.

10   It calls for a legal conclusion.                                        12:11:59

11        THE COURT:  Sustained on that.

12   BY MR. MORRISSEY:

13   Q.  Did you -- based on your investigation, did Mr. Simpson, in

14   your view, make more than one false statement to you in the

15   interview of January 7th, 2010.                                         12:12:14

16   A.  Yes.

17        MR. WILLIAMS:  Objection, calls for a legal

18   conclusion.

19        THE COURT:  Sustained.

20   BY MR. MORRISSEY:                                                       12:12:25

21   Q.  In your interview with Mr. Simpson on January 7th, 2010,

22   were his -- were Mr. Simpson's statements with respect to plans

23   of Mr. Deng that had been presented to Mr. Simpson, accurate?

24        MR. WILLIAMS:  Objection, foundation, speculation,

25   calls for a legal conclusion.                                           12:12:47

1          MR. MORRISSEY:  Your Honor, its source is based on his

2    investigation.

3          THE COURT:  Well, you may answer.

4          THE WITNESS:  Based on our investigation, when

5    Mr. Simpson told us that Mr. Yong had no plans to travel          12:12:57

6    overseas, we did not feel that was a truthful response.

7    BY MR. MORRISSEY:

8    Q.  And when you asked about Mr. Deng, at this point in this

9    investigation, Mr. Deng, we've established just through the

10   universe of five tapes, Mr. Deng had portrayed himself as        12:13:16

11   someone who would travel oversees to fight jihad, correct?

12   A.  Correct.

13   Q.  Based upon the investigation as it was presented to

14   Mr. Simpson through Mr. Deng, was Mr. Simpson's statement that

15   Mr. Deng was going back to Africa to go to his homeland          12:13:34

16   accurate?

17   A.  No.

18   Q.  Now, you were asked on cross whether or not Mr. Simpson, if

19   he had the visa worked out, would be able to fly to

20   South Africa.  Do you recall that?                               12:14:09

21   A.  Yes.

22   Q.  If Mr. Simpson had been placed on the no-fly list, would he

23   have been able to travel to South Africa?

24          MR. WILLIAMS:  Objection, speculation, relevance.

25          THE COURT:  Overruled.  You may answer.                   12:14:27

1        THE WITNESS:  If Mr. Simpson were on the TSA no-fly

2   list, he would not have been able to fly aboard any U.S.-based

3   carrier or any airline flying into the U.S.

4   BY MR. MORRISSEY:

5   Q.  You were asked on cross whether or not Mr. Simpson had ever          12:14:40

6   used the words 'violent jihad' together in quotes, those exact

7   words as a quote.  Do you recall that?

8   A.  I recall it.

9   Q.  Did Mr. Simpson do that, to your knowledge?

10  A.  I don't recall if he ever used those two words together.          12:14:56

11  Q.  Did you ever, either here today, grand jury, or at the

12  detention hearing, ever assert that he used those words in a

13  quote?

14  A.  No.

15  Q.  You were asked about whether or not you knew Mr. Simpson's          12:15:18

16  statements about his travel to Somalia were accurate given your

17  investigation.  Do you recall that?

18  A.  Yes.

19  Q.  Regardless -- well, assume for a minute that Mr. Simpson

20  had not been truthful to you about whether he had discussed          12:15:42

21  traveling to Somalia.

22  A.  Okay.

23  Q.  And that you knew that he had not been truthful.

24  A.  Okay.

25  Q.  Did whether or not he was truthful bear upon your risk          12:15:55

1    assessment of Mr. Simpson's ability to go fight jihad?

2            MR. WILLIAMS:  Objection, calls for speculation.

3            MR. MORRISSEY:  Goes to materiality, Your Honor.

4            THE COURT:  Well, I don't understand the question.

5            MR. MORRISSEY:  Let me rephrase it.                    12:16:13

6            THE COURT:  Okay.

7    BY MR. MORRISSEY:

8    Q.  If Mr. Simpson denied that he had discussed traveling to

9    Somalia, and you believed, based on the recordings, that he had

10   in fact had discussions about traveling to Somalia.           12:16:32

11   A.  Yes.

12   Q.  Then did it matter to your investigation whether or not

13   Mr. Simpson told you the truth or not?

14   A.  Yes, it did.

15   Q.  Why did it matter?                                        12:16:43

16           MR. WILLIAMS:  Objection, relevance.

17           THE COURT:  Overruled.

18           THE WITNESS:  It mattered in that the fact that

19   Mr. Simpson attempted to conceal what we felt were discussions

20   about going to Somalia to fight jihad, we felt that he truly  12:16:55

21   did intend to do that.  And his --

22           MR. WILLIAMS:  Objection, this is speculation and --

23           MR. MORRISSEY:  No, it's not.

24           THE COURT:  Well --

25           MR. MORRISSEY:  It goes to the course of              12:17:12

 1    investigation.

 2              MR. WILLIAMS:  It's speculation as to what he felt.

 3              THE COURT:  Well, I don't -- what they felt, I'm not

 4    sure is appropriate.  So that matter is sustained.

 5    BY MR. MORRISSEY:                                          12:17:25

 6    Q.  Agent Hebert, without reference to your feelings, would you

 7    answer what -- why did it matter to your investigation and what

 8    steps you would take regarding Mr. Simpson even if you did not

 9    believe his denial of having discussed traveling to Somalia?

10              MR. WILLIAMS:  Objection, form of the question.    12:17:46

11              THE COURT:  Overruled.  You may answer.

12              THE WITNESS:  Would you repeat the question, please.

13    BY MR. MORRISSEY:

14    Q.  Sure.  What steps did you want to take in the investigation

15    even though you did not believe Mr. Simpson's denial that he    12:17:59

16    had not discussed traveling to Somalia?

17    A.  We believe that due to Mr. Simpson's denial, he was trying

18    to conceal the fact that he truly did want to travel outside of

19    South Africa, specifically to Somalia, for jihad.  As such, we

20    needed to take additional steps to try to prevent him from    12:18:23

21    taking that first step to South Africa.  In this case, we

22    attempted to get him added to the no-fly list but were

23    unsuccessful.

24              Our next step would have been to request Attorney

25    General authority to release that -- his information to the    12:18:41

 1  South African government, which -- at which time we would have

 2  requested the South African government to assist us in our

 3  investigation.

 4          MR. MORRISSEY:  No further questions.

 5          THE COURT:  Thank you.  You may step down.                    12:18:57

 6          We will go ahead and take our lunch recess at this

 7  time.  And Mr. Mitchell is here and has been waiting very

 8  patiently.

 9          Can you come forward, Mr. Mitchell.

10          MR. MITCHELL:  Good afternoon again, Your Honor.  I           12:19:14

11  have had an opportunity to speak to my client, he is prepared

12  to testify today.  And the issues that were discussed with the

13  Court have been addressed.

14          THE COURT:  All right.  And so when will he be on your

15  schedule, is he next?                                                12:19:32

16          MR. MORRISSEY:  Yes.

17          THE COURT:  Okay.  So after lunch?

18          MR. MORRISSEY:  Yes.

19          MR. MITCHELL:  Judge, what is the Court's calendar for

20  the rest of the day?  What time are you coming back?                 12:19:39

21          THE COURT:  Well, I'm just about to determine that.

22  It's about 12:20 right now.  And we probably will return at

23  1:30.

24          MR. MITCHELL:  Okay.

25          THE COURT:  And so your direct is going to take --           12:19:51

1          MR. MITCHELL:  I have just a quick 1:30 hearing.  But

2    I anticipate that direct will last over 30 minutes or so?

3          MR. MORRISSEY:  We are going to get to recordings

4    pretty quick.

5          THE COURT:  You have a 1:30 here in the building?          12:20:05

6          MR. MITCHELL:  No, no, Your Honor, just across the

7    street.  I anticipate being here at two o'clock.  My more

8    concern is being present for the cross-examination than more

9    for the direct.  I'm not so much concerned about the direct

10   examination.  I'm more concerned about the cross.  But if it is     12:20:20

11   the Court's will that you want me here for all of his

12   testimony, then I will move something around so that I can be

13   back here at 1:30.  If the Court can just give me 1:45, even

14   so, they can start it, but I will be here by the time that they

15   finish the direct testimony.                                     12:20:39

16         MR. MORRISSEY:  May I speak, Your Honor?

17         THE COURT:  Yes.

18         MR. MORRISSEY:  I think that procedure will work.  But

19   I would ask Mr. Mitchell having now represented Mr. Deng and

20   having had his attorney-client discussions with Mr. Deng, does     12:21:01

21   the Court see a need to further inquiry -- inquire by itself

22   with Mr. Deng on these subjects?

23         THE COURT:  Well, I do.  That's what I'm trying to

24   figure out when I would do that, if it would be before he took

25   the stand.  And so what time do you think your hearing will be     12:21:18

```
 1   over?

 2          MR. MITCHELL:  I could be -- I could be back here at

 3   two o'clock, Judge.

 4          THE COURT:  Do you have -- you say you have another

 5   witness?                                                    12:21:32

 6          MR. MORRISSEY:  I do.  And I could put Mr. Turner on.

 7          THE COURT:  All right.  Then we will do that until --

 8          MR. WILLIAMS:  Your Honor, I just wanted the parties

 9   to be aware that I'm anticipating making a motion to dismiss

10   for misleading testimony being presented to the grand jury    12:21:44

11   based on the testimony of Agent Hebert.

12          THE COURT:  Well, are you making that now or --

13          MR. WILLIAMS:  I am making that motion now.

14          THE COURT:  All right.  Well --

15          MR. MITCHELL:  Excuse me.                           12:21:58

16          THE COURT:  Why don't you come back at two and then we

17   will proceed with -- or as soon as you can after you're done

18   with your 1:30.  I know we've imposed upon you unexpectedly

19   today, Mr. Mitchell, and I appreciate your willingness to

20   respond to the request of the Court to represent an individual  12:22:13

21   here today.

22          MR. MITCHELL:  Yes, ma'am.

23          THE COURT:  So you are relieved here.

24          MR. MITCHELL:  Thank you, Judge.

25          THE COURT:  And then, Mr. Williams, go ahead and make  12:22:23
```

1    your motion.

2         MR. WILLIAMS:  Your Honor, I make a motion to dismiss

3    for misleading evidence being presented to the grand jury.

4    Agent Hebert testified that Mr. Simpson had been asked on

5    several occasions whether or not he had discussed traveling to          12:22:42

6    Somalia, and his testimony today was that he did not ask in a

7    direct fashion.  He also indicated that a second question was

8    asked by -- that he asked a second question, and that's whether

9    or not he was planning to engage in a violent jihad.  And he

10   said no.                                                                12:23:07

11        At the grand jury, the testimony was that even though

12   he was asked in roundabout ways, he continued to deny any sort

13   of discussion of traveling to Somalia.

14        The second question or portion of that statement was

15   towards the end of the conversation, specifically, "I want a            12:23:23

16   'yes' or 'no' answer, have you discussed traveling to or are

17   you planning to travel to Somalia?"  This is on page 13 of the

18   grand jury transcripts.  That second question is a compound

19   question and could not be answered in a way that would allow

20   for a false statement.  And so I believe it -- it can't be              12:23:43

21   established that it's a false statement.

22        The other language that he had denied any sort of

23   discussion of traveling to Somalia is just not true.  And

24   that's the evidence, based on his own testimony, and that's the

25   evidence that was presented to the grand jury.  That's the             12:24:01

```
 1    issue that we are dealing with here today.  That is it.  It is
 2    misleading, and it is inaccurate.  And based on that, the --
 3    this case should be dismissed for that information in the
 4    fashion that it was presented to the grand jury.  So I move the
 5    case be dismissed.                                              12:24:18
 6         THE COURT:  Well, I'm just not that familiar with the
 7    standard for dismissing a case based on information or evidence
 8    presented at the grand jury, Mr. Williams.  What's the basis?
 9    Is there some authority?
10         MR. WILLIAMS:  Well, at least the standard for the        12:24:33
11    Government to present evidence is to -- and I know the Court is
12    well aware of this, is to establish probable cause as to where
13    a crime has been committed.  In this case, they are stating
14    that he had made statements or denied that he had traveled to
15    Somalia.  And by his own testimony, that wasn't -- or that he   12:24:50
16    had -- that they had asked him in roundabout ways that he had
17    denied traveling to Somalia.  And that's just not true.
18         THE COURT:  All right.  Mr. Morrissey?
19         MR. MORRISSEY:  Your Honor, the -- there's two flaws
20    with Mr. Williams' argument.  First, the testimony in the grand 12:25:13
21    jury, and I read it in, it was page 12, was whether or not
22    Mr. Simpson -- "Did Mr. Simpson specifically deny that he had
23    ever discussed with anyone traveling to Somalia?"
24         Answer, "He did deny that."
25         That is accurate testimony.  The agent reaffirmed it       12:25:33
```

1   on redirect that his testimony in the grand jury was accurate.

2           He was asked, the agent was asked, "Was he asked that

3   multiple times?"

4           Answer, "He was."

5           The agent reaffirmed that that was accurate testimony.    12:25:46

6           I understand that Mr. Williams would like to make an

7   argument to this Court on semantics.  But to convert that to

8   that this was misleading testimony that undermines the

9   viability of a probable cause determination is simply not

10  supported on this record.                                        12:26:08

11          When you go to page 12 of the grand jury, you don't

12  isolate one question.  The question, by the way, that

13  Mr. Williams focuses on -- actually he's focusing on an answer.

14  And the answer for the third or fourth time in that testimony,

15  it was a little confusing.  There's no doubt about that.  But   12:26:29

16  there's also no doubt that based on what Mr. -- Agent Hebert

17  was asked in the grand jury, which was point blank, he was

18  asked -- "Was Mr. Simpson asked whether he specifically denied

19  discussing with anyone traveling to Somalia?"  And the

20  testimony was he did deny that.  And we heard that on redirect.  12:26:48

21          There's no basis to say that inaccurate testimony was

22  given at the grand jury.  And Mr. Williams can argue whatever

23  he wishes to this Court, but that's argument, not a motion

24  based upon misleading a grand jury.

25          THE COURT:  Well, I guess, we -- I had asked            12:27:04

1    previously, and both sides were a little tentative in terms of

2    wanting this grand jury exhibit -- defense Exhibit 101

3    introduced into evidence.  But I think I need to read the

4    entire grand jury testimony at this point in time.  It looks

5    like it's about 20 pages from what I'm looking at here.        12:27:26

6          Is there any objection to that?  I'm just trying to

7    figure out why only certain parts were referred to and not the

8    whole grand jury.  One, Mr. Williams, if you think you have a

9    basis for a motion for -- based on misleading evidence, and,

10   two, if the Government thinks that that doesn't support the     12:27:49

11   motion, is there any objection to the Court's review of that

12   transcript?

13         MR. MORRISSEY:  I -- Judge, I don't have any objection

14   to this Court reviewing the grand jury testimony.  As we focus

15   on the trial issue before the Court, though, I object to       12:28:04

16   consideration of the grand jury testimony.  The guilt or

17   innocence that this Court will find as a finder of fact today

18   is based on trial testimony in court.

19         But for Mr. -- purposes of Mr. Williams' motion, I

20   have no objection to the Court reviewing the grand jury        12:28:26

21   testimony.

22         THE COURT:  All right.  Mr. Williams?

23         MR. WILLIAMS:  I agree.

24         THE COURT:  All right.  Thanks.  I'll look at that

25   over the -- over the lunch hour and then --                    12:28:34

1          MR. MORRISSEY:  Does the Court have a copy of it?

2          THE COURT:  I have defense Exhibit 101.  Is that it?

3          MR. MORRISSEY:  I think -- yes, it is.  Okay.

4          THE COURT:  Is that it?  It looks like it is.

5          MR. MORRISSEY:  It is.  Your Honor, what time are we          12:28:55

6   back?

7          THE COURT:  Well, let's go ahead and resume at 1:45.

8   And we will resume in my courtroom now.  It is -- everything is

9   fixed supposedly at this point in time.  So --

10         Is that a problem?          12:29:13

11         MR. MORRISSEY:  Yes.  Your Honor, I'll be first to

12  admit, I'm not great with audiovisual exhibits.  My office will

13  have Carol Ruiz here to assist me.  It works in this courtroom.

14  We've got it set up.  We've gotten the big speaker, I would ask

15  that we remain here at least for -- well, I would ask that we          12:29:30

16  remain here.

17         THE COURT:  Well, Mr. Williams?

18         MR. WILLIAMS:  Your Honor, I think based on what I

19  understand, we may finish today.  I don't see any reason, I

20  have no objection to --          12:29:44

21         THE COURT:  All right.  We will remain here today.  We

22  will not be here tomorrow if we continue.  We will be over in

23  my courtroom.  But we will go ahead and proceed here today,

24  this afternoon.

25         All right.  We will be in recess.          12:29:55

1          I should tell you, I have a couple of matters I tried

2   to schedule for the end of the day, criminal matters.  So

3   probably around 3:45, I'll need to see if everybody is present

4   on those.  I might have to take a brief recess around 3:30 to

5   take up one or two of those matters.  And then we can try to          12:30:16

6   resume if we are not finished by then.

7          All right.  We will be in recess.

8          (The noon recess was taken.)

9          THE COURT:  The record should reflect the presence of

10   the defendant, his counsel, counsel for the United States.          13:58:18

11          You may be seated.

12          Before we resume with the trial, I wanted to take up

13   the motion to dismiss.  I think, Mr. Williams, you styled it as

14   a motion to dismiss for misleading evidence being presented to

15   the grand jury.          13:58:19

16          MR. WILLIAMS:  Right.

17          THE COURT:  That's a novel way to present the motion,

18   but based on my review and the discussion, it appears that when

19   a defendant challenges an indictment based on evidence

20   presented before the grand jury, and it's linked to          13:58:19

21   misinformation or false information, then it calls into

22   question the conduct or misconduct of the prosecutor in

23   presenting that.

24          In looking over these types of motions, or related

25   motions that I found in other cases, it appears that when          13:58:19

```
 1    there's a question of whether a witness' testimony at trial
 2    showed that that same witness had given misinformation,
 3    misleading information, or perjured himself before the grand
 4    jury, and then there's a -- often a motion to dismiss based on
 5    that, and that's how I'm interpreting what you're asking for.      13:58:32
 6    Is that what you're asking?
 7               MR. WILLIAMS:  Your Honor, I phrased the motion in the
 8    way that I did because Detective Hebert's testimony was that he
 9    did not disclose to Mr. Morrissey that he had misstated the
10    testimony or misspoke the testimony until Sunday, this weekend.    13:58:50
11    And so there was no basis that the Government had intended or
12    purposely intended to introduce false or misleading testimony.
13    It sounds like he wasn't aware of it.  And that's why I phrased
14    it the way I did.
15               THE COURT:  All right.  Based on the record before me,   13:59:07
16    then, let me just tell you what I have been able to find and
17    then my ruling.  Alleged misconduct before the grand jury
18    requires dismissal of the indictment only as a drastic step and
19    is generally disfavored as any remedy.  And the defendant here
20    claims, from what I've been able to gather from the discussion    13:59:44
21    before the break, is that the Government presented misleading
22    testimony to the grand jury concerning these statements that
23    were made by Agent Hebert.  I'm sorry, there's a different way
24    of pronunciation.  What is it?
25               AGENT HEBERT:  I pronounce it Hebert.                    14:00:09
```

```
 1          THE COURT:  Hebert.  Based upon the testimony

 2   presented by Agent Hebert regarding the discussions that he had

 3   with the defendant in this case.  And to justify dismissal

 4   based on allegations of incorrect statements, the defendant

 5   must prove that the Government obtained an indictment by          14:00:32

 6   knowingly submitting perjured testimony to the grand jury.

 7   That appears to be the standard.  And for a statement to rise

 8   to the level of perjury --

 9          MR. WILLIAMS:  Your Honor, I apologize.  Based on that

10   and the information that I have, I withdraw the motion.           14:00:50

11          THE COURT:  All right.  The motion was withdrawn.

12   Thank you.

13          You may call your next witness.

14          MR. MORRISSEY:  Thank you, Your Honor.  May I walk

15   outside and see if Mr. Mitchell is here?  Because if he is        14:01:03

16   here, I'm going to call Mr. Deng.

17          THE COURT:  That's fine.

18          MR. MORRISSEY:  Your Honor, the Government calls Agent

19   Lance Turner.

20          THE COURT:  Please come forward and be sworn.              14:01:36

21          (The witness, Lance D. Turner, was duly sworn.)

22          THE COURTROOM DEPUTY CLERK:  Would you please state

23   your name for the record and spell your last name.

24          THE WITNESS:  Lance D. Turner, T-u-r-n-e-r.

25          THE COURTROOM DEPUTY CLERK:  Thank you, Mr. Turner.        14:01:58
```

```
 1                          LANCE D. TURNER,

 2   called as a witness herein, having been first duly sworn, was

 3   examined and testified as follows:

 4

 5                          DIRECT EXAMINATION

 6   BY MR. MORRISSEY:

 7   Q.  Agent Turner, who do you work for?

 8   A.  The Federal Bureau of -- excuse me, the Federal Bureau of

 9   Investigation.

10   Q.  How long have you worked for them?                    14:02:14

11   A.  Approximately six years.

12   Q.  What is your current assignment with the FBI?

13   A.  I'm assigned as a special agent working counterterrorism

14   matters.

15   Q.  Have you been assigned to counterterrorism for the entirety  14:02:25

16   of your six years with the FBI?

17   A.  Yes, I have.

18   Q.  Where are you currently located?

19   A.  The Las Vegas, Nevada division.

20   Q.  Did you previously work in the Phoenix division of the FBI?  14:02:35

21   A.  I did.

22   Q.  What were those dates?

23   A.  From February 2005 to June of 2010.

24   Q.  While you were with the Phoenix FBI, were you a case agent

25   on the Elton Simpson investigation?                       14:02:49
```

1    A.  Yes, I was.

2    Q.  In March -- specifically March 8th of 2007, did you have

3    contact with Elton Simpson?

4    A.  Yes, I did.

5    Q.  Where was that?                                                  14:03:03

6    A.  It was at Abdul -- Mr. Abdul Khabir Hyman's residence.

7    Q.  And how was it that you came to see Mr. Simpson on that

8    day?

9    A.  Subsequent to the arrest of a Mr. Hassan Abu Jihaad,

10   several of us were contacting people that knew Mr. Hassan Abu    14:03:21

11   Jihaad.

12   Q.  When you said several of us, who went to -- did you say

13   Mr. Hyman's house?

14   A.  Correct.

15   Q.  Who went there that day?                                        14:03:33

16   A.  Myself, Agent Jeff Hebert, Agent John Volpe, Agent Gil

17   Orrantia, and Agent Orlando Pages.

18          THE COURT REPORTER:  I'm sorry, Your Honor, I didn't

19   hear that name.

20          THE WITNESS:  Orrantia, O-r-r-a-n-t-i-a.                     14:03:35

21   BY MR. MORRISSEY:

22   Q.  And did you say one other name after Mr. Orrantia?

23   A.  Agent Orlando Pages.

24   Q.  Okay.  Describe what you did on that day at Mr. Hyman's

25   house.                                                              14:04:00

1    A.  We knocked on the door.  Mr. Simpson answered the door.  We

2    asked if we could speak with Mr. Simpson and Mr. Hyman, to

3    which Mr. Simpson allowed us into the residence.  At that

4    point, Mr. Pages, or excuse me, Agent Pages and Agent Orrantia

5    took Mr. Hyman into a separate room to interview him                14:04:17

6    separately.  At that point, myself, Agent Hebert, and Agent

7    Volpe attempted to interview Mr. Simpson there in the living

8    room.

9    Q.  When you say you attempted to interview Mr. Simpson, you

10   identified yourselves as FBI?                                        14:04:34

11   A.  Yes, we did.

12   Q.  And did you tell Mr. Simpson what you wanted to talk to him

13   about?

14   A.  We did.  We --

15   Q.  What was that topic?                                             14:04:41

16   A.  We stated we wanted to speak with him about his knowledge

17   of Mr. Hassan Abu Jihaad.

18   Q.  Had Mr. Abu Jihaad been recently arrested in Phoenix?

19   A.  Yes.

20   Q.  Was Mr. Simpson willing to talk to you about Hassan Abu          14:04:55

21   Jihaad?

22   A.  He was not.

23   Q.  Did you honor his request not to speak about Hassan Abu

24   Jihaad?

25   A.  Yes, we did.                                                     14:05:09

1   Q.  Did you or anyone have any discussion with Mr. Simpson

2   after that on that day?

3   A.  There was no discussion regarding Mr. Hassan Abu Jihaad or

4   anything of that nature.  However, we waited, Agent Hebert and

5   myself and Agent Volpe, while Agent Pages and Orrantia were                    14:05:30

6   finishing up their interview in a separate room.  We waited in

7   the living room with Mr. Simpson, at which point Mr. Simpson

8   proceeded to expound his beliefs on the religion of Islam.

9   Q.  And was Special Agent Volpe willing to engage in that

10  discussion?                                                                     14:05:50

11  A.  He was.

12  Q.  So there was a discussion between those two about Islam?

13  A.  The tenets of Islam, generally speaking.

14  Q.  Nothing about what you had gone to talk to Mr. Simpson

15  about that day?                                                                 14:06:00

16  A.  No.

17  Q.  On January 7th, 2010, did you go to interview Mr. Simpson

18  again?

19  A.  Yes.

20  Q.  Who were you with?                                                          14:06:12

21  A.  I was with Agent Hebert and Special Agent Wyatt Storm.

22  Q.  Where did your interview take place?

23  A.  It took place at -- I believe it was at Mr. Simpson's

24  father's residence.

25  Q.  Is that in Avondale, Arizona?                                              14:06:23

1    A.   Yes.

2    Q.   How did the contact begin on that day?

3    A.   We knocked on the door.  Mr. Simpson -- Elton Simpson

4    answered the door.  We identified ourselves as agents with the

5    FBI and that we had some questions for him.                        14:06:35

6    Q.   Was Mr. Simpson willing to talk to you?

7    A.   He was.  He proceeded to step out a little bit from the

8    door and then closed the front door.

9    Q.   And if he -- if he left the front to the house and shut the

10   door, where did the interview take place?                          14:06:53

11   A.   Right there on the front porch.

12   Q.   Did you make any -- did you or any other person present

13   make any promises that day to get Mr. Simpson to speak with

14   you?

15   A.   No.                                                           14:07:06

16   Q.   Did you make any threats?

17   A.   No.

18   Q.   Did you coerce him in any way?

19   A.   We did not.

20   Q.   Was he in custody on that day?                                14:07:11

21   A.   No.

22   Q.   At the outset of the interview, who was asking the

23   questions?

24   A.   I was.

25   Q.   Was there any small talk at the beginning?                    14:07:21

1    A.  Very little, if any.

2    Q.  Okay.  What did you ask Mr. Simpson?

3    A.  I asked Mr. Simpson about his travel plans to go to

4    South Africa.

5    Q.  What did Mr. Simpson say?                                    14:07:32

6    A.  He stated that he was preparing to go to South Africa.  I

7    believe he may have had a flight scheduled.  However, he was

8    awaiting a visa, that he was going to South Africa to study

9    for, I believe, five years at a madrassa.

10   Q.  If he was studying at a madrassa, did you know -- did you   14:07:50

11   know what a madrassa is?

12   A.  I do have some knowledge of a madrassa, yes.

13   Q.  What's a madrassa?

14   A.  From my understanding, it's a place to go and study Islam

15   full time.                                                      14:08:06

16   Q.  Was it clear from context that when Mr. Simpson told you he

17   was going to study at a madrassa, that he was going to study

18   Islam?

19   A.  I believe so, yes.

20   Q.  Did you ask Mr. Simpson the name of the school?             14:08:22

21   A.  I did.

22   Q.  What was the answer?

23   A.  He stated that because we were the FBI, we should already

24   have that information in our possession.

25   Q.  Did Mr. Simpson later supply that information to the FBI?   14:08:36

 1   A.  He did not.

 2   Q.  Do you know if he called Agent Storm and left the name of

 3   the school on Agent Storm's answering machine?

 4   A.  Okay.  Yes, he did.  I apologize for that.  I believe he

 5   did call later on, a few days later.                          14:08:50

 6   Q.  So not during the interview?

 7   A.  No.

 8   Q.  Okay.  Did you ask Mr. Simpson what he was going to do once

 9   he completed his studies in South Africa?

10   A.  I did.                                                    14:09:06

11   Q.  What did he say?

12   A.  He said he didn't have any firm commitments or plans at

13   that point.

14   Q.  Did you ask Mr. Simpson whether or not he had talked to

15   anyone about traveling to places other than South Africa?     14:09:17

16   A.  Correct.  At this point in the interview, Special Agent

17   Hebert asked specifically:  Have you discussed with anyone

18   travel to anywhere else other than South Africa?  To which he

19   replied no.

20        At that point, Agent Hebert asked:  Have you discussed   14:09:35

21   traveling anywhere -- or excuse me, discussed with anyone else

22   travel to Somalia.

23   Q.  And when Agent Hebert asked that question, what did

24   Mr. Simpson say?

25   A.  There was no direct response.  However, he said:  I don't  14:09:53

1    know where you would get that information or why anyone would

2    tell you that information.

3    Q.  So I understand, Mr. Simpson was asked by Agent Hebert:

4    Have you discussed with anyone traveling to Somalia; is that

5    right?                                                          14:10:13

6    A.  Yes.  At that point, yes.

7    Q.  And at that point, Mr. Simpson's response was to question

8    why he was being asked that question?

9    A.  Correct.

10   Q.  Is that what you mean by not a direct answer?              14:10:23

11   A.  Yes.

12   Q.  Was the question about discussions of travel to Somalia

13   asked a couple of times?

14   A.  It was.  At this point in the interview, Mr. Simpson looked

15   directly at me.  I think -- well, I think sensing that Agent   14:10:41

16   Hebert was being too aggressive.  He looked at me and said, "I

17   thought we were having a nice conversation here."  To which --

18   Q.  What did you say at that point?

19   A.  I probably shook my head.  I don't -- I was nonresponsive.

20   Q.  If you don't recall, it's okay.                            14:11:03

21   A.  I don't recall, however, I do recall after this Agent

22   Hebert said specifically --

23           MR. WILLIAMS:  Objection as to what Agent Hebert said.

24           THE WITNESS:  Excuse me.

25           MR. MORRISSEY:  Your Honor --                          14:11:13

1          THE COURT:  Sustained.

2    BY MR. MORRISSEY:

3    Q.  You were present.  Agent -- Agent -- I'm sorry, Mr. Simpson

4    turned to you and said, "Hey, I thought this was a friendly

5    interview."                                                    14:11:26

6    A.  Correct.

7    Q.  Did the topic of whether or not Mr. Simpson had discussed

8    with anyone traveling to Somalia continue?

9    A.  Yes.

10   Q.  Did another -- did you ask another question on that or did   14:11:38

11   Agent Hebert?

12   A.  Agent Hebert did.

13   Q.  What did Agent Hebert ask Mr. Simpson at that point?

14          MR. WILLIAMS:  Objection, hearsay as to what

15   Agent Hebert asked.                                            14:11:50

16          MR. MORRISSEY:  Your Honor, it is nonhearsay, the fact

17   of the question is nonhearsay.  It's both the course of the

18   investigation and not offered for its truth.

19          THE COURT:  I'm going to allow it.  Overruled.

20          You may answer the question.                            14:12:00

21          THE WITNESS:  The question was asked:  "Yes" or "no"

22   have you ever discussed with anyone travel to Somalia.

23   BY MR. MORRISSEY:

24   Q.  And what did Mr. Simpson say?

25   A.  No.                                                        14:12:10

1    Q.  He said no, he had not?

2    A.  He had not.

3    Q.  After this no answer on that topic, what happened?

4    A.  A follow-up question was answered; have you ever discussed

5    with anyone waging violent jihad?                              14:12:22

6    Q.  And what did Mr. Simpson say?

7    A.  No.

8    Q.  What happened next?

9    A.  I proceeded to show Mr. Simpson a series of pictures.

10   Q.  Did you show Mr. Simpson a picture of Dabla Deng?          14:12:40

11   A.  Yes.

12   Q.  Did he recognize Mr. Deng?

13   A.  He did.

14   Q.  Did you ask him -- did you ask any questions about Mr. Deng

15   at that time?                                                  14:12:53

16   A.  I asked if Mr. Deng had any plans to travel overseas.

17   Q.  What did Mr. Simpson say?

18   A.  He stated that if he did, it would have been to travel back

19   to his home country to live, which I believe is Sudan.

20   Q.  Who else did you show to him?                              14:13:09

21   A.  I showed him a photo of John Gordon Sabari.

22   Q.  How do you spell Sabari?

23   A.  S-a-b-a-r-i.

24   Q.  Did Mr. Simpson recognize Mr. Sabari?

25   A.  He did.                                                    14:13:21

1    Q.   Did he make any statements about Mr. Sabari?

2    A.   He was asked whether or not Mr. Sabari had any plans to

3    travel overseas, to which he replied no.

4    Q.   Who else did you show a photo of?

5    A.   I showed a photo of Roberto Yong.                          14:13:34

6    Q.   Is Yong spelled Y-o-n-g?

7    A.   Yes.

8    Q.   Did Mr. Simpson recognize Mr. Yong?

9    A.   He did.

10   Q.   Did say anything about Mr. Yong?                           14:13:45

11   A.   He was asked whether or not Mr. Yong had plans to travel

12   overseas, to which he replied no.

13   Q.   Anyone else you showed him a photo of?

14   A.   A photograph of Saabir Nurse.

15   Q.   How do you spell Saabir?                                   14:13:59

16   A.   S-a-a-b-i-r.

17   Q.   Did he recognize Mr. Nurse?

18   A.   He did.

19   Q.   Did you ask him anything about Mr. Nurse?

20   A.   No.  Mr. Simpson responded that he knew Saabir Nurse as a  14:14:07

21   good guy, someone he met in high school.  He was unaware that

22   Mr. Nurse was a Muslim until Mr. Simpson had, I believe, taken

23   shahada at the mosque.  And Mr. Nurse came up afterwards to

24   congratulate him, and that's when he found out that Mr. Nurse

25   was a Muslim.                                                   14:14:30

1    Q.  Did you know what shahada was?

2    A.  Yes.

3    Q.  What is shahada?

4    A.  It's my understanding, that it is the process you go

5    through to become a Muslim.                                    14:14:36

6    Q.  After the showing of the photographs and the discussions of

7    those individuals, was there any questioning or discussion

8    about what this group of individuals did together?

9    A.  Yes.  Mr. Simpson stated that this group of individuals

10   would get together about three times a month to discuss        14:14:55

11   politics and to generally hang out together.

12   Q.  Did Mr. Simpson have any questions for you on that day?

13   A.  He did.

14   Q.  What was his question?

15   A.  He asked me if I knew how the appeal was going for          14:15:13

16   Mr. Hassan Abu Jihaad.

17   Q.  What did you tell him?

18   A.  I told him I didn't have any information on that matter.

19   Q.  When Mr. Simpson denied to you that he had discussed with

20   others traveling to Somalia, was that denial capable of        14:15:32

21   influencing your investigation?

22   A.  Yes.

23         MR. WILLIAMS:  Object -- objection, calls for a legal

24   conclusion, ask that it be stricken.

25         THE COURT:  Overruled.                                    14:15:48

1          You may answer.

2    BY MR. MORRISSEY:

3    Q.  How was it capable of influencing your investigation?

4    A.  At that point in the investigation, we had several

5    recordings and tapes of Mr. Simpson stating to the contrary,          14:15:57

6    things to the nature of it's time to go to Somalia, things of

7    that nature.  To which, based upon getting a deceitful answer

8    from him, our investigation was heightened in that any travel

9    for this Mr. Simpson would be heavily scrutinized.  We would

10   try to put him on the no-fly list for one as we do not want a          14:16:23

11   threat of that nature to obviously go overseas.

12   Q.  Did you, subsequent to this interview with Mr. Simpson, in

13   fact attempt to place him on the no-fly list?

14   A.  Yes.

15   Q.  Was that successful?          14:16:41

16   A.  No.

17   Q.  Did Mr. Simpson's denial have any effect on your

18   investigations of his associates?

19   A.  Yes.

20   Q.  And in what way?          14:16:54

21   A.  In that, again, more scrutiny would be placed upon those

22   individuals as to what were they doing, what may they be

23   planning, not only here locally in the Phoenix area, but

24   overseas as well.

25          MR. MORRISSEY:  No further questions.          14:17:13

                        CROSS-EXAMINATION

1

2    BY MR. WILLIAMS:

3    Q.  Agent Turner, you were present at the interview of Sabari;

4    is that correct?

5    A.  Yes, I was.                                              14:17:27

6    Q.  And then he told you that he wasn't involved with anything,

7    correct?

8    A.  That he was not involved with anything?

9    Q.  Correct.

10   A.  Yes.                                                     14:17:33

11   Q.  He told you the others that he hung around with, including

12   Mr. Simpson, wasn't involved in any terrorist activity; is that

13   correct?

14   A.  He told us, as I recall, to not be concerned about these

15   guys, that -- but I specifically remember Mr. Sabari stating he  14:17:44

16   had no plans for travel.

17   Q.  And he told you not to be concerned, because they were not

18   involved in any illegal or terrorist activities, correct?

19   A.  I believe that's correct.

20   Q.  But yet you still interviewed Mr. Simpson the following    14:17:57

21   day, correct?

22   A.  I don't recall if it was the following day, but it was

23   shortly after.

24   Q.  It was after that, correct?

25   A.  Yes.                                                     14:18:08

1    Q.  The fact that one of his associates told you that nothing

2    was going on did not prevent you or stop you from conducting

3    your investigation, correct?

4    A.  Correct.

5    Q.  And that's because you were not going to rely on what they      14:18:20

6    told you?

7    A.  Correct.

8    Q.  And you, prior to speaking with Mr. Simpson on July 7,

9    2010, knew that he was --

10   A.  You mean January 7th?                                           14:18:35

11   Q.  January 7, 2010, knew that he was going to be traveling to

12   South Africa, correct?

13   A.  Yes.

14   Q.  And you knew that he was going to be traveling to

15   South Africa to study?                                             14:18:46

16   A.  Yes.

17   Q.  And you knew that he was going to South Africa to study at

18   a school.  And, in fact, prior to meeting with Mr. Simpson, you

19   knew the name of the school?

20   A.  I believe we did know the name of the school.                  14:18:57

21   Q.  Okay.  And so when Mr. Simpson said to you:  You're the

22   FBI, you should know, he was correct?

23   A.  Sure.  Sure.

24   Q.  And you were there investigating Mr. Simpson and you were

25   investigating the others because you felt that they may            14:19:12

1    possibly be traveling overseas to engage in some type of

2    terrorist activity, correct?

3    A.  Yes.  Based upon the tapes that we had through our

4    informant and from the informant information, yes, we believed

5    that these people or these subjects were discussing and                14:19:30

6    planning for overseas travel.

7    Q.  In terms of planning, you didn't have any information that

8    Mr. Simpson was planning to travel to anywhere other than

9    South Africa; would that be a fair statement?

10   A.  We knew he had a ticket to South Africa.                           14:19:50

11   Q.  And you knew he had discussed possibly going other places,

12   but you knew he was going to South Africa?

13   A.  Yes.

14   Q.  South Africa is not a hot bed of terrorism, is it?

15   A.  There are things that occur and it's awfully close to             14:20:02

16   Somalia.

17   Q.  It's about 2800 miles from Somalia, isn't it?

18   A.  I don't know that specifically, but it could be.

19   Q.  It's a long way.  So when you say it's awfully -- it's

20   close, did you misspeak?                                              14:20:19

21   A.  Well, you're getting closer that than from Phoenix,

22   Arizona.

23   Q.  But it's not close, is it?

24   A.  It depends on your definition of close.

25   Q.  Ten miles, 15 miles?                                              14:20:33

1    A.   It's not, no.

2    Q.   20 miles?

3    A.   That it is not.

4    Q.   A hundred miles?

5    A.   No.                                                          14:20:38

6    Q.   500 miles?

7    A.   I think you just told me 2800.

8    Q.   Okay.  Now, when you went to speak with Mr. Simpson on

9    January 7th of 2010, neither you, neither Agent Hebert, or

10   neither Agent Storm told Mr. Simpson why you were there, did    14:20:57

11   you?  Or what you wanted to speak with him about?

12   A.   We did.  We did want to speak to him about his travel to

13   South Africa.

14   Q.   And that was the only thing that you told him you wanted to

15   talk about?                                                      14:21:12

16   A.   You mean at the onset of the interview?

17   Q.   Yes, um-hmmm.

18   A.   At the onset of the interview, it started with the travel

19   to South Africa.  We also knew we were going to discuss his

20   discussions with others of traveling to Somalia.                14:21:26

21   Q.   Well that's what you knew, but you didn't tell that to

22   Mr. Simpson, did you?

23   A.   I did not lay out an interview plan with him, no.

24   Q.   Nor did you tell Mr. Simpson that you were interested in

25   whether or not he was going to be traveling overseas to engage  14:21:41

1  in any type of violent jihad?

2  A.  Well, based upon the questioning --

3  Q.  You didn't tell him that that's what you were interested

4  in, did you?

5  A.  I guess not.  I mean, but the questioning came out whether          14:21:54

6  he had discussed traveling overseas to Somalia and about jihad.

7  Maybe I'm not understanding the question.

8  Q.  Maybe I'm not asking the question correctly.  When you went

9  to go meet with Mr. Simpson, you and the other agents

10  identified who you were?                                                14:22:16

11  A.  Yes.

12  Q.  And it is common when go to speak with individuals, you not

13  only identify who you are, but you also tell them the reason

14  why you are there, correct?

15  A.  Yes.  Depending on the interview, yes.                             14:22:26

16  Q.  And depending on this interview, you did not advise

17  Mr. Simpson that you were there to talk about his possible

18  involvement in terrorist activity, correct?

19  A.  Not right up front, no.

20  Q.  You didn't tell him that he could have a lawyer if he              14:22:41

21  wanted?

22  A.  He wasn't in custody.

23  Q.  I understand.

24  A.  We were not going to arrest him.  And so we do a lot of

25  interviews on a daily basis where these people --                     14:22:50

1  Q.  I understand that.

2  A.  -- they may or may not be subjects.

3  Q.  Agent Turner, my question --

4         MR. MORRISSEY:  Objection.  Objection.  The witness

5  should be allowed to answer the question.                    14:22:58

6         MR. WILLIAMS:  It was a "yes" or "no" question.  He

7  did not answer it in a "yes" or "no" fashion.

8         THE COURT:  Why don't you ask it again.

9  BY MR. WILLIAMS:

10 Q.  You did not tell Mr. Simpson that you were there        14:23:06

11 investigating him and whether or not he would travel overseas

12 to engage in terrorist activity, correct?

13 A.  No.

14 Q.  And when you say "no," you did not ask him that, correct?

15 A.  I did not ask him whether he was going to travel         14:23:27

16 overseas -- I guess I'm missing the question here.

17 Q.  And I guess the original question was you did not advise

18 him that he had a right to have a lawyer?

19 A.  No, we did not.

20 Q.  Okay.  You did not tell him that he didn't have to talk to  14:23:41

21 you if he didn't want to?

22 A.  No, we did not.

23 Q.  You just simply asked him if he would talk to you?

24 A.  Yes.

25 Q.  And you had him then come outside, correct?             14:23:49

1    A.  We -- we wanted -- well, we asked to talk to him and

2    generally people will invite us inside.  He chose to come out,

3    which we were fine with.

4    Q.  Okay.  So he came out.

5    A.  Yes.                                                      14:24:04

6    Q.  All right.  And then you asked him questions about what his

7    travel plans were to South Africa?

8    A.  Yes, we did.  That's how we started.

9    Q.  Now, your investigation, or at least the FBI investigation

10   of Mr. Simpson started back sometime around 2006; is that      14:24:17

11   correct?

12   A.  Yes.

13   Q.  And it appears that sometime around 2009, the focus changed

14   to whether or not Mr. Simpson and the other individuals were --

15   would travel to overseas to engage in some type of terrorist   14:24:32

16   activities; is that correct?

17   A.  Yes.

18   Q.  And you are familiar with Dabla Deng?

19   A.  I am.

20   Q.  He is an informant for the FBI?                            14:24:46

21   A.  Correct.

22   Q.  You had a number of contacts with Mr. Deng?

23   A.  I have.

24   Q.  You were in part working with Agent Hebert in the

25   investigation with Mr. Deng?                                   14:24:59

1    A.  Yes.

2    Q.  Mr. Deng at one point had tried to convince Mr. Simpson and

3    other individuals that he had won the lottery and had won

4    $10,000, correct?

5    A.  Yes.                                                        14:25:14

6    Q.  And was that part of an FBI ruse?  Did you instruct him or

7    was he instructed to do that?

8    A.  That was part of our investigation.

9    Q.  And part of your investigation was to pretend that Mr. Deng

10   had $10,000 and that he could then suggest to Mr. Simpson and   14:25:27

11   the others that they had enough money now to travel overseas to

12   engage in some type of activity, correct?

13   A.  Yes.

14   Q.  Nobody took a bite, did they?

15   A.  They did not.                                               14:25:43

16   Q.  They did not.

17   A.  Well, excuse me.  How -- there was talk of Roberto Yong --

18   Q.  There was talk.

19   A.  -- wanting to bounce or something as they called it.

20   Q.  But nobody went?                                           14:25:54

21   A.  Nobody did, no.

22   Q.  There was also an indication that Mr. Deng had come into

23   some insurance money.  Was that also part of the FBI

24   investigation?

25   A.  I'm trying to recall if his vehicle had been wrecked.  I    14:26:07

 1   believe it had been, and that there was some money coming to

 2   him through insurance money.

 3   Q.  And was he instructed to convey that to Mr. Simpson and any

 4   others to see if it they would agree to take that money to go

 5   overseas and engage in terrorist activities?                    14:26:25

 6   A.  I think, yes.

 7   Q.  Nobody took the bite, did they?

 8   A.  No.

 9   Q.  And the whole purpose was to give them an opportunity to

10   say, okay, I'm going to go engage in terrorist activity now      14:26:37

11   that I have the funding, right?

12   A.  That was part of our investigation to fully vent this

13   threat.

14   Q.  And based upon your investigation, you were aware that

15   Mr. Simpson didn't have a lot of money?                          14:26:52

16   A.  Correct.

17   Q.  Mr. Yong didn't have a lot of money?

18   A.  Correct.

19   Q.  Any of the others didn't have any money?

20   A.  No.                                                          14:27:03

21   Q.  And the hope was that they would bite on this scheme?

22   A.  It would give them a -- no excuses, basically, to travel.

23   Q.  And again, certainly Mr. Simpson didn't give any indication

24   that he wanted to use that money to do anything?

25   A.  Correct.  He did not.  He had plans for South Africa, I      14:27:21

1   believe, at that point.

2   Q.  Okay.  But he didn't take any money from Mr. Deng either,

3   did he?

4   A.  No, there was a big discussion, I believe, with the sheik

5   about the --                                                          14:27:35

6   Q.  The discussion was that it would be a sin for them to take

7   the money?

8   A.  I think, yes.

9   Q.  And it was a sin for Mr. Deng to use the money?

10  A.  He would have to give it to his friends who could then use   14:27:44

11  the money.

12  Q.  And that was the only way that he could absolve himself

13  from the sin?

14  A.  I believe so.

15  Q.  If Agent Hebert testified that he only asked Mr. Simpson      14:28:08

16  two questions --

17         MR. MORRISSEY:  Objection.  Your Honor, it's improper

18  form to have Agent Turner commenting on Agent Hebert's

19  testimony when Agent Turner wasn't even in the room.  There is

20  no way this question ever comes out to be proper form.            14:28:29

21         THE COURT:  Well, let me hear the question.  You may

22  be correct.  Let me just hear the question.

23  BY MR. WILLIAMS:

24  Q.  If Agent Hebert testified that he only asked Mr. Simpson

25  two questions about traveling to Somalia, one whether he had      14:28:45

1   ever discussed traveling to Somalia, and, two, whether or not

2   he had planned to engage in violent jihad, would you agree that

3   that's inconsistent with the testimony that you provided here

4   today?

5           MR. MORRISSEY:  Objection, form, calls for                    14:29:04

6   speculation, it's an improper question.

7           THE COURT:  Overruled.  You may answer.

8   BY MR. WILLIAMS:

9   Q.  Would you agree with that?

10  A.  I wouldn't say it's inconsistent.                                 14:29:15

11  Q.  Well, you testified that Agent Hebert asked a number of

12  times whether or not Mr. Simpson had planned to travel to or

13  discussed traveling to Somalia; is that correct?

14  A.  To my recollection, it was have you ever discussed

15  traveling to Somalia, to which Mr. Simpson did not respond.          14:29:33

16  Agent Hebert then gave a very specific yes-no question, have

17  you ever discussed traveling to Somalia on a yes-no question.

18  Q.  Did -- is it your recollection that he then -- how many

19  questions did he ask Mr. Simpson, if you recall?

20  A.  I do recall also the -- have you ever discussed waging          14:29:55

21  violent jihad, so I guess if that is three separate questions,

22  two of which dealt with Somalia, one dealing with waging

23  violent jihad, I guess three -- well, three.

24  Q.  How many times did you ask Mr. Simpson?

25  A.  I did not ask him regarding that.                                14:30:17

1    Q.  Ever?

2    A.  Ever.

3    Q.  At any time?

4    A.  At any time.

5    Q.  During that interview did you ask Mr. Simpson whether or          14:30:21

6    not he had planned to travel to Somalia or discussed traveling

7    to Somalia?

8    A.  No, my question was regarding South Africa.  And then I

9    followed up with the pictures.

10   Q.  So the only question that you asked him about travel             14:30:33

11   involved South Africa?

12   A.  Correct.

13   Q.  And you're 100 percent sure about that?

14   A.  I'm very sure about that.

15   Q.  You testified that during the meetings with Mr. Simpson, it      14:31:09

16   appeared to Mr. Simpson that Mr. Hebert was becoming

17   aggressive?

18          MR. MORRISSEY:  Objection, misstates the testimony.

19          THE COURT:  Well, he can rephrase it.  That was my

20   recollection, too, Mr. Morrissey.  Do you have a different          14:31:29

21   recollection?

22          MR. MORRISSEY:  I do.

23          THE COURT:  What was your statement?

24          MR. MORRISSEY:  Agent Turner did not testify as to

25   Mr. Simpson's perceptions of Agent Hebert's aggressiveness.         14:31:38

1   Agent Turner himself offered the opinion that Agent Hebert at

2   that point got more aggressive.  It's a completely different

3   question.

4           MR. WILLIAMS:  I recall the way the Court indicated.

5   But I can work with that.                              14:31:55

6           THE COURT:  Now that you say that, I'm not sure which

7   one it was.  So do you want to rephrase your question?

8   BY MR. WILLIAMS:

9   Q.  You felt that Agent Hebert was becoming aggressive with

10  Mr. Simpson?                                           14:32:04

11  A.  Yes.

12  Q.  Okay.  Felt that his demeanor, perhaps, might be improper?

13  A.  No.  At no time was it improper.

14  Q.  But certainly aggressive?

15  A.  More direct, more to the point.                    14:32:15

16  Q.  Raised his voice?

17  A.  No.

18  Q.  Were you guys in close proximity to each other?

19  A.  Yes, we were.

20  Q.  Okay.  And would it be fair to say that the majority of  14:32:25

21  your conversations with Mr. Simpson with you was friendly?

22  A.  I believe that's why at one point he looked at me and said,

23  "Hey, I thought we were having a nice conversation."

24  Mr. Simpson to me.

25  Q.  Okay.                                              14:32:42

1    A.  Based upon the line of questioning that was coming from

2    Mr. Hebert, he then directed that towards me.

3    Q.  And so as Mr. Simpson is talking to you, and you are

4    conducting the conversation, Detective -- or Agent Hebert

5    interjects himself in an aggressive manner?                    14:33:02

6    A.  He started asking more poignant questions and maybe in a

7    different tone than I was asking.

8    Q.  And your questioning, again, let me rephrase that.  This

9    investigation by you was to determine whether or not

10   Mr. Simpson would be willing to travel or whether or not he was   14:33:24

11   planning to travel overseas to engage in terrorist activities;

12   is that correct?

13   A.  My sole mission as an FBI agent is to prevent, disrupt and

14   deter acts of terrorism both here and abroad.  So, yes, that

15   was it.                                                        14:33:43

16   Q.  And that's your sole mission as an agent.  But that was

17   also your purpose for interviewing Mr. Simpson that day?

18   A.  To make sure that we didn't have a threat on our hands.

19   Q.  And so you were asking him in trying to determine whether

20   or not he was a threat?                                        14:33:57

21   A.  Correct.

22   Q.  And were -- had you, at the point that Agent Hebert

23   interjected, had you asked Mr. Simpson directly whether or not

24   he was planning to engage in some type of terrorist activity?

25   A.  I had not, no.                                             14:34:13

1    Q.  But if that is your whole point, why did you not ask that

2    question?

3    A.  Agent Hebert and I have worked extensively together, have

4    been on multiple interviews.  I started off conducting a

5    conversation regarding his immediate travel plans to                    14:34:27

6    South Africa.  Agent Hebert interjected at one point, which I

7    was completely fine with.  Again, we work together and have

8    done so for many years.

9    Q.  So this was a plan by you and Agent Hebert?

10   A.  I wouldn't say specifically.  We've worked together long           14:34:46

11   enough that we bounce off each other, if you will, regarding

12   our interviews.

13           MR. WILLIAMS:  If I can have a minute, Your Honor?

14           THE COURT:  You may.

15   BY MR. WILLIAMS:                                                        14:34:58

16   Q.  Prior to your interview with Mr. Simpson, you could have

17   made arrangements to record the interview, correct?

18   A.  We could have.  It would have been possible.

19   Q.  And that would have simply required you calling the special

20   agent in charge and getting permission?                                 14:36:16

21   A.  As well as our chief division counsel I believe is -- well,

22   we would need to go through certain steps for that.

23   Q.  Okay.  And you could have simply used the same device that

24   Dabla Deng used to record the statement?

25   A.  We could use a recording device.                                    14:36:32

1  Q.  And did you decide not to record the devices (sic) or was

2  that even a consideration?

3  A.  Excuse me.  It's not our policy to interview -- or to

4  record subject interviews.  We interview lots of people on a

5  daily basis and rarely, if ever, record them.                    14:36:52

6  Q.  You also testified that there was an attempt to place

7  Mr. Simpson on the no-fly list.

8  A.  Yes.

9  Q.  Okay.  Is it because he did not meet the criteria of people

10  that are on the no-fly list that he was --                       14:37:10

11  A.  I believe that determination was made at a higher level

12  than myself, obviously.

13  Q.  Okay.  And do you know what that criteria is?

14  A.  I can't tell you right now without having that criteria in

15  front of me.                                                     14:37:30

16  Q.  Have you seen it before?

17  A.  I believe I have.

18         MR. WILLIAMS:  I have no further questions.

19

20                    REDIRECT EXAMINATION                          14:37:58

21  BY MR. MORRISSEY:

22  Q.  Agent Turner, on the subject of the no-fly list, do you

23  know whether or not the sole criteria for being placed on the

24  no-fly list is whether an individual is a direct threat to

25  aviation?                                                        14:38:13

 1          MR. WILLIAMS:  Objection, Your Honor.

 2          THE WITNESS:  That is correct.

 3          MR. WILLIAMS:  Objection, he testified that he didn't

 4  know.

 5          MR. MORRISSEY:  I asked him if he did know.                    14:38:18

 6          THE COURT:  Well, it was a rather leading question.

 7  But he's answered.  I'll go ahead and let it go.  But try to

 8  not ask leading questions, Mr. Morrissey, again.

 9  BY MR. MORRISSEY:

10  Q.  Agent Turner, you were asked about the scope of your           14:38:36

11  investigation into Mr. Simpson.  Did the scope of the

12  investigation include whether or not Mr. Simpson had had

13  discussions with anyone about traveling to Somalia?

14  A.  Yes.

15  Q.  Did the scope also include whether once he got overseas, he   14:38:50

16  might engage in terrorist acts?

17  A.  Yes.

18          MR. WILLIAMS:  Objection, leading.

19          THE COURT:  Yeah, what was the scope?

20          MR. MORRISSEY:  I'm sorry, Your Honor.                       14:39:00

21  BY MR. MORRISSEY:

22  Q.  You --

23          THE COURT:  So that was sustained.  So I'm going to

24  strike whatever answer there was.

25          MR. MORRISSEY:  That's fine.                                 14:39:09

 1   BY MR. MORRISSEY:

 2   Q.  You were asked on cross about the scope of your

 3   investigation.  Do you recall that?

 4   A.  Yes.

 5   Q.  What was the scope of your investigation?                    14:39:17

 6   A.  It was to determine whether or not Mr. Simpson, as well as

 7   some other individuals, would travel overseas to engage in

 8   terrorist activities as well as a possible cell here in the

 9   Phoenix area to possibly do something here.

10   Q.  Was the scope of that investigation then broad?              14:39:35

11   A.  Was it broad?

12   Q.  Yes.

13   A.  Yes.

14   Q.  Did it include all aspects of what might be involved in

15   planning to travel overseas to commit jihad?                     14:39:45

16          MR. WILLIAMS:  Objection, leading.

17          THE WITNESS:  Yes.

18          THE COURT:  Sustained.

19   BY MR. MORRISSEY:

20   Q.  You were asked on cross about your views of Agent Hebert's   14:40:02

21   demeanor in the interview.  Do you recall that?

22   A.  Yes, I do.

23   Q.  What is your view as to whether or not Agent Hebert behaved

24   appropriately in asking a "yes" or "no" question?

25   A.  Agent Hebert acted entirely appropriately throughout the     14:40:27

1    interview.

2    Q.  And what did that "yes" or "no" question address?

3          MR. WILLIAMS:  Okay, it's hearsay to what Agent Hebert

4    said or addressed.

5          THE COURT:  Overruled, you may answer.                    14:40:42

6          THE WITNESS:  The "yes" or "no" question was:  "Yes"

7    or "no," have you ever discussed traveling to Somalia with

8    other individuals.

9    BY MR. MORRISSEY:

10   Q.  You were asked on cross about the number of times that the   14:40:52

11   subject of discussions of traveling to Somalia occurred.  Do

12   you recall that?

13   A.  Yes.

14   Q.  Did -- would you tell us not how many times it was

15   answered, but roughly, how many times did that topic come up in   14:41:15

16   the interview?

17   A.  Well, there was the general travel overseas discussion of

18   travel overseas, the discussion of traveling to Somalia, as

19   well as the exact pointed question, "yes" or "no," have you

20   discussed with any other individuals traveling to Somalia.       14:41:39

21   Q.  You were asked on cross about Mr. Simpson's financial

22   ability.  Do you recall that?

23   A.  Yes.

24   Q.  From your investigation, did Mr. Simpson have enough money

25   to get to South Africa?                                          14:41:56

1    A.  Yes, he did.

2    Q.  From your investigation, would the -- would any money given

3    to Mr. Simpson by Mr. Deng -- would there be any limit to the

4    purposes to which that money could be placed?

5           MR. WILLIAMS:  Objection, it calls for speculation,            14:42:24

6    foundation.

7           THE COURT:  Can you lay the foundation for that?

8           MR. MORRISSEY:  Certainly.

9    BY MR. MORRISSEY:

10   Q.  Agent Turner, you were asked on cross about when the ruse         14:42:33

11   about having won the lottery of money was instituted.  Were

12   there discussions, to your knowledge, about the appropriate use

13   of that money?  Do you recall that?

14   A.  Yes.

15   Q.  You were asked whether or not the group viewed that money         14:42:52

16   as somehow sinful.  Do you recall that?

17   A.  Yes.

18   Q.  Did Mr. Simpson seek any of that money from Mr. Deng?

19   A.  I don't recall.  I believe what happened with that money

20   was that there was a discussion with the sheik by Mr. Simpson        14:43:19

21   as to what should the money be used for.  At that point, it was

22   discussed that Mr. Deng could give the money to his friends,

23   which would include Mr. Simpson, to be used.

24   Q.  And once that money was in Mr. Simpson's hands, to your

25   knowledge, could it have been used for any purpose?                  14:43:45

1  A.  Yes.  Any purpose.

2  Q.  You were asked on cross about whether or not you told

3  Mr. Simpson that he could have a lawyer present.  Do you recall

4  that?

5  A.  Yes.                                                    14:44:01

6  Q.  In a noncustodial interview does the FBI give subjects

7  Miranda rights?

8  A.  No.

9  Q.  In an everyday encounter with a citizen, does the -- well,

10 let me ask it this way:  Does the FBI frequently conduct        14:44:20

11 interviews with both subjects and nonsubjects?

12 A.  Frequently.

13 Q.  In your training from the FBI academy, did you cover when a

14 individual is entitled to a lawyer?

15 A.  Yes.                                                    14:44:44

16 Q.  And when is that person entitled to a lawyer?

17 A.  This person is in custody.  We -- we give them their

18 Miranda rights, and they can choose whether or not to have a

19 lawyer.

20 Q.  Was this a custodial interview?                         14:44:58

21 A.  No, it was not.

22 Q.  You were asked about Mr. Sabari on cross, and that you did

23 not credit Mr. Sabari's views that no one in the group was

24 going to engage in terrorist acts.  Do you recall that?

25 A.  Yes.                                                    14:45:16

1   Q.  Did you consider it possible that Mr. Sabari was not being

2   truthful to you?

3            MR. WILLIAMS:  Objection, speculation.

4            THE COURT:  Sustained.

5   BY MR. MORRISSEY:                                            14:45:25

6   Q.  When Mr. Sabari gave you that view, as an FBI agent, was it

7   incumbent upon you at that point to cease your investigation?

8   A.  Definitely not.  We had evidence to the contrary of

9   anything Mr. Sabari had said regarding other individuals.  And

10  I don't know if I clarified this for the record.             14:45:48

11           MR. WILLIAMS:  Your Honor, I would ask that he not --

12  there's no question before the witness.

13           THE WITNESS:  Okay.

14           MR. MORRISSEY:  Your Honor, if I can have one moment.

15           No further questions.                               14:46:19

16           THE COURT:  All right.  Before the agent steps down, I

17  want to bring up the issue of voluntariness.  I think it was

18  brought up pretrial.  And is -- do I need to make a finding at

19  some point, and when would be that point in time during the

20  trial?                                                       14:46:39

21           MR. MORRISSEY:  I have come around to the view that

22  it's not necessarily covered by 3501.  And I don't know that

23  the Court needs to make that finding.  I would be interested in

24  the defense's view on that.  But the -- I'm not against the

25  Court making that.  And it would make for a more complete     14:46:54

1    record.  But I don't know that it is legally required.

2            THE COURT:  Mr. Williams?

3            MR. WILLIAMS:  Your Honor, I have -- I am reading 3501

4    to address confessions.  I don't believe that this would

5    qualify as a confession.  If voluntariness is a separate issue          14:47:09

6    than 3501 and the Court feels that a record needs to be made in

7    that regard, I have no objection.

8            THE COURT:  Well, you all had raised that previously,

9    so I wanted to just follow up.  Let me just, in an abundance of

10   caution, make a finding here.  The test for voluntariness is           14:47:30

11   whether viewing the totality of the circumstances, the

12   Government gained the statement by physical or psychological

13   coercion or by improper inducement so that the subject's will

14   was overborne.  The pivotal question is usually the suspect's

15   will, and was it overborne.                                            14:47:51

16           In this case, it seems very apparent that this was a

17   noncustodial statement that was made to the law enforcement

18   officers.  And it appears from the totality of the

19   circumstances that it was not involuntarily given.  And it

20   seems like the defendant has -- I mean the Government has met          14:48:18

21   that by a preponderance of the evidence, and so I will go ahead

22   and make that finding.

23           It looks like there was no physical and/or

24   psychological coercion, there's no mental incapacity.  There

25   were no coercion made or promises or threats by law                    14:48:38

```
 1    enforcement, although there weren't any questions asked

 2    regarding whether or not he was -- the defendant was under the

 3    influence of alcohol or drugs.  And there's nothing in the

 4    record to support that he was.

 5              So I will go ahead and make that finding for the          14:48:57

 6    record.

 7              MR. MORRISSEY:  Thank you, Your Honor.

 8              THE COURT:  You may step down.

 9              THE WITNESS:  Thank you.

10              MR. MORRISSEY:  May I call my next witness?               14:49:06

11              THE COURT:  You may.

12              MR. MORRISSEY:  The Government calls Dabla Deng.

13              THE COURT:  Can you step aside, Mr. Morrissey, for

14    just a moment.  And then, Mr. Mitchell, can you come forward

15    with your client here.                                             14:49:46

16              And, sir, can you please state your name.

17              THE WITNESS:  Dabla Deng.

18              THE COURT:  Say it again.

19              THE WITNESS:  Dabla Deng.

20              THE COURT:  Thank you.  And I'm going to have the         14:50:05

21    courtroom deputy go ahead and have you take the oath at this

22    time.

23              (The witness, Dabla Deng, was duly sworn.)

24              THE COURT:  And before you take the stand, Mr. Deng,

25    and while Mr. Mitchell is at your side, I just want to bring to     14:50:28
```

```
1    your attention, I think it's already been brought to your

2    attention that you've been asked to be a witness in this case.

3    And it appears that you are willing to testify in this case.

4    Is that correct?

5              THE WITNESS:  Yes.                                    14:50:46

6              THE COURT:  All right.  It's also been brought to my

7    attention, and apparently to yours as well, that some issues

8    have been identified regarding your possible failure to pay

9    taxes on the money that was provided to you by the Government.

10             THE WITNESS:  Yes.                                    14:51:10

11             THE COURT:  All right.  It's possible that there may

12   be civil penalties that result if that is true.  It's also --

13   do you understand that?

14             THE WITNESS:  Yes, ma'am.

15             THE COURT:  And it's also possible that criminal     14:51:26

16   penalties might result, that there's a potential for criminal

17   penalties that might result if that is true.

18             THE WITNESS:  Yes.

19             THE COURT:  Do you understand that?

20             THE WITNESS:  Yes.                                    14:51:41

21             THE COURT:  All right.  And have you had a chance to

22   talk to your lawyer about that, Mr. Mitchell?

23             THE WITNESS:  Yes.

24             THE COURT:  All right.  And I want to make sure that I

25   explain and to see if he explained to you that you have a Fifth  14:51:50
```

1    Amendment privilege not to answer any questions that might lead

2    to criminal prosecution of you or that might implicate you in

3    any sort of criminal prosecution.  Do you understand that?

4              THE WITNESS:  Yes.

5              THE COURT:  And has Mr. Mitchell explained that to you          14:52:13

6    as well?

7              MR. MITCHELL:  Judge, just for the record, I don't

8    want him to divulge any conversations that he had with me.  But

9    I will avow to the Court that that issue was addressed.

10             THE COURT:  Thank you.  That's -- and is that true?          14:52:27

11             THE WITNESS:  Yes.

12             THE COURT:  And is it my understanding, I don't know

13   if that question will come about, but it's likely to come

14   about.  I just want to make sure you understand that you, by

15   taking the stand, you will be waiving that privilege.  Is that          14:52:44

16   correct?

17             THE WITNESS:  Yes.

18             THE COURT:  All right.  You may be seated.

19             Is there anything else, Mr. Morrissey?

20             MR. MORRISSEY:  No, Your Honor.          14:52:56

21             THE COURT:  You may take the stand, sir.

22             MR. MITCHELL:  And, Judge, for the record, I will stay

23   in the courtroom in case there is an issue.

24             THE COURT:  All right.

25

1                         DABLA DENG,

2    called as a witness herein, having been first duly sworn, was

3    examined and testified as follows:

4

5                       DIRECT EXAMINATION

6    BY MR. MORRISSEY:

7    Q.  Mr. Deng, when did you come to the United States?

8    A.  August 28th, 2000.

9    Q.  And where did you come to the United States from?

10   A.  Can you repeat that?                                    14:53:32

11   Q.  Sure.  Where were you born?

12   A.  Sudan.

13   Q.  Why did you come to the United States from Sudan in 2000?

14   A.  Because it was war was going on over there in Sudan.  So

15   that's why we moved.                                        14:53:49

16   Q.  And your status the United States then when you came here

17   in 2000, do you know what your status was?

18   A.  As a refugee.

19   Q.  When you came to the United States in 2000, where did you

20   go?                                                         14:54:04

21             THE COURT REPORTER:  I didn't hear that, Your Honor.

22             THE COURT:  Can you repeat that.

23             THE WITNESS:  Pittsburgh, Pennsylvania.

24   BY MR. MORRISSEY:

25   Q.  Did you go to high school in the United States?         14:54:15

DABLA DENG - DIRECT EXAMINATION BY MR. MORRISSEY    169

1    A.  Yes.

2    Q.  What was the name of your high school?

3    A.  Northgate High School.

4    Q.  In Pittsburgh?

5    A.  Yes.                                                    14:54:23

6    Q.  Did you finish -- did you get your diploma from Northgate

7    High School in Pittsburgh?

8    A.  No.

9    Q.  Did you ever get your degree?

10   A.  G.E.D.                                                  14:54:32

11   Q.  Okay.  And do you know what a G.E.D. stands for?

12   A.  A high school diploma.

13   Q.  Okay.  So that was your high school diploma?

14   A.  Yes.

15   Q.  Was there a school you got your G.E.D. from?          14:54:48

16   A.  PCDI.

17   Q.  And how do you -- are those initials, PCBI or DI?

18   A.  No, PCDI.

19   Q.  Okay, PCDI.

20         Mr. Deng, how many languages do you speak?          14:55:06

21   A.  Three.

22   Q.  What are they?

23   A.  Arabic and Dinka and English.

24   Q.  Do you know Agent Hebert as Jeff?

25   A.  Yes.                                                    14:55:20

 1    Q.  Is Jeff in the courtroom today?

 2    A.  Yes.

 3    Q.  When did you first meet Jeff?

 4    A.  Maybe 2005.

 5    Q.  2005?                                            14:55:33

 6    A.  Yes.

 7    Q.  When you met Jeff, did you know he was an FBI agent?

 8    A.  Yes.

 9    Q.  In that discussion, did you offer to do something for the

10    FBI?                                                 14:55:48

11    A.  Yes.

12    Q.  What was that?

13    A.  They told me to go into the community.

14    Q.  They told you to go into the community?

15    A.  Yes.                                             14:56:02

16    Q.  And what were you going to do in the community?

17    A.  Just look around and what's going on.

18    Q.  Okay.  When you were going to go into the community, what

19    parts of the community were you going to?

20    A.  Sudanese community or African.                   14:56:21

21            THE COURT:  Can you repeat that, sir.

22            THE WITNESS:  Sudanese community.

23    BY MR. MORRISSEY:

24    Q.  Okay.  And in 2006, did the FBI show you a photo of Elton

25    Simpson?                                             14:56:37

1   A.  Yes.

2   Q.  Did they ask you if you recognized Mr. Simpson?

3   A.  Yes.

4   Q.  Did you?

5   A.  Yes.                                                   14:56:42

6   Q.  Is Mr. Simpson in this courtroom today?

7   A.  Yes.

8   Q.  Would you point out where he is?

9   A.  Over there.

10  Q.  What's he wearing?                                     14:56:48

11  A.  In the corner with a pink shirt.

12          MR. MORRISSEY:  Your Honor, may the record reflect the

13  identification of Mr. Simpson?

14          THE COURT:  The record may so reflect.

15  BY MR. MORRISSEY:                                          14:57:00

16  Q.  Once you told the FBI you recognized Mr. Simpson, did they

17  ask you to do something with respect to Mr. Simpson?

18  A.  Yes.

19  Q.  What did they ask you to do?

20  A.  To get to know him.                                    14:57:14

21  Q.  Get to know him better?

22  A.  Yes.

23  Q.  To do that, how were you going to present yourself?

24  A.  Being a Muslim.

25  Q.  Are you a Muslim?                                      14:57:26

1    A.   No.

2    Q.   How were you raised in the Sudan?

3    A.   As a Christian.

4    Q.   In the Sudan, did you learn about the Muslim religion?

5    A.   Yes.                                                        14:57:41

6    Q.   And why -- why did you learn about the Muslim religion in

7    the Sudan?

8    A.   Because over there, I was forced to be -- to learn.

9    Q.   And who -- who forced you?

10   A.   The --                                                      14:57:55

11           THE COURT REPORTER:  I didn't understand that, Your

12   Honor.

13           THE COURT:  Can you repeat that, sir.

14           THE WITNESS:  The Muslims.

15   BY MR. MORRISSEY:                                                14:58:01

16   Q.   And, Mr. Deng, did you just say the government of Sudan?

17   A.   Yes.

18   Q.   What happens to individuals in the Sudan who are not

19   Muslim?

20   A.   Can you repeat?                                             14:58:16

21   Q.   Why -- what would the government do in Sudan if you were

22   not Muslim?

23   A.   They can torture you or something like that.

24   Q.   Would you be allowed to go to school?

25   A.   No.                                                         14:58:38

1    Q.  With the FBI, you agreed to pretend you're a Muslim to

2    Mr. Simpson; is that right?

3    A.  Yes.

4    Q.  In -- in that role, were you -- how knowledgeable of a

5    Muslim were you?                                                14:59:01

6    A.  Not a lot.

7    Q.  And what were you going to say about that to Mr. Simpson?

8    A.  Can you repeat?

9    Q.  Were you going to let Mr. Simpson know that you were not a

10   very knowledgeable Muslim?                                      14:59:17

11   A.  Yes.

12   Q.  And what was the idea that would happen at that point?

13   A.  He was willing to teach me.

14   Q.  In 2006, when -- when you were helping the FBI, did the FBI

15   pay you money to do that?                                       14:59:41

16   A.  Yes.

17   Q.  Were you helping only for the money?

18   A.  No.

19   Q.  Why else were you helping?

20   A.  Because I was interested.                                   14:59:56

21   Q.  Okay.  In 2006, were you also working any other jobs

22   besides helping the FBI?

23   A.  Yes.

24   Q.  What was that?

25   A.  A warehouse.                                                15:00:07

1    Q.   Do you remember the name of the warehouse?

2    A.   Carl Rackley (phonetic), sanitary supplies.

3    Q.   When you were asked to get to know Mr. Simpson better, you

4    believe that was in 2006?

5    A.   I don't remember exactly.                                15:00:36

6    Q.   Don't remember the exact date, okay.

7         Did you go about getting to know Mr. Simpson better?

8    A.   Yes.

9    Q.   How did you do that?

10   A.   Just by spending time together, going to the masjid and   15:00:47

11   hanging out and invite each other to each other's houses.

12   Q.   Okay.  I think you just said "masjid"; is that right?

13   A.   Yes, masjid.

14   Q.   Is that spelled m-a-s-j-i-d?

15   A.   Yes.                                                      15:01:06

16   Q.   What is the masjid?

17   A.   I don't know how to explain it, but it's like a temple, but

18   for Muslims.

19   Q.   Okay.  In 2007, were you still helping the FBI?

20   A.   Yes.                                                      15:01:22

21   Q.   Were you also working other jobs?

22   A.   Yes.

23   Q.   As you got to know Mr. Simpson, and he learned that you

24   were a pretty new Muslim, what was his reaction?

25   A.   He was happy about it.                                    15:01:46

DABLA DENG - DIRECT EXAMINATION BY MR. MORRISSEY     175

1   Q.  Was he willing to teach you?

2   A.  Yes.

3   Q.  You said that you would go to Mr. Simpson's house

4   sometimes?

5   A.  Yes.                                                    15:01:59

6   Q.  Would he come to your house?

7   A.  Yes.

8   Q.  Did you spend a lot of time with Mr. Simpson?

9   A.  Yes.

10  Q.  What kind of things did you talk about?               15:02:07

11  A.  We talk a lot of stuff.

12  Q.  Okay.  Can you give me an example of what you talked about?

13  A.  We talk about -- we talk about religion, we talk about

14  jihad, and we talk about traveling.

15  Q.  Did you ever watch television with Mr. Simpson?       15:02:30

16  A.  Yes.

17  Q.  Did you ever get on the Internet with Mr. Simpson?

18  A.  Yes.

19  Q.  What kind of TV shows did you watch?

20  A.  Sometime we watch wrestling and sometime we watch videos  15:02:41

21  also.

22  Q.  And what kind of videos?

23          MS. SITTON:  Objection, relevance.

24          MR. MORRISSEY:  Your Honor, it's going to go directly

25  to the type of videos they watched, which bear upon jihad.  15:02:56

1        THE COURT:  Overruled.  You may answer.

2    BY MR. MORRISSEY:

3    Q.  What type of videos did you watch?

4    A.  Jihad, about jihad.

5    Q.  And how would you -- how would you find those videos?        15:03:10

6    A.  Through Mr. Simpson.

7    Q.  Would he give them to you?

8    A.  Yes.

9    Q.  And when you called them jihad videos, what was shown on

10   these videos?        15:03:29

11   A.  It's a lot.

12   Q.  A lot of what?

13   A.  It's about Muslim fighting against nonMuslims.

14   Q.  Did any of the videos depict violence?

15   A.  Yes.        15:03:46

16   Q.  When the FBI had you spend time with Mr. Simpson, did they

17   give you a recording device?

18   A.  Yes.

19   Q.  Did you use that while you were with Mr. Simpson?

20   A.  Yes.        15:03:59

21   Q.  What would you do with a recording device after -- after

22   you met with Mr. Simpson?

23   A.  I called the FBI and we met and we switched recorders.

24   Q.  Okay.  When you say you switched the recorders, what would

25   you give the FBI?        15:04:17

1   A.  I give them the recorder that I used, and he give me the

2   new one to be used for the next time.

3   Q.  When you were making a recording for the FBI, did you

4   usually say what the date of the recording was?

5   A.  Yes, sir.                                              15:04:31

6   Q.  And when would you do that?

7   A.  Before I met with him.

8   Q.  Before you met him?

9   A.  Yes.  Before we meet, yes.

10  Q.  On July 31st, 2007, did you meet with Mr. Simpson?      15:04:43

11  A.  Yes.

12  Q.  Did you record that meeting?

13  A.  Yes.

14  Q.  After that meeting, did you give the recording to the FBI?

15  A.  Yes.                                                   15:04:56

16  Q.  Have you listened to portions of that recording?

17  A.  Yes.

18  Q.  Are those recordings -- is that recording accurate in terms

19  of what is on the recording?

20  A.  Yes.                                                   15:05:11

21       MR. MORRISSEY:  Your Honor, at this point, Exhibit 1

22  is in evidence.  I'm going to play Exhibit 1 from the Sanctions

23  program.  It will have a scrolling transcript.  The transcript

24  is not stipulated to by the parties.  But the parties feel it

25  is an aid to the Court and, of course, the Court's           15:05:39

 1    determination is ultimately of what is on the recordings.

 2            But the Government in particular feels that the

 3    transcripts will be an aid.  And so that's how it's going to

 4    get played.

 5            THE COURT:  All right.  Is that correct,                15:05:56

 6    Mr. Williams -- I am sorry, Ms. Sitton, is this your witness?

 7            MS. SITTON:  It is my witness, Your Honor.  Mr. -- we

 8    had conversations between the parties as to whether the rolling

 9    transcript would be used.  And we will agree to that.  But we

10    will not stipulate to the accuracy of the transcripts, and we   15:06:17

11    would ask that the Court consider its own view of what they

12    actually say.

13            THE COURT:  Okay.

14            (A portion of Exhibit No. 1 was played.)

15            MR. WILLIAMS:  Your Honor, we don't have a visual.      15:06:46

16            MR. MORRISSEY:  I'm sorry, Your Honor, I should have

17    asked.  May the scrolling transcript be published to -- I

18    thought it would be counsel table and to the public.

19            THE COURT:  Yes.  Just a second.  You're going to have

20    to rewind it.  I don't know if there is something on the first  15:07:01

21    part of that.  But let's make sure we have it up.

22            I'm sorry.

23            MR. MORRISSEY:  I'm trying to rewind it.  Is that what

24    you're asking me to do?

25            THE COURT:  No, go ahead and rewind it and tell me,     15:07:20

1    I'm trying to figure out.  Did you ask him what date this was?

2              MR. MORRISSEY:  Yes.

3              THE COURT:  What date is it?

4              MR. MORRISSEY:  July 31st, 2007, and this is Exhibit 1

5    that is being played.                                              15:07:30

6              THE COURT:  All right.  Thank you.

7              MR. MORRISSEY:  Your Honor, also for the portion of

8    the record, for the record, I should note that the time stamp

9    on Exhibit 1 from the beginning of this conversation is

10   22:04:07.  In Exhibit 1 it would be found in what is             15:07:48

11   denominated as session two.

12             THE COURT:  Just one moment.

13             All right, go ahead and proceed.

14             (A portion of Exhibit No. 1 was played.)

15   BY MR. MORRISSEY:                                                 15:08:26

16   Q.  Mr. Deng, whose voice is it that said:  Who give halaqa and

17   then go fight the disbelievers?

18   A.  Mr. Simpson.

19   Q.  Is -- do you know what language the word "halaqa" comes

20   from?                                                             15:08:39

21   A.  It is Arabic.

22   Q.  I realize the translation may not be perfect English, but

23   roughly what does "halaqa" mean?

24   A.  "Halaqa" mean that a person that is speaching or --

25   Q.  Giving a speech?                                              15:08:57

1    A.   Yes.

2              (A portion of Exhibit No. 1 was played.)

3    BY MR. MORRISSEY:

4    Q.   Mr. Deng, in this discussion are you and Mr. Simpson

5    discussing a speech that a sheik gave?                          15:11:09

6    A.   Yes.

7    Q.   Was -- well, okay.

8              (A portion of Exhibit No. 1 was played.)

9    BY MR. MORRISSEY:

10   Q.   Mr. Deng, did you just hear the phrase, "all for Allah     15:11:42

11   Tewaqal"?

12   A.   Tewaqal.

13   Q.   Would you tell us what that word, is that an Arabic word?

14   A.   Yes.

15   Q.   What does that mean?                                        15:11:54

16   A.   Tewaqal is like give it up, that's how I can say it.

17   Q.   Give it up for who?

18   A.   Tewaqal is just give it up to God, Allah.

19   Q.   For God, for Allah?

20   A.   Yeah.                                                       15:12:36

21             (A portion of Exhibit No. 1 was played.)

22   BY MR. MORRISSEY:

23   Q.   Did Mr. Simpson just say make a reference to when the

24   companions were fighting jihad?

25   A.   Yes.                                                        15:13:03

1           THE COURT:  Mr. Morrissey, can you lower it?

2           (A portion of Exhibit No. 1 was played.)

3    BY MR. MORRISSEY:

4    Q.  Did Mr. Simpson just talk about fighting the kaffir?  Did

5    you hear that?                                          15:14:00

6    A.  Can you rewind, please?

7    Q.  Sure.

8           (A portion of Exhibit No. 1 was played.)

9    BY MR. MORRISSEY:

10   Q.  Did you hear Mr. Simpson speak about the kaffir?      15:14:30

11   A.  Yes.

12   Q.  Who is the kaffir?

13   A.  Nonbelievers.

14   Q.  Nonbelievers?

15   A.  Yeah.                                                 15:14:42

16   Q.  Nonbelievers in what?

17   A.  Like nonMuslim.

18          (A portion of Exhibit No. 1 was played.)

19   BY MR. MORRISSEY:

20   Q.  Is "jannah" an Arabic word?                          15:15:24

21   A.  Yes.

22   Q.  What does "jannah" mean?

23   A.  Heaven.

24   Q.  Did Mr. Simpson just say that we are here if we get shot or

25   get killed, it's jannah straight away?                   15:15:37

1    A.  Yes.

2    Q.  You asked Mr. Simpson whether or not you had to leave

3    America to pursue the path of jannah.

4    A.  Yes.

5    Q.  And Mr. Simpson stated that he was talking about going out?   15:16:10

6    A.  Yes.

7    Q.  Did that mean leaving America?

8    A.  Yes.

9    Q.  Did Mr. Simpson say, "We slaves to Allah, we going to fight

10   you to the death"?                                               15:18:40

11   A.  Yes.

12            (A portion of Exhibit No. 1 was played.)

13   BY MR. MORRISSEY:

14   Q.  Did Mr. Simpson just state, "Just the whole thing is how

15   you get there, though"?                                          15:19:15

16   A.  Yes.

17   Q.  Is that "there" outside America?

18            MR. WILLIAMS:  Objection.

19            THE COURT:  Sustained.

20   BY MR. MORRISSEY:                                                15:19:23

21   Q.  Where did you understand "there" to be?

22   A.  Can you rewind, please?

23   Q.  Sure.

24            (A portion of Exhibit No. 1 was played.)

25   BY MR. MORRISSEY:                                                15:06:32

DABLA DENG - DIRECT EXAMINATION BY MR. MORRISSEY     183

1    Q.  In this conversation, was Mr. Simpson telling you where the

2    Muslims needed help?

3    A.  Yes.

4    Q.  Was that -- what was that help going to be?  How were they

5    going to get help?                                          15:20:29

6    A.  Yeah.

7    Q.  And what countries in this conversation did Mr. Simpson

8    mention that needed help?

9    A.  A few countries.

10   Q.  Do you remember which ones?                              15:20:46

11   A.  Palestine, Iraq.

12   Q.  Did you just tell Mr. Simpson that he had to find the right

13   people?

14   A.  Yes.

15   Q.  The right people to do what?                             15:21:48

16   A.  Can you repeat?

17   Q.  You just told Mr. Simpson on that tape that:  I know we can

18   do it, man, but you have to find the right people.

19           Do you recall that?

20   A.  Yes.                                                     15:22:08

21   Q.  The right people to do what?

22   A.  To do jihad.

23   Q.  And Mr. Simpson replied, "You got to have connects"?

24   A.  Yes.

25           (A portion of Exhibit No. 1 was played.)            15:06:32

1    BY MR. MORRISSEY:

2    Q.  On that tape, did you hear the word "Yahya"?

3    A.  Yes.

4    Q.  Did you know a person as Yahya?

5    A.  Yes.                                                    15:22:56

6    Q.  And who was that person?

7    A.  His name is John Sabeer.

8    Q.  John Sabari?

9    A.  I don't know how to pronounce his last name.

10   Q.  His first name is John?                                 15:23:13

11   A.  Yes.

12   Q.  On May 29th, 2009, did you have another meeting with

13   Mr. Simpson that you recorded?

14   A.  Yes.

15   Q.  After that recording, did you give that recording to the   15:23:35

16   FBI?

17   A.  Yes.

18        MR. MORRISSEY:  Your Honor, at this point I'm going to

19   play Exhibit 2, which is the recording of May 29th, 2009.  For

20   the record, I would note it is session three of the tape, and   15:23:52

21   it begins at 13:46:35.

22        Your Honor, rather than having it published each

23   separate time, can the transcripts remain published each time I

24   identify an exhibit that I'm playing?

25        THE COURT:  Any objection?                             15:24:10

1          MS. SITTON:  No, Your Honor.

2          THE COURT:  And just before you play, is this your

3    witness?

4          MS. SITTON:  Yes, Your Honor.

5          THE COURT:  Then you'll need to make the objections,      15:24:25

6    if there's any.  I think Mr. Williams made one.  But I don't

7    recall, so you need to make them.

8          MR. MORRISSEY:  Sorry, Your Honor, is it ready to

9    play?  Is it okay to play?

10         THE COURT:  Yes.                                          15:24:38

11         (A portion of Exhibit No. 2 was played.)

12   BY MR. MORRISSEY:

13   Q.  Mr. Deng, in your time you spent with Mr. Simpson, did he

14   sometimes call you Akee?

15   A.  Yes.                                                        15:25:38

16   Q.  What does "akee" mean?

17   A.  That's a brother.

18   Q.  Okay.  What language is that word from?

19   A.  In Arabic.

20         THE COURT:  I'm sorry, what does "akee" mean?             15:25:52

21         MR. MORRISSEY:  Brother or is it friend?

22         THE WITNESS:  It's brother.

23         (A portion of Exhibit No. 2 was played.)

24   BY MR. MORRISSEY:

25   Q.  Did Mr. Simpson just say, "Akee, it's time to go to        15:26:27

1   Somalia, brother"?

2   A.  Yes.

3   Q.  Did he then say, "We know plenty of brothers from Somalia"?

4   A.  Yes.

5   Q.  Mr. Deng, did you ever go to a mosque at 32nd Street in          15:27:08

6   Phoenix?

7   A.  Yes.

8   Q.  You're from the Sudan, correct?

9   A.  Yes.

10  Q.  Do -- do different groups sometimes go to the different         15:27:23

11  mosques?

12          MS. SITTON:  Objection, leading.

13          THE COURT:  I'll -- overruled, I'll allow it.

14  BY MR. MORRISSEY:

15  Q.  You can answer that.                                            15:27:37

16  A.  Yes.

17  Q.  Was there a group that was associated or known to go with

18  the 32nd Street mosque?

19  A.  Yes.

20  Q.  And what group was that?                                        15:27:46

21  A.  Somalians.

22  Q.  Did you know what country Mr. Simpson was talking about the

23  Ethiopians fighting against?

24  A.  Yes.

25  Q.  What country was it?                                            15:29:22

1    A.   Somalia.

2    Q.   Now, Mr. Simpson here is talking about establishing sharia

3    law.

4    A.   Yes.

5    Q.   And how would that be done?                                15:29:32

6              MS. SITTON:  Objection, speculation.

7              THE COURT:  Can you lay the foundation?

8              MR. MORRISSEY:  Sure.

9    BY MR. MORRISSEY:

10   Q.   Did you hear Mr. Simpson speak about if they keep fighting   15:29:43

11   against us, it's because they don't want us to establish

12   sharia?  Did you hear that on the recording?

13   A.   Yes.

14   Q.   So what was the method going to be to establish sharia?

15             MS. SITTON:  Objection, speculation.                  15:29:58

16             THE COURT:  How does he know?

17   BY MR. MORRISSEY:

18   Q.   What did Mr. Simpson tell you the method would be to

19   establish sharia?

20   A.   Jihad.                                                     15:30:05

21             (A portion of Exhibit No. 2 was played.)

22             THE COURT:  I'm sorry, what was his response?

23             MR. MORRISSEY:  Jihad.

24             (A portion of Exhibit No. 2 was played.)

25   BY MR. MORRISSEY:                                               15:30:21

1   Q.  Is jihad violent?

2   A.  Yes.

3           (A portion of Exhibit No. 2 was played.)

4   Q.  Did Mr. Simpson just state, "We are going to make it to the

5   battlefield, Akee.  It's time to roll"?                          15:31:13

6   A.  Yes.

7   Q.  Was that battlefield going to be Somalia?

8           MS. SITTON:  Objection, speculation.

9           THE COURT:  Sustained.

10  BY MR. MORRISSEY:                                                15:31:23

11  Q.  What's the country you were discussing in this

12  conversation?  Do you recall the earlier -- did Mr. Simpson say

13  earlier in that discussion, 'It's time to go to Somalia,

14  brother"?

15  A.  Yes.                                                         15:31:38

16          MS. SITTON:  Objection, leading.

17          MR. MORRISSEY:  Your Honor, I can -- we played the

18  tape, I can ask him whether he heard it.

19          THE COURT:  Then do it.  But you are leading,

20  Mr. Morrissey.  And this is rather critical information.  So if  15:31:46

21  you need to replay it, then replay it.

22          MR. MORRISSEY:  That's fine.

23          THE COURT:  This is like the third time that we've had

24  these kind of objections.  And you need to limit your questions

25  to nonleading questions.                                         15:32:03

1    MR. MORRISSEY:  Your Honor, I would like to proceed in

2  a manner that is not objectionable to the Court.  If I play the

3  tape, and a phrase, and Mr. Deng affirms that that's where you

4  heard that, I believe I'm entitled to ask a follow-up question

5  about that phrase.                                       15:32:22

6    THE COURT:  You can.  But you're asking leading

7  follow-up questions.  And in that instance, you could have

8  asked him, what country, and you know, it's a lot more broader

9  than the country of Somalia.  And so --

10    MR. MORRISSEY:  I thought I did.  If I phrased it      15:32:37

11  improperly, then I will --

12    THE COURT:  Well, the objection was sustained.

13    (A portion of Exhibit No. 2 was played.)

14  BY MR. MORRISSEY:

15  Q.  Mr. Deng, did you hear a country mentioned there?     15:33:26

16  A.  Yes.

17  Q.  What country was that?

18  A.  Somalia.

19  Q.  Did the rest of this discussion with Mr. Simpson deal with

20  any countries other than Somalia?                        15:33:40

21  A.  No.

22    (A portion of Exhibit No. 2 was played.)

23  BY MR. MORRISSEY:

24  Q.  Mr. Deng, did you hear on that tape Mr. Simpson speak about

25  making it to the battlefield?                            15:35:40

1     A.  Yes.

2             (A portion of Exhibit No. 2 was played.)

3     BY MR. MORRISSEY:

4     Q.  What did Mr. Simpson say would happen if you got a plane

5     ticket?                                                      15:36:38

6     A.  Can you back it up again?

7             MR. MORRISSEY:  Sure.

8             (A portion of Exhibit No. 2 was played.)

9     BY MR. MORRISSEY:

10    Q.  What did Mr. Simpson say would happen if you got a plane  15:37:04

11    ticket?

12    A.  To leave.

13    Q.  To leave where?

14    A.  To fight, that's what I know.

15    Q.  And what country were you in when you were having that    15:37:18

16    discussion?

17    A.  Somalia.  Say it again?  Repeat?

18    Q.  Where were you -- what country were you living in when you

19    and Mr. Simpson had this discussion in May of 2009?

20    A.  Arizona.                                                  15:37:34

21            (A portion of Exhibit No. 2 was played.)

22    BY MR. MORRISSEY:

23    Q.  In this conversation, did you use the word "jihad"?

24    A.  Yes.

25    Q.  Did Mr. Simpson use the word "jihad"?                     15:39:51

1    A.   Yes.

2            THE COURT:   How much more of this tape?

3            MR. MORRISSEY:   Not more than two minutes.

4            THE COURT:   All right.

5            (A portion of Exhibit No. 2 was played.)          15:40:04

6    BY MR. MORRISSEY:

7    Q.   Mr. Deng, did you just say -- I'm sorry, let me rephrase.

8    What did you just say about jihad right there?

9    A.   Can you rewind a little bit?

10   Q.   Sure.                                                15:40:34

11           (A portion of Exhibit No. 2 was played.)

12   BY MR. MORRISSEY:

13   Q.   What did you just say about jihad?

14   A.   Jihad is not bad.

15   Q.   And was this part of your role that you were playing on   15:41:08

16   behalf of the FBI?

17   A.   Yes.

18   Q.   What did Mr. Simpson say when you said "Jihad is not bad,

19   you know"?

20   A.   Repeat?                                              15:41:28

21   Q.   What did Mr. Simpson say, what did he reply when you said,

22   "Jihad is not bad"?

23   A.   He said it's bad for kaffir.

24           (A portion of Exhibit No. 2 was played.)

25   BY MR. MORRISSEY:                                         15:43:00

1  Q.  Mr. Deng, what's being discussed in this conversation right

2  at this point?

3  A.  Can you rewind, please, because I was having a hard time

4  hearing it.

5  Q.  Sure.                                                    15:43:15

6           (A portion of Exhibit No. 2 was played.)

7  BY MR. MORRISSEY:

8  Q.  What's being discussed at this point in the conversation?

9  A.  Breaking necks and stuff.

10 Q.  And did you ever get a -- well -- was Mr. Simpson in that  15:44:00

11 section, what was he talking about?

12 A.  I still didn't understand.  Can I hear the tape?

13          THE COURT:  Does your witness know it's on the screen,

14 Mr. Morrissey?

15          MR. MORRISSEY:  I don't know, Your Honor.  The        15:44:56

16 transcription scrolls very fast.  His spoken English is much

17 better than his reading of written English.

18          THE COURT:  We are going to take our recess at this

19 time.  And I need to take up a couple of criminal matters.  So

20 our recess will be a little bit longer.  We will probably       15:45:16

21 resume around 4:20.  So I'll let you gather your things.

22          The next matter is the tax case against Ms. Taylor.

23 I'm going to step down and have a brief five-minute recess

24 before I resume.  But I see that the lawyers are all here.

25          I want to make sure that you all have conferred before 15:45:43

1    we have the hearing.

2            MR. GALATI:  We have a settlement, Your Honor.

3            THE COURT:  All right.  Thank you.

4            And then, Ms. Williams, I think you're right after

5    that.  So if your client and the other lawyer is here, we will     15:45:58

6    be proceeding right after that.

7            MS. WILLIAMS:  The client is in custody, Your Honor.

8            THE COURT:  We will be in recess.

9            (A recess was taken.)

10           THE COURT:  The schedule.     16:29:49

11           MS. SITTON:  Yes.

12           THE COURT:  Do you need to leave by a certain time?

13           MS. SITTON:  By five, I was hoping.

14           THE COURT:  I'm going to try to recess right before

15   five.  I'm sorry, I had to take these other two hearings.  But     16:29:56

16   we can go until a little bit before five.

17           So the record should reflect the presence of the

18   defendant, his counsel, counsel for the United States.  And we

19   are ready to resume with the direct examination of Mr. Deng.

20           MR. MORRISSEY:  Thank you, Your Honor.     16:30:20

21           THE COURT:  And so, Mr. Deng, I just want to remind

22   you you are still under oath.

23           Please proceed.

24   BY MR. MORRISSEY:

25   Q.  Mr. Deng, just as before the break, I'm going to play a     16:30:31

1  section of the recording for you, okay?

2  A.  Yes.

3  Q.  Could -- you're testifying today in English, obviously,

4  right?

5  A.  Yes.                                                      16:30:46

6  Q.  Is your spoken English better than your ability to read

7  English?

8  A.  Not a lot.

9  Q.  Not a lot.  As we go through, then let me just play a

10 section.                                                      16:31:00

11         (A portion of Exhibit No. 2 was played.)

12 BY MR. MORRISSEY:

13 Q.  Did you listen to what Mr. Simpson just said?

14 A.  I'm still having a hard time hearing it.

15 Q.  You're having a hard time hearing that portion.  Okay.    16:31:39

16         (A portion of Exhibit No. 2 was played.)

17 BY MR. MORRISSEY:

18 Q.  Mr. Simpson (sic), that recording was Exhibit 2, May 29th,

19 2009.  In that same period, did you continue to have frequent

20 meetings with Mr. Simpson?                                    16:33:24

21 A.  Yes.

22         THE COURT:  And, Mr. Morrissey, you just said

23 "Mr. Simpson" there.  And I just want the record to reflect

24 that it's Mr. Deng you're directing that question to.

25         MR. MORRISSEY:  Your Honor, I am grateful for the      16:33:36

 1  correction.  Thank you.

 2  BY MR. MORRISSEY:

 3  Q.  Mr. Deng?

 4  A.  Yes.

 5  Q.  Did you continue to have frequent meetings with Mr. Simpson     16:33:42

 6  during this time period?

 7  A.  Yes.

 8  Q.  When you would have those meetings, did you continue to

 9  follow your practice of meeting with the FBI very shortly

10  afterwards and giving them the recording?     16:34:03

11  A.  Yes.

12  Q.  Did you meet with Mr. Simpson on June 17th, 2009?

13  A.  Yes.

14          MR. MORRISSEY:  Your Honor, at this point the

15  Government is going to play Exhibit 3.  This is session one     16:34:23

16  from Exhibit 3, and there are actually two different clips

17  which I'll identify as they go along.  The first clip is at

18  17:01:25.

19          (A portion of Exhibit No. 3 was played.)

20          MR. MORRISSEY:  Your Honor, I apologize for the     16:34:56

21  variation in the sound.  The different videos have different

22  audio quality.  Sorry about that.

23          THE COURT:  That's all right.

24          (A portion of Exhibit No. 3 was played.)

25  BY MR. MORRISSEY:     16:35:31

1    Q.  Mr. Deng, do you hear Mr. Simpson's voice right there?

2    A.  Yes.

3    Q.  What did he just say?

4    A.  It's time to get out of here.

5    Q.  What did you hear Mr. Simpson say?                    16:36:04

6    A.  To fighting against Allah.

7    Q.  And who is fighting against Allah?

8           MS. SITTON:  Objection, foundation, speculation.

9           THE COURT:  Overruled.  You may answer.

10   BY MR. MORRISSEY:                                          16:36:16

11   Q.  Who was fighting against Allah?

12   A.  Can you play that again, please?

13   Q.  Sure.

14          (A portion of Exhibit No. 3 was played.)

15   BY MR. MORRISSEY:                                          16:36:48

16   Q.  From this conversation, do you recall who Mr. Simpson felt

17   was fighting against Allah?

18          THE COURT REPORTER:  I didn't hear the witness, Your

19   Honor.

20          THE COURT:  Can you repeat that, please.           16:37:00

21          THE WITNESS:  NonMuslims.  NonMuslim people.

22          (A portion of Exhibit No. 3 was played.)

23   BY MR. MORRISSEY:

24   Q.  What did you just hear on the tape?  What's the phrase?

25   A.  Can you rewind this, please?                           16:37:20

1              (A portion of Exhibit No. 3 was played.)

2    BY MR. MORRISSEY:

3    Q.  What did you hear?

4    A.  I still don't get it.

5    Q.  You don't get it, okay.                                    16:37:42

6              (A portion of Exhibit No. 3 was played.)

7              MR. MORRISSEY:  Your Honor, for the record, this next

8    portion is at 17:03:58.

9              (A portion of Exhibit No. 3 was played.)

10   BY MR. MORRISSEY:                                              16:39:58

11   Q.  Mr. Deng, what did you just hear?

12   A.  Got everything on lock.

13   Q.  Okay.  Let me replay and tell me what you hear.

14             THE COURT:  What did he say right now?

15             MR. MORRISSEY:  I didn't understand his answer.      16:40:10

16             THE COURT:  Okay.

17             (A portion of Exhibit No. 3 was played.)

18   BY MR. MORRISSEY:

19   Q.  What did Mr. Simpson just say?

20   A.  Martyrdom operations.                                      16:40:38

21   Q.  Martyrdom operations?

22   A.  Yeah.

23   Q.  Is that what you and Mr. Simpson were discussing at that

24   time?

25   A.  Yes.                                                       16:40:46

 1              (A portion of Exhibit No. 3 was played.)

 2    BY MR. MORRISSEY:

 3    Q.  What's the last thing you just heard Mr. Simpson say?

 4    A.  Yahya.

 5    Q.  And you told us before, but what -- Yahya was a name you          16:41:09

 6    knew for an individual?

 7    A.  A Muslim name, yes.

 8    Q.  A Muslim name?

 9    A.  Yes.

10    Q.  Do you know what his other name is?                              16:41:19

11    A.  John.

12    Q.  Okay.

13              (A portion of Exhibit No. 3 was played.)

14              MR. MORRISSEY:  Your Honor, the next clip begins at

15    17:12:04.                                                           16:42:04

16              Mr. Deng, if you could listen.

17              (A portion of Exhibit No. 3 was played.)

18    BY MR. MORRISSEY:

19    Q.  Do we hear your voice there?

20    A.  Yes.                                                            16:42:18

21    Q.  And what do you tell Mr. Simpson?

22    A.  Can you repeat that?

23    Q.  Sure.

24              (A portion of Exhibit No. 3 was played.)

25    BY MR. MORRISSEY:                                                   15:06:32

1    Q.   What did you just say?

2    A.   Can you rewind, please, one more time?

3    Q.   Sure.

4           (A portion of Exhibit No. 3 was played.)

5    BY MR. MORRISSEY:                                          16:42:52

6    Q.   What did you just say?

7    A.   I'm going back to my country.

8    Q.   Okay.

9           (A portion of Exhibit No. 3 was played.)

10   BY MR. MORRISSEY:                                          16:44:03

11   Q.   What did Mr. Simpson just say?

12   A.   Look for a brother that can lead you to, you know what, you

13   already know.

14          (A portion of Exhibit No. 3 was played.)

15   BY MR. MORRISSEY:                                          15:06:32

16   Q.   What did Mr. Simpson just say?

17   A.   Can you repeat it, please?

18   Q.   Yes.

19          (A portion of Exhibit No. 3 was played.)

20   BY MR. MORRISSEY:                                          15:06:32

21   Q.   What did he just say?

22   A.   I still don't hear it.

23   Q.   Okay.  Try it one more time and then we will move on.

24          (A portion of Exhibit No. 3 was played.)

25          THE WITNESS:  You got to be careful, man.            16:45:25

1    BY MR. MORRISSEY:

2    Q.  When you go back?

3    A.  When you go back.

4    Q.  And where was back?

5           MS. SITTON:  Objection, foundation, speculation.          16:45:36

6           THE COURT:  If he knows, I'll allow it.

7           Go ahead, you may answer.

8           THE WITNESS:  I don't remember.

9    BY MR. MORRISSEY:

10   Q.  You don't remember.                                           16:45:53

11          (A portion of Exhibit No. 3 was played.)

12          MR. MORRISSEY:  Your Honor, this clip is at 18:12:56.

13          (A portion of Exhibit No. 3 was played.)

14   BY MR. MORRISSEY:

15   Q.  What did Mr. Simpson just say?                                16:46:56

16   A.  Repeat again.

17          (A portion of Exhibit No. 3 was played.)

18   BY MR. MORRISSEY:

19   Q.  Did you hear Mr. Simpson say anything there?

20   A.  The sharia government.                                        16:47:16

21          (A portion of Exhibit No. 3 was played.)

22   BY MR. MORRISSEY:

23   Q.  What did Mr. Simpson just say?

24   A.  It's not democratic.

25   Q.  And what isn't?                                               16:48:42

 1   A.  Sharia.

 2           (A portion of Exhibit No. 3 was played.)

 3   BY MR. MORRISSEY:

 4   Q.  What did Mr. Simpson just say?

 5   A.  You have to go fight, you got to go.  You have to go.        16:49:37

 6   Q.  What would make you have to go fight?

 7   A.  Repeat?

 8   Q.  What would make -- what did Mr. Simpson say would make you

 9   have to go fight?

10   A.  Can you replay that again, sir?                              16:49:59

11   Q.  Sure.

12           (A portion of Exhibit No. 3 was played.)

13   BY MR. MORRISSEY:

14   Q.  If who was telling you to do something?

15   A.  Can you play it, repeat it a little bit?                     16:50:34

16           (A portion of Exhibit No. 3 was played.)

17   BY MR. MORRISSEY:

18   Q.  What did you hear there?

19   A.  "Brother, you have to go fight, you have to."

20           (A portion of Exhibit No. 3 was played.)                15:06:32

21   BY MR. MORRISSEY:

22   Q.  Do you hear your voice there?

23   A.  Yes.

24   Q.  What did you just ask?

25   A.  How do you bring it back?                                    16:52:18

1    Q.  And what's "it"?  What is it that you're talking about

2    bringing back?

3    A.  The sharia.

4            THE COURT:  I think we are going to end there.

5            MR. MORRISSEY:  Your Honor, can I note for the record    16:52:33

6    that I'm on the 18:12:56 clip.  And that will tell me where to

7    pick up tomorrow.  Thank you.

8            THE COURT:  All right.  Let me just ask, since this

9    is -- the "UI" keeps appearing there.  Is that UI?

10           MR. MORRISSEY:  Unintelligible, I believe.    16:52:54

11           THE COURT:  That's what -- I just wasn't clear.

12           MR. MORRISSEY:  Yes.

13           THE COURT:  All right.  We will resume -- let me ask

14   you, how much more do you have, Mr. Morrissey?

15           MR. MORRISSEY:  I believe I have less than 45 minutes.    16:53:06

16           THE COURT:  With this witness?

17           MR. MORRISSEY:  Yes.

18           THE COURT:  And is this your last witness?

19           MR. MORRISSEY:  Yes.

20           THE COURT:  All right.  And so there will be cross,    16:53:20

21   redirect, and then you'll have witnesses?

22           MR. WILLIAMS:  Your Honor, at this time, we believe

23   that the only possible witness would be Mr. Simpson.

24           THE COURT:  And you'll decide that tomorrow?

25           MR. WILLIAMS:  Yes, Your Honor.    16:53:37

1          THE COURT:  Okay.  Then let's -- we will start at 9:30

2    tomorrow morning.

3          MR. MORRISSEY:  In your courtroom?

4          THE COURT:  In my courtroom.  Thank you.  Sorry, I was

5    a little -- we have it now up and running, hopefully for the          16:53:53

6    video.  You can check it if you want to come in earlier than

7    that to double-check it.

8          MR. MORRISSEY:  Yes, Judge, would we have access by

9    8:30?

10          THE COURT:  I think so.  Bobby, how soon can they come     16:54:04

11    into the courtroom?

12          THE COURTROOM DEPUTY CLERK:  I can be there by 8:30.

13          MR. MORRISSEY:  Thank you, Your Honor.

14          THE COURT:  We will be in recess, see you all

15    tomorrow.                                                            16:54:15

16          (The court stood in recess.)

17                        *    *    *

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3

4

5

6              I, MERILYN A. SANCHEZ, do hereby certify that I am

7     duly appointed and qualified to act as Official Court Reporter

8     for the United States District Court for the District of

9     Arizona.

10             I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15

16

17             DATED at Phoenix, Arizona, this 29th day of October,

18    2010.

19

20

21                               S/Merilyn A. Sanchez

22                               MERILYN A. SANCHEZ, CRR

23

24

25